```
 1            IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF MISSISSIPPI
 2                     JACKSON DIVISION

 3   RICHARD WORLEY                              PLAINTIFF

 4
     V.                  CAUSE NO. 4:17-cv-193 SA/JMV
 5

 6   DEPUTY DANNY LAWRENCE, Individually and in his
     Official Capacity as a Deputy of the Grenada
 7   County Sheriff's Office; DEPUTY BRYAN GRIFFITH,
     Individually and in his Official Capacity as a
 8   Deputy of the Grenada County Sheriff's Office;
     DEPUTY RANDY SWEAT, Individually and in his
 9   Official Capacity as a Deputy of the Grenada
     County Sheriff's Office; DEPUTY TIM GHOLSTON,
10   Individually and in his Official Capacity as a
     Deputy of the Grenada County Sheriff's Office;
11   DEPUTY DONNY WILLIS, Individually and in his
     Official Capacity as a Deputy of the Grenada
12   County Sheriff's Office; JOHN DOES I-X,
     Individually and in his Official Capacity as a
13   Deputy of the Grenada County Sheriff's Office;
     SHERIFF ALTON STRIDER, Individually and in his
14   Official Capacity as a Sheriff of the Grenada
     County Sheriff's Office; GRENADA COUNTY,
15   MISSISSIPPI                                 DEFENDANTS

16
     ***************************************************
17
                 DEPOSITION OF BRYANT GRIFFIN
18
     ***************************************************
19

20        DATE:   WEDNESDAY, AUGUST 15, 2018
          PLACE:  GORE, KILPATRICK & DAMBRINO
21                2000 GATEWAY, SUITE 160
                  JACKSON, MISSISSIPPI
22           TIME: 11:26 a.m.

23

24                BETHANY CAMMACK
             Certified Shorthand Reporter
25            Mississippi CSR No. 1526
```

844.533.DEPO

Ex B

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Bryant Griffin - 08/15/2018 Pages 2..5

### Page 2

APPEARANCES

ANDREW C. CLARKE
Attorney at Law
6256 Poplar Avenue
Memphis, Tennessee 38119
901.680.9777
aclarke@accfirm.com
    Counsel for Plaintiff

MARY MCKAY GRIFFITH
DANIEL "DANNY" GRIFFITH
Jacks Griffith Luciano
150 North Sharpe Avenue
Cleveland, Mississippi 38732
662.843.6171
mgriffith@jlpalaw.com
dgriffith@jlpalaw.com
    Counsel for Defendants

KATELYN A. RILEY
Allen, Allen, Breeland & Allen
Post Office Box 751
Brookhaven, Mississippi 39601
601.833.4361
kriley@aabalegal.com
    Counsel for Defendant Bryant Griffin

### Page 3

TABLE OF CONTENTS
                                              PAGE

Title Page................................... 1

Appearance Page.............................. 2

Table of Contents............................ 3

Exhibit Index................................ 4

EXAMINATION OF BRYANT GRIFFIN
  By Mr. Clarke.............................. 5
  By Ms. Riley............................... 62
  By Ms. Griffith............................ 76
  By Mr. Clarke.............................. 76
  By Ms. Riley............................... 82
  By Mr. Clarke.............................. 82

Reporter's Certificate....................... 85
Deponent's Certificate....................... 86
Correction Sheet............................. 87

### Page 4

EXHIBIT INDEX

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Responses to Interrogatories | 13 |
| 2 | Responses to Requests for Production of Documents | 13 |
| 3 | Professional Certificate, Part-Time Law Enforcement Officer | 15 |
| 4 | Note to Produce Police Training Certificate | 16 |

### Page 5

            BRYANT GRIFFIN,
      having been first duly sworn,
   was examined and testified as follows:
            EXAMINATION
BY MR. CLARKE:
  Q. Would you please state your name?
  A. My name is Bryant O'Neal Griffin, Sr.
  Q. And where do you live?
  A. I live here in Grenada, for 51 years. All my life. 110 Sunflower Drive, Grenada, Mississippi.
  Q. And have you ever given a deposition before?
  A. No, sir.
  Q. Okay. Because you haven't given a deposition, I want to go over some ground rules. Okay?
  A. Okay.
  Q. Obviously you're under oath here, and your testimony is subject to the penalty of perjury. You understand that?
  A. Yes, sir.
  Q. A lot of times when we get into a conversation with people, you know, we anticipate what they're going to say and start answering

### Page 34

1  MS. GRIFFITH: Object to the form.
2 MR. CLARKE CONTINUED:
3  Q. All right. Now, once -- okay. So what
4 all did Strider say when you told him that?
5  A. He told me I can't be using that kind of
6 force on a handcuffed person. And I told him I
7 understand. Now I do.
8  Q. Did he fire you?
9  A. No. He laid me off. I been laid off ever
10 since it happened.
11  Q. So you've been laid off since 12/24/16?
12  A. Yes, sir.
13  Q. All right. Have you gone to any other
14 training or anything since then?
15  A. No, sir.
16  Q. Did you get any paperwork saying you were
17 laid off?
18  A. No, sir.
19  Q. He just told you, "We don't need you until
20 this lawsuit's over"?
21  A. Yes, sir.
22  Q. Did you have any type of -- did he say,
23 "We're going to investigate this through internal
24 affairs" or anything?
25   MS. GRIFFITH: Object to the form.

### Page 35

1   THE WITNESS: No, he didn't tell me
2 nothing about that.
3 MR. CLARKE CONTINUED:
4  Q. Did you have to talk to anybody else about
5 what happened?
6  A. No more than. . .
7  Q. Not your lawyers. Did you speak to your
8 lawyers at any time?
9  A. No, sir.
10  Q. I'm not asking you any conversations with
11 that. I'm talking about people from Grenada.
12  A. No, sir.
13  Q. All right. Danny Lawrence, tell me what
14 he knows about this case that you're aware of.
15  A. Everything I just told you, that I -- that
16 I'm aware of.
17  Q. So Danny Lawrence was there when you
18 punched him three times?
19  A. Was he there?
20  Q. Yeah. Was he in the sally port?
21  A. Yes, sir.
22  Q. Did he see it?
23  A. I don't know if he seed it or not, but he
24 was in the sally port.
25  Q. Did you ever talk to him about that you

### Page 36

1 hit him?
2  A. No, sir.
3  Q. Did you talk to Randy Sweat about that?
4  A. I told Randy I had to punch him two or
5 three times.
6  Q. And where was Deputy Lawrence when you
7 punched him?
8  A. I can't -- I can't remember. I think he
9 was on the other side of the truck. He was letting
10 the door down.
11  Q. Of the sally port?
12  A. Yeah.
13  Q. Where was Officer -- Deputy Sweat?
14  A. I think he was behind me.
15  Q. Did you hear -- did you say anything to
16 Mr. Worley during this time?
17  A. I told him -- I told him to calm down.
18  Q. All right. Did Mr. Worley say anything to
19 you?
20  A. Yes, sir.
21  Q. Did he say anything to you before you
22 punched him the first time?
23  A. Yes, sir. He told me don't touch him.
24  Q. And after you hit him the first time, then
25 did he say anything?

### Page 37

1  A. He started cussing.
2  Q. Okay. Did he --
3  A. Calling me the N word and, "I'm going to
4 kill you." Told me he's going to make me suck his
5 private part before he killed me.
6  Q. All right. And then you hit him again,
7 right?
8  A. Not because of that.
9  Q. I'm just going chronologically.
10  A. I hit him again because he was still
11 trying to come at me and bite me.
12  Q. All right. I'm not asking you that. I'm
13 asking the chronology. Before you hit him the
14 first time, he said, "Don't touch me," correct?
15  A. Yes, sir.
16  Q. After that, he cussed you, called you the
17 N word, told you he was going to kill you, and he
18 was going to make you suck his dick?
19  A. Yes, sir.
20  Q. And then you hit him again, correct?
21  A. No, sir. After he came at me and tried to
22 bit me again, that's when I hit him again the
23 second time. And after I spinned him around, he
24 tried to kick me in my groin, and I hit him a third
25 time.

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Bryant Griffin - 08/15/2018                                    Pages 38..41

Page 38
1   Q.  I'm trying to just -- my question is
2   asking you -- we already -- I already understand
3   you allege that he tried to bite you.  Okay.  I'm
4   trying to find out anything that was said in
5   between the three punches.  Okay?  The first one,
6   before you hit him the first time, he said, "Don't
7   touch me," correct?
8   A.  Yes, sir.
9   Q.  Before you hit him the second time, he
10  called you the N word.  He told you -- he said he
11  was going to make you suck his dick, and --
12  A.  Well, after -- after that, he just
13  repeated the same thing over and over.
14  Q.  Okay.
15  A.  "I'm going to kill you, nigger.  Before I
16  kill you, you're going to suck me."  And he just
17  kept saying the same thing over and over.
18  Q.  And you hit him again?
19  A.  Yeah.  After he tried to kick me, I hit
20  him again.
21  Q.  Well, no, I'm -- let's break this down.
22  First punch, before you hit him the first time, he
23  said, "Don't touch me."
24  A.  Yeah.  Before I even hit him the first
25  time, he told me don't touch him.

Page 39
1   Q.  And then you say he tried to bite you, and
2   you hit him in the face?
3   A.  Yes, sir.
4   Q.  Okay.  Then after you hit him in the face,
5   then he started saying --
6   A.  Cursing and --
7   Q.  Cursing and saying the N word?
8   A.  Yes, sir.
9   Q.  Saying he was going to make you suck his
10  dick?
11  A.  Yes.
12  Q.  And you hit him again, correct?
13  A.  Yes, sir.
14  Q.  And then you turned him to the side?
15  A.  Yes, sir.
16  Q.  Turned him to get him out of the truck,
17  his seat?
18  A.  Get him out of the truck.
19  Q.  And did he say anything?  Was he still
20  saying the same thing?
21  A.  Still saying the same thing.
22  Q.  Still saying the same thing.
23      MS. GRIFFITH:  Object to the form.  I
24  think, just for clarification, during all of this,
25  he was threatening to kill him.  I'm not sure he

Page 40
1   said that.
2       MR. CLARKE:  That's -- you can object
3   to the form, but. . .
4       MS. GRIFFITH:  Okay.  Thanks.
5   MR. CLARKE CONTINUED:
6   Q.  And then he was saying those same things
7   again as you turned his legs around to get him out?
8   A.  Yes, sir.
9   Q.  And then you say he tried to kick you?
10  A.  Yes, sir.
11  Q.  And you punched him again in the face?
12  A.  Yes, sir.
13  Q.  All right.  Now --
14  A.  I don't think he probably really meant
15  that he was going to kill me or nothing like that,
16  because he was intoxicated.  I could smell the
17  alcohol beverage.  As far as what he had to drink,
18  I couldn't tell you.
19      But, like, I know he probably was mad at
20  me because I -- you know, I hit him in the face.  I
21  understand that.  But, I mean, none of us would
22  have took no bite from nobody, you know.
23  Q.  I mean, and if he didn't try to bite you,
24  then --
25  A.  If he wouldn't have never -- this ain't my

Page 41
1   first time carrying somebody to jail.  If wouldn't
2   have never tried to bite me, I wouldn't have never
3   hit him.  I don't -- unloaded people at the sally
4   port before, I ain't never had no trouble.  And I
5   worked every weekend.  Every weekend.
6   Q.  I understand.  My guy says it didn't
7   happen.  So. . .
8   A.  Yeah.
9   Q.  He said it didn't even happen there.  So
10  we're going to get to that.
11  A.  Yes.
12  Q.  All right.  But Danny Lawrence was, you
13  think, trying to close the sally port, but he was
14  in the sally port?
15  A.  Yeah.  He was in the sally port, but he
16  was on the other side of the truck.
17  Q.  Randy Sweat was behind you?
18  A.  Yes, sir, he was behind me.
19  Q.  And to be clear, Mr. Worley did not bite
20  you and did not actually kick you?
21  A.  No, sir.
22  Q.  All right.  Tim Gholston, you have him
23  down here.  What does Tim Gholston know?  Was he in
24  the sally port?
25  A.  He was in the sally port, but he was in

**Page 42**

1 front of his pickup truck. He wasn't nowhere close
2 to me like Randy Sweat was. Randy Sweat was the
3 only one really close to me.
4 Q. Did he come to you or assist you in any
5 way in the sally port?
6 A. Who? Tim?
7 Q. Yeah.
8 A. Yeah. He come over there and, you know,
9 tried to break us up or whatever, get me away from
10 him.
11 Q. Did anybody tell you don't punch him?
12 A. They told me to stop. Yeah, they told me
13 to stop.
14 Q. Who told you to stop?
15 A. Tim Gholston, Randy Sweat.
16 Q. All right. Donny Willis, what does he
17 know about this?
18 A. Donny Willis wasn't out there.
19 Q. Do you know Donny Willis?
20 A. Yes, sir.
21 Q. Did you know that -- prior to you punching
22 Mr. Worley, do you know whether or not Mr. Worley
23 had said anything racially derogatory of Donny
24 Willis or Sonja Willis?
25 A. Not to my knowledge.

**Page 43**

1 Q. So Donny Willis, you wrote him -- you
2 don't think he has any information about that?
3 A. I didn't put Donny down.
4 Q. Well, you did. You signed this.
5 A. Donny was not there.
6 Q. Okay. Well, I understand. And he was
7 named in the lawsuit, and that -- you may be just
8 putting him for that. But I'm just trying to ask
9 you what you know about these people.
10 A. Oh, I know both of them.
11 Q. Do you know --
12 A. I went to school with both of them.
13 Q. Do you know Donny Willis -- do you know if
14 he has information pertaining to this incident?
15 A. To my case?
16 Q. Yeah.
17 A. I don't -- I don't know.
18 Q. Okay. Barbara Kitchens, do you know
19 anything about her?
20 A. No, sir.
21 Q. Marilyn Bibbs?
22 A. No, sir.
23 Q. Jamica Hankins?
24 A. No, sir.
25 Q. Linda Evans?

**Page 44**

1 A. No, sir.
2 Q. Who is Linda Evans?
3 A. I don't know.
4 Q. Josephine Hubbard?
5 A. I don't know.
6 Q. Patricia Moody?
7 A. I don't know.
8 Q. Sonja Willis?
9 A. I know Sonja.
10 Q. Do you know if she knows anything -- have
11 you talked to her about this?
12 A. I haven't talked to her about this case,
13 and I don't know if she knows anything about it,
14 but she was not in the sally port neither.
15 Q. Richard Busby?
16 A. I don't know him.
17 Q. You don't even know who he is?
18 A. No, sir.
19 Q. Calvin Roach?
20 A. No, sir.
21 Q. All right. If we go to Interrogatory No.
22 10 -- it's on page 7. If you look at the
23 interrogatory number, it says, "Please state with
24 specificity and in chronological order the exact
25 sequence of events from the time that you became

**Page 45**

1 aware of and/or involved in the incident involving
2 the plaintiff," who is Mr. Worley, "until you
3 completed your shift assignment and returned to
4 your home." Do you see that?
5 A. Uh-huh (affirmative response).
6 Q. All right. I want you to read over that
7 response here, and then I'm going to ask you some
8 questions about it.
9 A. (Reviewing document.) Okay.
10 Q. Based on what you've told me today, would
11 you agree that this interrogatory response is very
12 misleading?
13 A. Yeah, I agree with it.
14 Q. You agree that it's misleading, or you
15 agree --
16 A. No, sir. I agree with it that it's right.
17 Q. Did you say in this interrogatory response
18 that you hit him ever?
19 A. I don't think I did. In the report, I
20 didn't.
21 Q. Well, you understand about half truths,
22 right?
23 A. Yes, sir.
24 Q. You know what this lawsuit was about. You
25 got a copy of the lawsuit, right?