RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018

```
 1              IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF MISSISSIPPI
 2                      JACKSON DIVISION

 3   RICHARD WORLEY                           PLAINTIFF

 4
     V.                  CAUSE NO. 4:17-cv-193 SA/JMV
 5

 6   DEPUTY DANNY LAWRENCE, Individually and in his
     Official Capacity as a Deputy of the Grenada
 7   County Sheriff's Office; DEPUTY BRYAN GRIFFITH,
     Individually and in his Official Capacity as a
 8   Deputy of the Grenada County Sheriff's Office;
     DEPUTY RANDY SWEAT, Individually and in his
 9   Official Capacity as a Deputy of the Grenada
     County Sheriff's Office; DEPUTY TIM GHOLSTON,
10   Individually and in his Official Capacity as a
     Deputy of the Grenada County Sheriff's Office;
11   DEPUTY DONNY WILLIS, Individually and in his
     Official Capacity as a Deputy of the Grenada
12   County Sheriff's Office; JOHN DOES I-X,
     Individually and in his Official Capacity as a
13   Deputy of the Grenada County Sheriff's Office;
     SHERIFF ALTON STRIDER, Individually and in his
14   Official Capacity as a Sheriff of the Grenada
     County Sheriff's Office; GRENADA COUNTY,
15   MISSISSIPPI                              DEFENDANTS

16
        **********************************************
17
                DEPOSITION OF DANNY LAWRENCE
18
        **********************************************
19

20          DATE:  WEDNESDAY, AUGUST 15, 2018
            PLACE:  GORE, KILPATRICK & DAMBRINO
21               2000 GATEWAY, SUITE 160
                 JACKSON, MISSISSIPPI
22               TIME:  1:53 p.m.

23

24              BETHANY CAMMACK
            Certified Shorthand Reporter
25            Mississippi CSR No. 1526
```

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 2..5

**Page 2**

```
 1              APPEARANCES
 2
 3   ANDREW C. CLARKE
     Attorney at Law
 4   6256 Poplar Avenue
     Memphis, Tennessee  38119
 5   901.680.9777
     aclarke@accfirm.com
 6        Counsel for Plaintiff
 7
     MARY MCKAY GRIFFITH
 8   DANIEL "DANNY" GRIFFITH
     Jacks Griffith Luciano
 9   150 North Sharpe Avenue
     Cleveland, Mississippi  38732
10   662.843.6171
     mgriffith@jlpalaw.com
11   dgriffith@jlpalaw.com
          Counsel for Defendants
12
13   KATELYN A. RILEY
     Allen, Allen, Breeland & Allen
14   Post Office Box 751
     Brookhaven, Mississippi  39601
15   601.833.4361
     kriley@aabalegal.com
16        Counsel for Defendant Bryant Griffin
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              TABLE OF CONTENTS
 2                                      PAGE
 3
     Title Page.................................. 1
 4
     Appearance Page............................ 2
 5
     Table of Contents.......................... 3
 6
     Exhibit Index.............................. 4
 7
 8   EXAMINATION OF DANNY LAWRENCE
 9     By Mr. Clarke............................ 5
       By Ms. Griffith........................ 115
10     By Ms. Riley........................... 124
       By Mr. Clarke.......................... 129
11
12   Reporter's Certificate.................... 134
13   Deponent's Certificate................... 135
14   Correction Sheet......................... 136
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              EXHIBIT INDEX
 2
     NO.  DESCRIPTION                      PAGE
 3
 4   1    Grenada County Incident Detail,
          12/23/16                            9
 5
     2    Booking Sheet, 12/23/16            12
 6
     3    Responses to Interrogatories and
 7        Requests for Production            15
 8   4    Deputy Lawrence's Personnel File   42
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1              DANNY LAWRENCE,
 2         having been first duly sworn,
 3       was examined and testified as follows:
 4              EXAMINATION
 5   BY MR. CLARKE:
 6     Q.  Would you please state your full name?
 7     A.  Danny Joe Lawrence.
 8     Q.  And what's your address?
 9     A.  891 Gillon Road.
10     Q.  And we'll keep that -- I mean, this is in
11   case we have to serve a subpoena or get in touch --
12     A.  I'm in the middle of moving.
13     Q.  Oh, okay.
14     A.  Okay.  Next week, it should be different.
15     Q.  Okay.  All right.  Have you ever given a
16   deposition before?
17     A.  In a civil matter, yes, sir.
18     Q.  And under what circumstances?
19     A.  Someone had left a gathering and had a
20   wreck, and his airbags didn't deploy.  And we had
21   to give our side of the story of what happened
22   leading up to his accident.
23     Q.  Were you in pursuit of them?
24     A.  Oh, no.  This was all between a
25   manufacturer and the person who's permanently
```

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 6..9

Page 6

1  disabled from it.
2      Q.  Was your testimony involving you going to
3  the scene of this accident as a law enforcement, or
4  were you a civilian?
5      A.  No, sir.  This was prior to law
6  enforcement.
7      Q.  All right.  Well, the reason why I ask
8  that, I want -- any other time you gave a
9  deposition?
10     A.  No, sir.
11     Q.  Okay.  Obviously, I just want to kind of
12 go over some ground rules to make sure that we
13 communicate effectively.  All right?
14     A.  Yes, sir.
15     Q.  Obviously your testimony here is under
16 oath, subject to the penalty of perjury.  Do you
17 understand that?
18     A.  Yes, sir.
19     Q.  Now, a lot of times when we get in
20 conversations, we kind of say uh-huh or huh-uh or
21 nod our head, and the court reporter can't take
22 that down.  So --
23     A.  Yes, sir.
24     Q.  Please give audible answers, "Yes," "No,"
25 "I don't know," or explain your answer.  Okay?

Page 7

1      A.  Yes, sir.
2      Q.  Another thing that happens a lot of times
3  when you're in a conversation, you kind of have an
4  idea of what my question's going to ask, and before
5  I get done, you may start to answer.  And, listen,
6  I do the same thing too.  Sometimes I think your
7  answer's over, and I start asking my next question.
8  But we can't do that, because the court reporter
9  needs to be able to take down the full question and
10 full answer.  She can't type while we're both
11 talking.  Okay?
12     A.  Yes, sir.
13     Q.  So I know I'll make this mistake during
14 this depo, and that -- you know, if you hadn't
15 finished, tell me to let you finish.  All right?
16     A.  Yes, sir.
17     Q.  Obviously your testimony here is important
18 to all the parties and the court and the jury if it
19 goes to trial.  So I don't want you to answer a
20 question if you don't understand it.  Okay?
21     A.  Yes, sir.
22     Q.  If you don't understand a question, if
23 you'll ask me to rephrase it, I will if I can.  All
24 right?
25     A.  Yes, sir.

Page 8

1      Q.  And if you answer a question, I'm going to
2  assume you understood that.  Is that fair?
3      A.  Yes, sir.
4      Q.  All right.  Before you came in for your
5  deposition, other than speaking with your
6  attorneys, did you review anything, any documents?
7      A.  In what time period?  In the past couple
8  of years or. . .
9      Q.  Since this incident.
10     A.  Yes, sir, a couple of times.
11     Q.  What have you reviewed?
12     A.  I reviewed my report.
13     Q.  Okay.  And your report is -- is it your
14 incident report?
15     A.  Yes, sir.
16     Q.  Let me show you -- I don't have another
17 copy of it.  And if you'll say on the record --
18 there's some Bates numbers down at the bottom
19 right-hand corner.
20     A.  Yes, sir.
21     Q.  Like CO --
22     A.  Yes, sir.
23     Q.  What are the numbers?
24     A.  CO DEF 12, CO DEF 13, and CO DEF 14.
25     Q.  Okay.  Is that your incident report?

Page 9

1      A.  It is one of them.
2      Q.  Okay.
3      A.  This was the first.
4      Q.  Let me put a number 1 on -- can you put
5  that down there on the bottom somewhere?
6      A.  Just anywhere?
7          COURT REPORTER:  On the right-hand
8  side if possible.
9          THE WITNESS:  Good enough?
10         COURT REPORTER:  Yeah, good.
11     (EXHIBIT 1 WAS MARKED FOR THE RECORD.)
12         MR. CLARKE:  What other -- I'm not
13 aware of any other.  Can we go off the record for a
14 second?
15         (OFF THE RECORD.)
16 MR. CLARKE CONTINUED:
17     Q.  Did you write another report?
18     A.  Yes, sir.
19     Q.  And was it an incident report?  What type
20 of report?
21     A.  It was 30 to 45 minutes, maybe an hour
22 after this first. . .
23     Q.  And it would have your name on it?  Would
24 it have the same --
25     A.  Yes, sir.

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 10..13

Page 10

1    Q.  -- incident report number?
2    A.  It would have a separate incident. . .
3    Q.  Okay.  And I'll look when we have a break,
4    but I -- maybe I didn't see it.  But you believe
5    you wrote a second incident report.  Is that
6    correct?
7    A.  Yes, sir.
8    Q.  Would it be typed up on the same type of
9    format and the same computer program, just have a
10   different --
11   A.  I would hope -- yes, sir.
12   Q.  I'm trying to get you to identify it.
13   Would it look like that report; it would just be a
14   separate report?
15   A.  Yes, sir.
16   Q.  All right.  And I'm not trying to trick
17   you.  I may have overlooked it.  Okay.  But I
18   thought that I went through everything.
19   A.  Can I explain?
20       MS. GRIFFITH:  And if we failed to
21   produce it, obviously we will.
22       MR. CLARKE:  No, I'm not -- I'm just
23   trying to make sure while we're here, we --
24   MR. CLARKE CONTINUED:
25   Q.  Is there a way to get that faxed to you?

Page 11

1    A.  Yes, sir.
2    Q.  I haven't seen one.  If you're aware of
3    one -- I'm not trying to trick you.  I mean, I went
4    through all the documents at lunch.  Well, maybe
5    we'll see if we can get that done on a break --
6    A.  Yes, sir.
7    Q.  -- before we get -- before we get going.
8    So it's your understanding you wrote two separate
9    incident reports?
10   A.  Yes, sir.
11   Q.  I guess the one that I showed you that we
12   marked as Exhibit No. 1, that would be of the
13   arrest, correct?
14   A.  No, sir.
15   Q.  What is -- what does that pertain to?
16   A.  This is the initial call where he was at
17   Ms. Kitchens' mother's residence.
18   Q.  Okay.  All right.
19   A.  And there's a separate one for my second
20   contact with him, and that's when I made the
21   arrest.
22   Q.  Okay.  Let me look at that for a second.
23   I'm sorry.  So that's the first call you made?
24   A.  Yes, sir.
25   Q.  Other than that report that we marked as

Page 12

1    Exhibit No. 1, and then a second report of the
2    arrest, did you complete any other documents?
3    A.  I'm not sure if I did an actual arrest
4    report or not.  I do not remember.
5       MS. GRIFFITH:  And just for the
6    record, I'm emailing somebody at the SO to ask them
7    if they could send us. . .
8       MR. CLARKE:  Right.  Yeah.
9    MR. CLARKE CONTINUED:
10   Q.  A lot of these things look the same.  And
11   I'm not casting any, you know --
12   A.  Can I -- can I explain that?
13   Q.  Yeah.
14   A.  An arrest report, not everybody does them.
15   I typically do them.  I'm one of the few that
16   actually types my arrest reports.  And it will say
17   "Arrest Report" and what the charges were on it.
18   And it won't go into full detail.  It will just
19   tell the charges he was arrested on, with his name.
20   Whether it was handwritten or typed.  And I think
21   most of mine are typed.
22   (EXHIBIT 2 WAS MARKED FOR THE RECORD.)
23   MR. CLARKE CONTINUED:
24   Q.  Let me show you what I'm marking as
25   Exhibit No. 2, which is CO DEF 11, and that's the

Page 13

1    only other thing that I found pertaining to the
2    arrest, and see if you can identify that.
3    A.  Yes, sir, that is --
4    Q.  Is that something that you complete?
5    A.  No, sir.  The jail completes this.  This
6    is a booking sheet.
7    Q.  Okay.  So you didn't complete that?
8    A.  No, sir.
9    Q.  Okay.  So there should be a separate
10   incident report about the -- about the arrest,
11   correct?
12   A.  Yes, sir.
13   Q.  And you don't know one way or the other,
14   but your habit was to create an arrest report,
15   correct?
16   A.  Typically, yes, sir.
17   Q.  Do you know if you reviewed an arrest
18   report at any time since the lawsuit was filed up
19   until you got ready for your deposition?
20   A.  I can't honestly say either way.  I'm
21   thinking.
22   Q.  And I understand.  That's fair.  I'm just
23   trying --
24   A.  I'm not going to lie.
25   Q.  And I understand everything you're saying.

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                Pages 14..17

Page 14

1  I'm just trying to -- the potential documents that
2  could be there in addition to what we've marked as
3  Exhibit No. 2 are a second incident report that
4  pertains to the actual arrest of Mr. Worley,
5  correct?
6      A.  Could you say that again?
7      Q.  Yes.  The first one that we marked as
8  Exhibit No. 1, that is an incident report that you
9  completed from the first contact you had with
10 Mr. Worley at his mother-in-law's house or
11 something, correct?
12     A.  Yes, sir.
13     Q.  Okay.  There should be another incident
14 report about the arrest that occurred at the levee,
15 right?  Or wherever it was.
16     A.  Yes, sir.  Below the levee, yes, sir.
17     Q.  Okay.  There could be, and you can't
18 recall right now, an arrest report where you typed
19 up something in addition to a second incident
20 report, correct?
21     A.  Yes, sir.  Either handwritten or typed-up
22 arrest report.
23     Q.  Okay.  And I'm going to -- we can look
24 through those and make sure that we have them.  All
25 right.  Anything else that you looked at?  Did you

Page 15

1  look at your interrogatory responses?
2          THE WITNESS:  Is that the thing that
3  we had to sign?
4          MS. GRIFFITH:  (Nods head
5  affirmatively.)
6  MR. CLARKE CONTINUED:
7      Q.  The thing --
8      A.  Yes, sir.
9      Q.  -- you had to sign, yeah.
10     A.  Two different occasions.
11         MR. CLARKE:  I'll mark as Exhibit
12 No. 3 a copy of the interrogatory responses.
13     (EXHIBIT 3 WAS MARKED FOR THE RECORD.)
14         MR. CLARKE:  There you go.
15         MS. GRIFFITH:  Oh, thank you.
16         MR. CLARKE:  I attached all those at
17 the end of it.
18         THE WITNESS:  Is there a question?
19 MR. CLARKE CONTINUED:
20     Q.  Did you review those before you signed the
21 oath page at the end?
22     A.  Yes, sir.
23     Q.  Okay.  So all the statements in there are
24 true and accurate to the best of your knowledge,
25 information, and belief?

Page 16

1          MS. GRIFFITH:  And just so the record
2  reflects, I believe you stated -- you told me that
3  there is one correction that you need to make.
4          THE WITNESS:  Yes, ma'am.  Okay.
5  MR. CLARKE CONTINUED:
6      Q.  Do you know what the correction is?
7      A.  Somewhere -- and I never really saw it the
8  other day.
9      Q.  Well, if you can just tell me about it,
10 and then we can try to figure out -- however you
11 want to do it.
12     A.  There it is right there.  I see it today.
13 Number 5, end of page 2.
14     Q.  Okay.
15     A.  Somewhere I completely did not see that,
16 and I still didn't see it the other day.
17     Q.  Asking about your criminal record?
18     A.  Yes, sir.
19     Q.  Okay.  And what should -- what should the
20 change be?
21     A.  I have been arrested.
22     Q.  For what?
23     A.  Disorderly conduct twice in Lee County.
24     Q.  When did that occur?
25     A.  Around the '82 -- '81-'82 timeframe.

Page 17

1      Q.  When you were young enough to be
2  disorderly?
3      A.  Yes, sir.  Before I joined the military.
4      Q.  Okay.  So we'll just take this testimony
5  as an amendment to that.
6      A.  Then there was --
7          MS. GRIFFITH:  Thank you.
8          THE WITNESS:  -- one other time in
9  Grenada, they arrested me for a DUI, but it was
10 thrown out.  It was an open container.  I went
11 against -- well, I won the case.
12 MR. CLARKE CONTINUED:
13     Q.  Okay.  When did that happen?
14     A.  '90.  1990 timeframe.
15     Q.  Before the military?
16     A.  It was in the military, yes, sir.  The
17 military brought me here in '88.
18     Q.  Okay.  All right.  And that was one where
19 you were arrested, and you went to court?
20     A.  Yes, sir.
21     Q.  And the charges were dismissed?
22     A.  Yes, sir.
23     Q.  Okay.  The other two, did you just plead
24 guilty to?
25     A.  I pled guilty.  On one case, I pled

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 18..21

Page 18

1  guilty, the other fellow pled guilty, I paid my
2  fines, and loaned him the money for his fines.
3      Q.  Okay.
4          COURT REPORTER:  And you said that
5  was Leake County?
6          THE WITNESS:  Lee County.  Tupelo.
7          COURT REPORTER:  Lee.
8          THE WITNESS:  Lee, L-e-e.
9          COURT REPORTER:  Thank you.
10 MR. CLARKE CONTINUED:
11     Q.  All right.  Any other things that you saw
12 in those interrogatories?
13     A.  Only thing that. . .
14         THE WITNESS:  Did anybody ever answer
15 No. 6 about the military?
16         MS. GRIFFITH:  (No audible response.)
17 MR. CLARKE CONTINUED:
18     Q.  Yeah, No. 6 talks about military.  Why
19 don't you just tell me your military service.
20 Because it's not in the documents they produced
21 that's here in front of me.
22     A.  I joined the military December of '80, and
23 served until the end of November of 2013.  Zero
24 administrative action and received no disciplinary
25 actions.  Secret security clearance for 20 plus

Page 19

1  years.  I retired out of the military 27 and a half
2  years active duty.
3      Q.  Okay.  Thank you for your service.
4      A.  Thank you, sir.
5      Q.  Did you serve overseas?
6      A.  Yes, sir.  One full year.  Twelve months.
7      Q.  Again, double thank you for your service.
8          MR. CLARKE:  All right.  We'll count
9  that as an amendment.
10         MS. GRIFFITH:  (Nods head
11 affirmatively.)
12         MR. CLARKE:  You don't have to do the
13 paperwork.
14         MS. GRIFFITH:  Thank you.
15         THE WITNESS:  That's the only two
16 that I remember --
17 MR. CLARKE CONTINUED:
18     Q.  Okay.  And you were honorably discharged
19 and everything?
20     A.  Yes, sir.
21     Q.  What branch were you in?
22     A.  Army.
23     Q.  Army?
24     A.  Yes, sir.
25     Q.  All right.  We'll go through a little bit

Page 20

1  of background.  Tell me about your educational
2  background.  Did you graduate from high school?
3      A.  Yes, sir.
4      Q.  Where did you graduate from high school
5  and when?
6      A.  Shannon High School, June of -- May or
7  June of '81.
8      Q.  And where is Shannon High School?
9      A.  Lee County.  Outside of Tupelo.  South of
10 Tupelo.
11     Q.  Is that where you were born and raised?
12     A.  No, sir.  I was born in Canada on a naval
13 station.
14     Q.  Okay.
15     A.  All of my family pretty well lived in
16 Louisiana, Central Louisiana.  And my father was on
17 a second tour in 'Nam, my mother divorced him and
18 moved in with some friends in Lee County.
19     Q.  Okay.  You graduated -- you were living in
20 Mississippi for high school?
21     A.  Yes, sir.
22     Q.  Graduated from high school.  Did you have
23 any post high school education?
24     A.  Yes, sir.  I've got a little over 100
25 hours of college.  I never completed a degree plan,

Page 21

1  so it's just hours.  I never got a degree.
2      Q.  What was your concentration or your focus?
3      A.  I didn't do a degree plan, so it was just
4  whatever was offered to me through the military.
5      Q.  Okay.
6      A.  They say, "We're doing these courses.  You
7  want in?"  I said, "Sure."
8      Q.  So you took advantage of the educational
9  opportunities provided you by the Army?
10     A.  Yes, sir.
11     Q.  And did you have those at all different
12 types of facilities, colleges, or. . .
13     A.  Hinds and William Carey College were the
14 two.
15     Q.  Okay.  All right.  And so no degree, but
16 you said roughly 100 hours or so?
17     A.  A little over 100.  Between 100 and 120.
18 I'd have to pull the transcripts.
19     Q.  Okay.  All right.  And take me through
20 your employment history up to the present.  Just
21 start from -- I don't care about little jobs.  I
22 mean significant employment that you had after
23 graduating from high school.
24     A.  After graduating, I worked in a factory,
25 in Tupelo Furniture Factory until July of '88.  I

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 22..25

Page 22

1  took a full-time position with the Mississippi Army
2  National Guard, which moved me to Camp McCain.
3      Q.  Camp McCain?
4      A.  Camp McCain.  Just south of here at
5  Elliot.  And that's where I stayed active -- well,
6  I never really moved until 2014.  I volunteered to
7  go -- or to transfer to a unit in Crystal Springs.
8  And about three weeks later, of course we got our
9  deployment notification, and we spent most of '14
10 training to go.  I left, I think, the 3rd of
11 January of '15, got back late December of '15.
12         I took another position to get me back in
13 Grenada.  And stayed there roughly a year, and then
14 was selected to be over a recruit sustainment
15 program in Northwest Mississippi.  It was my job
16 and my staff's job duties to get all new trainees
17 in Northwest Mississippi trained, ready to go to
18 basic training.  They didn't go until I said they
19 were ready.
20     Q.  Okay.  And all those different positions
21 and movements were while you were employed by the
22 Army?
23     A.  Yes, sir.
24     Q.  You didn't have any other part-time jobs,
25 law enforcement jobs during that time?

Page 23

1      A.  I did some work with Steve's Pest Control,
2  which no longer exists.  I started law enforcement,
3  I think, December of 2009 with the police
4  department, sheriff's department.  And then 2010,
5  from January through May, two nights a week, couple
6  of weeks at one span and a couple of weekends, went
7  with the part-time military academy in Grenada.
8      Q.  All right.  Well, when is the first time
9  you put on a police officer's badge?
10     A.  December, January of 2009, I started
11 riding with the police department.
12     Q.  And which police department?
13     A.  Grenada.
14     Q.  The city?
15     A.  City, yes, sir.
16     Q.  Okay.  Did you have to go to any kind of
17 academy before you --
18     A.  That's the part-time academy I was telling
19 you about.  Grenada County had a -- they held a
20 certified law enforcement officers training
21 academy, LEOTA, certified academy here for
22 part-time.
23     Q.  Okay.  So in 2009, you went to the LEOTA
24 academy?
25     A.  Started in January of 2010.

Page 24

1      Q.  Okay.
2      A.  And went through towards the -- May of
3  2010.
4      Q.  And there's two different academies.
5  There's a part-time academy and there's a full-time
6  academy, correct?
7      A.  Yes, sir.  Yes, sir.
8      Q.  So in January of -- and there's a period
9  of time after you hire on before you have to go to
10 the academy, correct?  Because I think you said you
11 started putting on a badge in 2009.
12     A.  You really don't hire on.  You volunteer
13 your time.
14     Q.  Okay.  So in 2009, you volunteered your
15 time?
16     A.  Yes, sir.
17     Q.  When you were with the City of Grenada,
18 did they have any training before you went on, or
19 was it on-the-job training?
20     A.  It was -- if I was in a car, it was
21 minimal time.  Right after that, a couple of weeks,
22 you had the holidays, and then right after that,
23 the academy started.  So two nights a week, several
24 weekends, and there was a two-week period.
25     Q.  Did you have to -- I'm sorry.  I didn't

Page 25

1  mean to interrupt you.
2      A.  I'm sorry.  Go ahead.
3      Q.  Did you have to qualify with a firearm
4  before you went out in a car?
5      A.  Yes, sir.
6      Q.  And did you do that at the City of
7  Greenville?
8      A.  City of Grenada.
9      Q.  City of Greenville.  I'm sorry.  City of
10 Grenada.  All right.  So then you went to the
11 academy sometime in January of 2010, and the
12 reserve academy until sometime in May of 2010,
13 correct?
14     A.  Yes, sir.
15     Q.  And that actual academy was put on by the
16 County of Grenada, correct?
17     A.  Yes, sir.
18     Q.  All right.  Now, did you then after you
19 got out of the part-time academy continue working
20 part-time for Greenville?
21     A.  For Grenada.
22     Q.  Greenville.  Grenada.  I'm sorry.
23     A.  I'm paying attention.
24     Q.  No, you're paying attention more than I
25 am.  And I apologize for that.

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                    Pages 26..29

Page 26

1    So after you got out of the academy, you
2  were then a reserve or a part-time for the City of
3  Greenville?
4    A.  Grenada.
5        (OFF THE RECORD.)
6        THE WITNESS:  Yes, sir, Grenada.
7  MR. CLARKE CONTINUED:
8    Q.  City of Grenada.
9    A.  And somewhere in that time period, I rode
10 a couple of times or did some work with the county.
11   Q.  Okay.  So when you were certified as a
12 reserve officer, how did you get your assignments
13 with the City of Grenada?
14   A.  There's really no assignments.  The only
15 requirements for the city on the reserve side is,
16 you do a minimum of eight hours a month.  You
17 volunteer that.  At the time, there was no pay at
18 all when I started.
19       You had to meet a mandatory meeting the
20 first Tuesday of every month for a reserve meeting,
21 and you had to do -- they have a food pantry here
22 the fourth Saturday morning of every month, and you
23 -- as mentor, you work it, traffic control and
24 crowd control.
25       And they had a rotation of city council

Page 27

1  meetings.  Had two reserves that worked as -- to
2  keep the peace at the city council.
3    Q.  Okay.  And at some point, you said while
4  you were a reserve officer for the City of Grenada,
5  you had rode sometimes with county.  How did that
6  come about?
7    A.  I had joined both of them.
8    Q.  Okay.
9    A.  I could do either one.  There's two
10 different structured environments for them.  The
11 reserve for Grenada police has a -- the city police
12 has a reserve, reserve only, which has full arrest
13 of powers -- full arrest powers.  The county has a
14 reserve, part-time, and full-time, and only
15 part-time and full-time have arrest powers.
16   Q.  So reserve for Grenada County are not
17 allowed to make arrests?
18   A.  Unless in the presence of a part-time or
19 full-time.
20   Q.  So when you got out of the academy, you
21 could work as reserve for either the city or the
22 county based on your certification?
23   A.  Yes, sir.
24   Q.  And the city had a different type of
25 program than the county did?

Page 28

1    A.  Yes, sir.
2    Q.  City had certain requirements you had to
3  make with the number of hours and other type of
4  functions, like you said, being at city council
5  meetings or the food pantry, correct?
6    A.  Yes, sir.
7    Q.  Have you ever been -- are you now a
8  full-time deputy?
9    A.  No, sir.
10   Q.  Okay.  So what is your status with the
11 City of Grenada -- I mean, the County of Grenada?
12   A.  County of Grenada?  Part-time.  I went
13 part -- excuse me.
14   Q.  When did you go from -- was there a time
15 -- as a part-time with the county, you can make
16 arrests, correct?
17   A.  Yes, sir.
18   Q.  When did you go from -- and I don't know
19 if I'm using the terminology right.  Is it reserve,
20 part-time, and then full-time, three different
21 distinctions under the county?
22   A.  Yes, sir.
23   Q.  Reserve, is it -- under the county policy,
24 do they always have to ride with a certified
25 officer?

Page 29

1    A.  99 percent of the time.  There's a very
2  few exceptions.
3    Q.  What are the exceptions?
4    A.  We've got some motorcycles.  And at the
5  time, there was four of us or five of us that were
6  all reserve officers, and we were the only ones
7  that rode them.
8    Q.  Okay.
9    A.  Now there's two of us part-time and one
10 reserve.  If two of us couldn't make it, the
11 reserve could, as escorts.  It's for the governor,
12 for the highway patrol, for the county, for
13 funerals, things like that.
14   Q.  Could a reserve for the county write
15 traffic tickets?
16   A.  I don't know the answer to that.  I don't
17 think it's ever been done, but I don't know the
18 answer to it.
19   Q.  Well, most of the time, these reserves
20 would be with a full-time officer who would fill
21 that out, correct?
22   A.  Yes, sir.
23   Q.  Okay.  When did you go from being a
24 reserve with the county to a part-time employee
25 with the county?

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                        Pages 30..33

1    A. I'm guessing November or December of 2012.
2  I was on my way out of the military.
3    Q. Okay. And when you went to part-time, did
4  you then have a more normal actual weekly schedule
5  that you had to show up on?
6    A. Yes, sir.
7    Q. And how many hours is part-time? I'm
8  trying to figure out --
9    A. Yes, sir. Anywhere from no hours up to --
10  I have done more than -- well, 40, 40 hours a week.
11    Q. Do you know of any MLEOTA standards as to
12  the number of hours that a part-time officer is
13  allowed to work?
14    A. Can I retract that and rephrase it?
15    Q. Sure.
16    A. I have done up to that many hours.
17  There's the -- MLEOTA, there's a thing in emergency
18  situations -- when I was first hired on, they had
19  me working as animal control, which is a part-time
20  officer, for the county a few hours a week. And
21  then the other few hours a week, I would be working
22  as a deputy. I'd be in the same vehicle, but the
23  duties were different.
24    Q. Okay.
25    A. But I could also respond to calls if I

1  wasn't doing anything as far as animal control.
2    Q. Are you aware of any requirements under
3  MLEOTA as to the number of hours a part-time
4  officer can work before they have to be a certified
5  officer?
6    A. It's my understanding there's a monetary
7  amount that they say you can make. I'm not sure of
8  the amount, but there's a -- and there's a couple
9  of -- MLEOTA says a monetary amount. And I'm
10  trying to figure out on the county side, because
11  the pay's more. It's either 16 or 24 hours
12  equates -- around the 20, 24 hour equates to the
13  monetary amount that MLEOTA allows you to work.
14    Q. Are you still in any way working as a
15  reserve for the City of Greenville today?
16    A. Grenada. And can you -- can you rephrase
17  that, please?
18    Q. When you went part-time with the county --
19    A. Yes, sir.
20    Q. Did you continue working as a reserve for
21  the city?
22    A. Yes, sir.
23    Q. Do you continue to work for the city as a
24  reserve today?
25    A. That's going to take a little bit more

1  than a yes or a no. It's --
2    Q. Well, I mean --
3    A. Okay, okay. I just took --
4        MS. GRIFFITH: You can explain.
5        THE WITNESS: Okay. I just took this
6  job. It gives me benefits. So I'm still on the
7  reserve, but --
8  MR. CLARKE CONTINUED:
9    Q. Roster?
10    A. Roster. It's still up in the air with
11  human resources whether or not I can because I'm
12  salaried. The chief and all the captains say I can
13  still work because they consider it coming out of a
14  different department. The woman over human
15  resources says I can't. They're going through it
16  right now. I plan on working Saturday, whether
17  it's volunteer or getting paid.
18    Q. For Green- -- for the city?
19    A. For Grenada, yes, sir.
20    Q. I just -- I honestly apologize. I just --
21  a block.
22    A. But since I've took this, I haven't been
23  able -- for six weeks, I've been focusing on my
24  next retirement.
25    Q. Well, from what I understand, sometime in

1  December or the end of 2012, beginning of 2013, you
2  became part-time with the county.
3    A. Yes, sir.
4    Q. Since December or January -- December of
5  2012 or January of 2013, have you ridden or served
6  or been out on the streets as a reserve for the
7  City of Grenada?
8    A. Can you repeat that?
9    Q. Yes. Since you went part-time with the
10  county, have you rode as an officer for the city?
11    A. Yes, sir.
12    Q. Okay. And when I asked you the question,
13  Are you still working for Greenville right now,
14  there's apparently some kind of analysis going on
15  as to whether or not you can still serve as a
16  reserve for the City of Grenada based on your
17  position with the county. Is that correct?
18    A. Based on my position with the city. I'm a
19  salaried city employee. I'm a department head.
20    Q. What do you do now?
21    A. Airport manager.
22    Q. Okay. That's okay. So you're no longer
23  in law enforcement?
24    A. I'm still in law enforcement.
25    Q. Okay. But you're no longer -- are you a

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                      Pages 34..37

Page 34

1 part-time deputy with the county?
2     A. Yes, sir.
3     Q. Okay. You're also a reserve, pending
4 whatever this analysis is, reserve with the City of
5 Greenville, correct?
6     A. Grenada. Yes, sir.
7     Q. Grenada. Okay. All right. And you're
8 also the airport manager for the city?
9     A. Yes, sir.
10    Q. Okay. So you have three hats on right
11 now?
12    A. Yes, sir.
13    Q. At least.
14    A. Yes, sir.
15    Q. Okay. What is your normal schedule with
16 the county?
17    A. Prior to this -- prior to this, it was
18 every Monday and Friday. Monday, Thursday, and
19 Friday.
20    Q. Okay. And once this gets worked out, you
21 don't know what your schedule will be with the
22 county?
23    A. Right now, it's on a basis of what I can
24 do. I worked -- I've worked two days with the
25 county since I took this position, 4th of July and

Page 35

1 Sunday before last. I'm going to work the 26th. I
2 know that already. I'm on the schedule.
3     Q. All right. Now, so you've never been to
4 the full-time police academy?
5     A. No, sir.
6     Q. And the part-time police academy, you went
7 to in 2010, right? January?
8     A. Yes, sir. Yes, sir.
9     Q. Now, when you go to the part-time academy,
10 they don't train you on the particular policies of
11 a particular department, do they?
12    A. I can only speak for the part-time. No,
13 sir, because each department is individually --
14    Q. Right. They're different policies.
15    A. Different SOPs, yes, sir, standard
16 operating procedures.
17    Q. You just get your general law enforcement
18 training for whatever the curriculum is for the
19 state for the part-time academy, correct?
20    A. Yes, sir.
21    Q. All right. And the majority of the work
22 that you do at the part-time academy is physical
23 fitness, correct?
24    A. No, sir.
25    Q. Okay. Well, I mean, we can go to the

Page 36

1 MLEOTA standards. I mean --
2     A. Yes, sir.
3     Q. -- they'll have the number of hours that
4 you have to do them. But a big portion of it is
5 physical fitness. You do that just about every day
6 when you're in the academy, correct?
7     A. Yes, sir.
8     Q. All right. And you have different types
9 of courses, correct?
10    A. Yes, sir. They'll have classroom.
11    Q. And you have -- you go to the firing
12 range, correct?
13    A. Yes, sir.
14    Q. Do you get on the track and do any
15 emergency vehicle driving?
16    A. Yes, sir.
17    Q. Did you have any training on ethics when
18 you were in the part-time academy?
19    A. Yes, sir.
20    Q. Were you -- did they discuss anything in
21 there called "the code of silence"?
22    A. I cannot answer that one.
23    Q. Did you have any training that it's
24 improper for officers to turn a blind eye if they
25 see something going wrong from a fellow officer?

Page 37

1     A. No, sir.
2        MS. GRIFFITH: Object to the form.
3 You can answer.
4        THE WITNESS: Ma'am?
5 MR. CLARKE CONTINUED:
6     Q. You can answer.
7        MS. GRIFFITH: I was objecting, but
8 you can answer.
9        THE WITNESS: Okay. No, sir.
10 MR. CLARKE CONTINUED:
11    Q. So you had no training on that?
12    A. No, sir.
13    Q. All right. Now, did you have training on
14 proper arrest? You know, reasonable suspicion and
15 probable cause and things of that nature?
16    A. Yes, sir.
17    Q. What does reasonable suspicion allow you
18 to do?
19    A. Reasonable suspicion only allows you to do
20 reports and turn it over to investigators, if it's
21 my understanding. In my understanding, if I
22 suspect something, if I don't witness something, I
23 have no arrest authority.
24    Q. Do you know --
25    A. Unless it's a warrant or I see it

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 38..41

Page 38

1 happening.
2    Q.  You don't know what the term "reasonable
3 suspicion" means in law enforcement?
4    A.  Not the book word, no, sir.
5    Q.  Do you know what a Terry stop is?  A Terry
6 stop.
7    A.  Not the term, no, sir.  Probable cause.
8    Q.  When you have probable cause, were you
9 trained that that allows you to make a full-blown
10 arrest?
11    A.  The probable cause. . . Could you -- I'm
12 sort of confused about that.
13    Q.  Okay.  There's certain levels of suspicion
14 or evidence that you have that allow law
15 enforcement officers to engage in certain
16 activities.  Do you agree with that?
17    A.  Yes, sir.
18    Q.  You can walk up to anybody on the street
19 and say, "Hello.  I want to talk to you," correct?
20    A.  Yes, sir.
21    Q.  If they don't want to talk to you, they
22 don't have to, right?
23    A.  Yes, sir.
24    Q.  In order to be able to detain somebody and
25 to stop them or arrest them, you have to have

Page 39

1 probable cause, correct?
2    A.  Yes, sir.
3    Q.  Once you have probable cause, you can
4 arrest them, bring them to jail, correct?
5    A.  If there is a crime committed, yes, sir.
6    Q.  Right.  And that would be the probable
7 cause, right?
8    A.  Well, probable cause isn't always the
9 reason they get arrested.  Like a seatbelt, wearing
10 a seatbelt, you can stop them on that, then you can
11 educate them on it.  But if you happen to see. . .
12    Q.  But you can't arrest for a traffic
13 offense.  That's not a crime, correct?
14    A.  Yes, sir, you can.
15    Q.  You can arrest on a traffic --
16    A.  Every ticketable offense is an arrestable
17 offense.  You're allowing them -- giving them
18 the -- you're giving them -- you're entrusting them
19 to show up in court on that offense.  I can ask
20 that the jail and the courts make somebody bond out
21 on a traffic offense.
22    Q.  Have you done that?
23    A.  Yes, sir.
24    Q.  Okay.  I didn't know that.
25        MR. GRIFFITH:  Counsel, he's correct.

Page 40

1 Under Atwater versus Lago Vista, United States
2 Supreme Court, and in the Fifth Circuit, Price
3 versus Roark.  If you need an example, I'll
4 participate.
5        MR. CLARKE:  He's not right, because
6 it's not a crime.  But Atwater said you don't
7 violate the Constitution, the Fourth Amendment, by
8 arresting somebody even when state law says it's a
9 nonarrestable offense.  But we can -- we can have a
10 theoretical discussion about things later on.
11 MR. CLARKE CONTINUED:
12    Q.  But that's your training.  Your training
13 is, you can arrest anybody for a traffic ticket?
14        MS. GRIFFITH:  Object to the form.
15 You can answer.
16        THE WITNESS:  Yes, sir.
17 MR. CLARKE CONTINUED:
18    Q.  Okay.  All right.  Now, when you got out
19 of the training academy, were you given a set of
20 policies -- well, let me -- in the training
21 academy, were you taught about report writing?
22    A.  Yes, sir.
23    Q.  And do they tell you when you're involved
24 in an incident you're supposed to document?
25    A.  Yes, sir.

Page 41

1    Q.  And when they said -- did they talk to you
2 about events that required you to write a report?
3        MS. GRIFFITH:  Object to the form.
4 You can answer.
5        THE WITNESS:  In the academy, it
6 would be too generic.  It's each policy and their
7 procedure on when they're to be wrote.  The two
8 different departments here have two different
9 policies.
10 MR. CLARKE CONTINUED:
11    Q.  They just talk to you about -- okay.  Now,
12 let's talk about the county policy.  When you got
13 out, were you provided a copy of the policies?
14    A.  Yes, sir.
15    Q.  Did you have take any kind of --
16    A.  Can I back up on that?
17    Q.  Yes.
18    A.  When I got out of the academy, I was not,
19 because I was reserve.
20    Q.  When did you get a copy of -- did you ever
21 get a copy of the county's policies?
22    A.  Yes, sir.
23    Q.  When did you get a copy of the county's
24 policies?
25    A.  The first -- I signed for it.  I don't --

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 42..45

Page 42

1  I don't recall the date.
2          MR. CLARKE:  Let me mark -- where we
3  at?  Exhibit No. 4.
4      (EXHIBIT 4 WAS MARKED FOR THE RECORD.)
5  MR. CLARKE CONTINUED:
6      **Q.  What I've identified as Exhibit No. 4 is a**
7  **copy of all documents that were produced by the**
8  **county when I requested your personnel file.  See**
9  **if you can look at that.**
10         MS. GRIFFITH:  I'm just taking a
11  quick look if you don't mind.
12         MR. CLARKE:  That's fine.
13  MR. CLARKE CONTINUED:
14     **Q.  You can look at those documents.  Do those**
15  **documents tell you when you got the policy book?**
16     A.  No, sir.
17     **Q.  Was it after you became a part-time**
18  **officer?**
19     A.  Yes, sir.
20     **Q.  Did you take any tests pertaining to your**
21  **knowledge of the policies?**
22     A.  No, sir.
23     **Q.  Did you have any actual classroom training**
24  **on the policies?**
25     A.  No, sir.

Page 43

1      **Q.  When I was asking you questions, when we**
2  **got onto this track, you said the city and the**
3  **county have different requirements/policies with**
4  **respect to when you write reports.**
5      A.  Yes, sir.
6      **Q.  Tell me what the -- when the county**
7  **requires you to write a report pursuant to policy.**
8      A.  Any call.  Any call or contact.  If
9  someone comes to the sheriff's department, wants a
10  report, you have to do a report.  If you go and
11  respond to a wreck on the interstate, which is
12  highway patrol jurisdiction, you still have to do a
13  report.  If you -- any call, you're supposed to get
14  the call number -- or the case number, time of call
15  and time of arrival, and do a report, whether
16  it's -- and there's no specific on how detailed it
17  has to be.
18     **Q.  Are you required under the county policy**
19  **to write up a report when somebody is injured?**
20     A.  Was there at that time, or is there now?
21     **Q.  Okay.  In December -- let's ask the**
22  **question both ways.  In December 23rd, 2016, did**
23  **you have to write a report if somebody was injured?**
24     A.  No, sir.
25     **Q.  And after December 23rd, 2016 -- and I**

Page 44

1  **think they enacted some new policies in March of**
2  **2017.  Do you have to write a report setting forth**
3  **the circumstances when somebody is injured?**
4      A.  I don't remember.
5      **Q.  When you wrote your second incident**
6  **report, which we don't -- I don't have a copy of,**
7  **and I'll look for, did you note in that report that**
8  **Mr. Worley had been injured?**
9      A.  I did not in that incident report.  I
10  thought that I had done a narrative, but I don't
11  think I can find it.  In my mind, I thought I did a
12  narrative on what had happened.
13     **Q.  But since this lawsuit, you've never been**
14  **able to find it?**
15     A.  Yes, sir.
16     **Q.  Okay.  All right.  Now --**
17     A.  To the best of my knowledge.  Unless I did
18  find it and provided it.
19         THE WITNESS:  Do you remember?
20         MS. GRIFFITH:  I don't remember.
21         THE WITNESS:  I don't remember.
22         MS. GRIFFITH:  I don't remember
23  seeing it.
24         THE WITNESS:  I don't remember.  I
25  recall looking for it, but I don't recall finding

Page 45

1  it.
2  MR. CLARKE CONTINUED:
3      **Q.  Where would you look for it?**
4      A.  I would look for it on my personal thumb
5  drive and on the hard -- the computer that we had
6  at the time crashed on us.  It's -- I can show you
7  where it's at.  It's still sitting where they put
8  it the day it crashed.  That's where a lot of our
9  stuff went.
10         Now, I didn't always back up my thumb
11  drive faithfully, daily.  And I think that's where
12  my narrative -- because I wanted to protect myself.
13     **Q.  Okay.  Why did you want to protect**
14  **yourself?**
15     A.  Because the totality of the circumstances.
16     **Q.  Is it because of what Officer Griffin did?**
17     A.  Yes, sir.
18     **Q.  Had you worked with Officer Griffin**
19  **before?**
20     A.  I think he came with another deputy and
21  backed me up on someone who tried to run over me.
22  And I got in a foot pursuit, and he rode with me
23  from that arrest to the jail.  But I can't think of
24  any other time.  Best of my memory, he didn't -- I
25  don't like people riding with me.

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 46..49

Page 46

1    Q.  Okay.  And that was prior to the Worley
2    incident?
3    A.  Yes, sir.
4    Q.  Did he mistreat that prisoner?
5         MS. GRIFFITH:  Object to the form.
6    You can answer.
7         THE WITNESS:  Mistreat?  No.
8    MR. CLARKE CONTINUED:
9    Q.  Did he strike him?
10   A.  Yes, sir.
11   Q.  All right.  Did you report that to the
12   sheriff?
13   A.  I don't know if I did or one of the
14   full-time officers did.  I think the full-time
15   officer may have.  I can't speak for them.
16   Q.  Okay.
17   A.  I did not.
18   Q.  Did the inmate or the person in custody
19   sustain injures?
20   A.  No, sir.
21   Q.  What did he do -- what did Officer Griffin
22   do to the inmate or the suspect?
23   A.  In that case, he hit him.
24   Q.  Did he punch him in the face?
25   A.  Yes, sir.  He was trying to bite several

Page 47

1    of us.  He was not cuffed.
2    Q.  Under the Grenada County policies, if you
3    see an officer strike somebody or mistreat
4    somebody, what are you supposed to do?
5    A.  We go back to, the part-time is
6    responsible for who is with them -- or the
7    full-time.  That's why I did not want anybody
8    riding with me, because I didn't want to take
9    anybody -- be responsible for what someone may pull
10   on their own.  He was not riding with me that day.
11   He only went to help with the transport.
12   Q.  Okay.
13   A.  Which was only about two blocks.
14   Q.  I thought he was in the car with you.
15   A.  He arrived to back me up when I requested
16   help.  Everybody in the city and county came.
17   Q.  Okay.  And I thought your testimony was
18   that he rode back with you to the jail.
19   A.  To the jail, about two blocks, yes, sir.
20   Q.  Who was the deputy who was with -- or the
21   supervisor or the --
22   A.  If I'm not mistaken, he arrived with Eric
23   Williamson.
24   Q.  Eric Williams?
25   A.  Williamson.

Page 48

1    Q.  Williamson.  Okay.  And where did the
2    officer -- or Deputy Griffin, where was the suspect
3    when he punched him?
4    A.  In a yard.  In a yard.  He was fighting
5    and trying to bite three or four of us at one time.
6    I was asking a city officer to tase him.  We
7    couldn't get cuffs on him.  In fact, he -- this
8    gentleman has been -- about two -- three years ago,
9    two years ago, went before our circuit judge.  Went
10   crazy in front of him, and he has still not been
11   sent to Whitfield or anything yet.
12   Q.  You know the person's name?
13   A.  Aaron Williams.
14   Q.  Is the person that was arrested?
15   A.  Yes, sir.  A-a-r-o-n Williams.
16   Q.  All right.  So other than that event and
17   what happened in Worley, those are the only times
18   that you have been serving as a county deputy where
19   you were -- where you observed or worked with
20   Officer Griffin, correct?
21   A.  (No audible response.)
22   Q.  Or on a call together.
23   A.  On a call together.  I've seen him -- you
24   know, we swap -- he usually come in after 4:00.  I
25   left at 4:00.

Page 49

1    Q.  Right.
2    A.  I knew he was out there, and, you know, he
3    may have showed up with some people on different
4    calls.  And I don't know that we -- well, I worked
5    with him on a -- he was on a search warrant with us
6    one night on a house.
7    Q.  All right.  Did he strike anybody that
8    night?
9    A.  No, sir.
10   Q.  Have you worked with him since the Worley
11   incident?
12   A.  No, sir.
13   Q.  Do you know whether or not he's actively
14   serving as a deputy -- or reserve deputy for
15   Grenada County since the Worley incident?
16   A.  As far as I know, he hasn't.
17   Q.  Do you know whether or not that was
18   because the sheriff took him off the job after this?
19   A.  That's my understanding.
20   Q.  All right.
21        (OFF THE RECORD.)
22   MR. CLARKE CONTINUED:
23   Q.  Have you ever been disciplined with the
24   County of Grenada for any type of. . .
25   A.  No, sir.

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 50..53

Page 50

1    Q.  With the City of Greenville --
2    A.  Grenada.
3    Q.  City of Grenada, have you ever been
4  disciplined in your law enforcement capacity?
5    A.  No, sir.
6    Q.  Now, you knew Mr. Worley before the events
7  of December 23rd, 2016, didn't you?
8    A.  Yes, sir.
9    Q.  What did you know about Mr. Worley?
10   A.  That was either my third or fourth time to
11 arrest him.
12   Q.  And what did you arrest him for?
13   A.  The first time I arrested him was on
14 Thanksgiving Day the year prior.  There was a
15 disturbance at his house with him and Ms. Kitchens.
16 He was very intoxicated.  And he just kept on.  Of
17 course, he was on his property.  And he was told
18 not to go to the jail or he'd be arrested on public
19 drunk, and he stumbled straight out there.
20   Q.  Is that when you arrested somebody else
21 there at the property?
22   A.  Yes, sir.  Thomas Shane Lamb.  Yes, sir.
23   Q.  What's the next time?  So did you arrest
24 him without incident there?
25   A.  Other than his typical squalling one

Page 51

1  minute. . .
2    Q.  Other than his typical what?
3    A.  Squalling, crying.  And the next second,
4  he's -- when he's drunk, he's crying one minute,
5  he's mean as he can be the next.  It's just like
6  this (indicating up and down).
7    Q.  But you didn't have any problem arresting
8  him, right?
9    A.  No, sir.
10   Q.  You just had to put up with him, right?
11   A.  Yes, sir.
12   Q.  All right.  When's the next time you
13 arrested him?
14   A.  Either one or two times -- one in
15 particular I remember, we had an active warrant on
16 him, and I was coming up a road, and I saw a car on
17 the side of the road with the door open, in the
18 middle of the road.
19       And I went up and I ran the tag, and it
20 come back to Ms. Kitchens, and I realized then that
21 Worley was in the area.  She came out of the woods,
22 said they were digging worms to go fishing, out of
23 the woods.
24       I said, "Tell Richard to come on.  I've
25 got a warrant for him."  He come on up there, put

Page 52

1  his hands behind him.  He was stone sober.  No
2  problems.
3    Q.  What was the warrant for?
4    A.  I do not recall.
5    Q.  What's the next time you arrested him?
6    A.  I'm thinking there's another warrant in
7  there somewhere.
8    Q.  Okay.
9    A.  And it must not have been an incident -- I
10 can't remember if -- I'm not sure.
11   Q.  All right.  Did you have any problems
12 arresting him at that time -- any of those times?
13   A.  Negative.  No, sir.
14   Q.  Okay.  Now, tell me what happened on
15 December 23rd.  You apparently had a --
16   A.  Well, can I back up on that?  Can I --
17   Q.  Yeah.
18   A.  Had problems with him once we got him to
19 the jail.  And I do not remember which one we had
20 more problem out of, either him or Thomas Shane
21 Lamb.  Maybe Randy Sweat can answer that, if he
22 remembers it.  Because it was me and him on the
23 call, two separate trucks and two separate arrests,
24 two separate transports.  We got to jail, and there
25 was trouble out of one of them or both of them at

Page 53

1  the jail.
2    Q.  All right.  Now, what was the trouble?
3    A.  Drunk, mouthing, threatening.  Vague
4  threats.  You get them all the time, you know.
5  Sometimes you just to have overlook it.
6    Q.  Well, you don't take any of the threats
7  seriously, do you, of Mr. Worley?
8    A.  You -- I have to disagree with that one.
9    Q.  Okay.  But you arrested --
10   A.  Up until the -- this date, I never took
11 him seriously.
12   Q.  All right.  So it was just -- when you
13 went to the academy, they told you you're going to
14 have to deal with belligerent people, drunk people,
15 jerks?
16   A.  De-escalate.
17   Q.  And that's what you're supposed to do?
18   A.  Yes, sir.
19   Q.  Did you go to verbal judo classes?
20   A.  Yes, sir.
21   Q.  All right.  And when somebody's like that,
22 you've got time on your side, you just let them --
23 you back up and de-escalate, correct?
24   A.  Yes, sir.
25   Q.  All right.  He never threw a punch at you,

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 54..57

Page 54

1  tried to bite you or anything in any of those --
2  you know, we're talking about prior to December
3  23rd, 2016.  Correct?
4     A.  I do not recall what happened on
5  Thanksgiving Day at the jail.  That's my only
6  problem with answering that question.
7     Q.  Well, this is my opportunity to find out
8  what you're going to testify to in this case.
9     A.  I can't testify to anything because I
10 can't remember it.  I just know there was an
11 incident.
12    Q.  Did he try to bite you?
13    A.  Not that I'm aware of that day, no, sir.
14    Q.  Did he throw a punch at you?
15    A.  He was cuffed.  And somebody like that,
16 that's that way, we swap the cuffs out.  We don't
17 completely take them off if we see there's a risk.
18 On my arrests.  I can't speak for everybody else.
19    Q.  I understand.  There's no -- there's no
20 policy that you're aware of that requires how you
21 handle prisoners or suspects from the county?
22    A.  No, sir.
23       MS. GRIFFITH:  Object to the form.
24 Are you talking about policies pre-2016 or --
25       MR. CLARKE:  I'm talking about

Page 55

1  policies that applied to his arrests before
2  December 23rd, 2016.
3        MS. GRIFFITH:  You can answer if you
4  know.
5        THE WITNESS:  I do not recall any
6  written policies on how we hand them off.
7  MR. CLARKE CONTINUED:
8     Q.  Is there some kind of custom that you
9  follow?
10    A.  My custom is, I don't take the cuffs off.
11 I'll stand there and listen to the mouths until the
12 jail takes over, get the things they need, do their
13 little search, get their cuffs on, get my cuffs
14 off.  And then I ask them if they're okay.  And
15 once they say they're okay, then I leave.
16    Q.  All right.  So let's talk about December
17 23rd, 2016.  Apparently, based on the first
18 incident report -- or the incident report that we
19 marked as Exhibit No. 1, you went to a call at
20 Barbara -- I think it was Barbara Kitchens'
21 mother's house.
22    A.  Yes, sir.
23    Q.  And do you know Barbara Kitchens?
24    A.  I do, yes, sir.
25    Q.  Are you kin to her somehow?

Page 56

1     A.  No, sir.
2        THE WITNESS:  Did you put him up to
3  that?
4        MS. GRIFFITH:  No, I did not.
5  MR. CLARKE CONTINUED:
6     Q.  Is somebody married to somebody, you got a
7  nephew or something that's a Kitchens?
8     A.  Did she tell you that again?
9     Q.  Yeah.
10    A.  Does she really believe that?  No, sir.
11    Q.  Okay.
12    A.  See, there we go again.
13    Q.  I don't know anything.  But you're not --
14 you're not kin, don't have a nephew, don't have
15 anything that's kin to Barbara Kitchens?
16    A.  No, sir.
17    Q.  Okay.  All right.
18    A.  You didn't ask me that about Mr. Worley.
19 I'm wondering where that come from.  Because
20 actually there was a situation with her in court
21 where she said that.  She said her niece was my --
22 no, her -- her niece was my uncle, I believe is the
23 way she kept saying it.
24    Q.  Okay.  All right.  Well, but that's not --
25 whatever it is, you don't have any kinship.

Page 57

1     A.  No, sir.
2     Q.  Through marriage or blood or anything.
3     A.  No, sir.
4     Q.  Okay.  But you ended up going to the
5  mother's house.  Tell me what you observed when you
6  got there.
7     A.  I got there, and he was mouthing, very
8  drunk.  They wanted him off the property.  Barbara
9  was driving, very apologetic.  One minute he was
10 screaming and hollering, one minute he was loving
11 the world, one minute he was screaming and
12 hollering.
13       It was right at Christmas.  Here we go
14 with another holiday.  "I don't want to do this,
15 Richard.  Go home."  I sat there and said, "Go
16 home.  Please go home so I don't have to do
17 anything right here at the holidays again."
18       He would be loud, he'd be quiet, he'd be
19 loud.  And the mother-in-law -- or Barbara's mother
20 -- I'm not sure if Worley and her are married.  I
21 think they've just lived together so long.  But
22 it's her mother's house.  They were adamant he
23 wasn't staying there.  Barbara promised me she
24 would take him straight home.
25    Q.  And apparently that didn't happen.  At

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 58..61

Page 58
1  some point, based on the radio traffic we had, you
2  were responding to some kind of call and then
3  encountered them, correct?
4      A.  No, sir.  I went to that call, told her to
5  take him straight home.  Do not stop, go straight
6  home.  If I saw them out, I was -- he had to go to
7  jail, because I couldn't take a chance on him --
8  any more disturbances, period.
9         I spent a little -- Tim, SO-12, Tim
10 Gholston, we met there at the -- somewhere in the
11 neighborhood, and I rode through the neighborhood
12 looking for somebody I had a warrant on.  I look
13 for people with warrants every day I'm out.  I
14 maintain the warrant list.
15         So I made a few loops through the
16 neighborhood, and it was getting late.  You know,
17 it was dusk, little bit before dusk.  And the
18 levee's two and a half miles long.  And when I
19 approached the end of the levee going south, I saw
20 Barbara's car coming towards me.  And it turned and
21 went down towards the spillway.
22         Well, when it did, it went down by the
23 spillway and pulled up in front of the bathhouse.
24 And I said:  Okay.  He's got to use the restroom.
25 I'm not going to say he's got to go straight home.

Page 59
1  If he's got to use the restroom, let him go use it
2  instead of doing it in the vehicle, in my mind.
3      Q.  Right.
4      A.  So I pulled up, and he went -- got out of
5  the passenger seat.  Tried to open -- stumbled,
6  tried to open the back door and couldn't get it to
7  open.  And he looked at me, and I pointed to the
8  bathroom.  He looked back down and tried to open
9  the door again, and looked back at me, and I
10 pointed.  You know, "Please, Richard, go to the
11 bathroom."  I'm in my truck.
12     Q.  Right.
13     A.  Well, he stumbled -- and it's a pretty
14 good distance.  It's from here to -- pretty close
15 to the trees from where you park to the front of
16 the restroom.  And he stumbled up there.  And I
17 told Barbara, I said, "Barbara, I told you to take
18 him home."  I said, "If you don't take him home, I
19 have no option.  He's got to go with us."
20         She said, "He made me stop and get some
21 beer, and he said he's going fishing."
22         And apparently he had his fishing gear and
23 beer in the back seat.  So I called for Tim.  I
24 asked if he was close, and he said he was.  I said,
25 "Come on down here.  It may go bad," especially as

Page 60
1  drunk as he was.
2         And, you know, I'd heard rumors about his
3  history and how he gets, and I've seen him, you
4  know.  Usually I can de-escalate, but I'd rather
5  have somebody there with me.  I'm a -- I'm a pretty
6  independent person, but when I figure something may
7  go wrong, I don't hesitate to call for backup.
8         Tim gets down there, and a few minutes
9  later, he starts stumbling back towards the car.
10 So I told him, I said, "Richard, you need to go
11 home.  I've given you more than enough chance.  I
12 don't want to take you for public drunk."  And he
13 told me he was going fishing.  I said, "No, sir.  I
14 don't have any choice."
15         And he turned and went towards -- at the
16 front of the car, and I met him.  When I did, he
17 run around to the side -- or the best he could, run
18 to the side of the car.  And I grabbed one arm, got
19 the cuffs on him, then me and Tim had to get the
20 other one.  He resisted on us.
21         And we took him to the back passenger side
22 of my patrol truck.  And when we got him to the
23 door and up in the seat, he was hollering and
24 carrying on, slob- -- you know, he was just being
25 Richard drunk.

Page 61
1         He got up there, and I'm not sure if he
2  tried to headbutt me or what he had done, but it
3  was obvious he wasn't going to sit in the back seat
4  of that truck.  And he -- I held the door the best
5  I could with him -- he had attempted to kick it,
6  and either hit me in the head with his head or the
7  door.
8         I told Tim, I said, "Go around the other
9  side and let's drag him in."  And I held the door.
10 And he was steadily trying to kick the door and
11 butt his head against it.
12         Tim drug him in, shut the door.  By this
13 time, I think all the city -- you know, once I
14 started transporting, he -- we go back to the same
15 thing.  I never believe anybody, but I believed him
16 that day.  He threatened to kill me and my family,
17 burn our house down, and he made it clear he knew
18 where I lived.  So I called for backup at the jail.
19     Q.  Okay.  Let's break this down a little bit.
20 Sometime throughout this, you said you'd heard
21 rumors about Mr. Worley.
22     A.  In law enforcement, if you -- I've got
23 several people I can -- I can give you a list of
24 names right now, and you can go ask other law
25 enforcement, and they know you use caution with

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 62..65

Page 62

1 them. Because --
2          COURT REPORTER: Use -- I'm sorry?
3          THE WITNESS: Use caution with them.
4 Because they've got a history of wanting to resist,
5 or wanting to hit, or wanting to bite, or wanting
6 to. . .
7 MR. CLARKE CONTINUED:
8     Q. I understand what a rumor is.
9     A. Right, a rumor. But it's a rumor to
10 protect us.
11    Q. I understand. What were the rumors that
12 you heard?
13    A. I've heard he's bit a man's ear off. I
14 heard he'll headbutt you in a heartbeat. I know
15 for a fact he's a drunk, drunk, you know, or -- and/or
16 drugs. He's lost so much weight now, I believe he
17 is, or was, doing both. I've never caught him with
18 drugs on him.
19    Q. So you heard rumors that he's -- he bit
20 somebody's ear off?
21    A. Yes, sir.
22    Q. What are the other rumors you heard?
23    A. He can -- he can hurt a man. In a
24 heartbeat.
25    Q. Have you ever --

Page 63

1     A. And he's a -- and I was told he was a
2 convicted felon.
3     Q. All right. Who told you these things?
4     A. I couldn't start to tell you.
5     Q. Just kind of stuff around?
6     A. You sit there and eat lunch every day with
7 different people in the law enforcement world, and
8 it's a daily thing, and -- "Well, we had an
9 incident with Richard Worley."
10         "Well, you better watch him, you know.
11 He's -- don't ever let your guard down around him."
12    Q. You'd arrested him two or three times
13 before, and --
14    A. Either two or three.
15    Q. And none of those rumors panned out?
16    A. Not up to that point, no, sir.
17    Q. So you had your own personal knowledge of
18 him being a loud, belligerent drunk, but --
19    A. Yes, sir.
20    Q. -- not being violent, correct?
21    A. Yes, sir. Or resisting, up until the
22 point he was going to go fishing.
23    Q. All right. Did he try to run away from
24 you?
25    A. He was either trying to run away or get

Page 64

1 into the back passenger seat. When he cut that
2 way, I couldn't tell you what his intent was.
3     Q. All right. But you --
4     A. But I told him to stop, that he was under
5 arrest, and he just -- that's when. . .
6     Q. It's your testimony here today that you
7 got a handcuff on him, and then Tim Ghoolston -- is
8 it --
9     A. Gholston.
10    Q. Gholston --
11    A. Had to assist me with that.
12    Q. Had to assist, and you got the handcuffs
13 on him.
14    A. Yes, sir.
15    Q. And then he resisted getting into the --
16 getting into the car?
17    A. In the truck, yes, sir.
18    Q. In the truck. You were in a marked truck,
19 right?
20    A. Yes, sir.
21    Q. And you're saying -- did you put a
22 seatbelt on him?
23    A. I couldn't. He was just -- it was at the
24 point there was a safety issue with me, and him
25 wanting to headbutt or bite. It was in the back of

Page 65

1 my head.
2     Q. Did you see him try to bite you?
3     A. I didn't see him bite, but when he -- you
4 know, when you come at somebody with your head,
5 you're handcuffed, and you hear the rumors, it's
6 just -- it's there: I've got to protect myself.
7     Q. Okay. Where were you? Were you outside
8 the car?
9     A. I was outside the truck, yes, sir.
10    Q. I mean, how was he going to headbutt you
11 if he's in the car?
12    A. You reach across and put the seatbelt on
13 or reach across to give the other deputy the
14 seatbelt to fasten for you, you're putting yourself
15 in danger.
16    Q. Were you doing that? I thought you said
17 you couldn't get his seatbelt on.
18    A. I didn't attempt to, no, sir.
19    Q. So you didn't have yourself inside the car
20 to get headbutted, correct?
21    A. No, sir. I was not doing it.
22    Q. Okay. So anything that he did, you were
23 not in danger from it?
24         MS. GRIFFITH: Object to the form.
25 You can answer. Not sure I understand.

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 66..69

Page 66

1  MR. CLARKE CONTINUED:
2      Q.  It's my understanding, you said you had
3  trouble getting him into the car.  Correct?
4      A.  Yes, sir.  In the truck, yes, sir.
5      Q.  All right.  Did he try to headbutt when
6  you were standing up with him?
7      A.  I wasn't real clear if he was trying to
8  headbutt me or -- he went towards me.  Now, whether
9  it was towards the door or not -- because after we
10  got him contained, he was butting his head against
11  the back door.
12      Q.  Okay.  I'm trying to --
13      A.  He lunged.
14      Q.  Okay.  I'm trying to --
15      A.  In my opinion, it was at me.  I'm sorry, I
16  overspoke.
17      Q.  When you put him -- when he was standing
18  up before you attempted to put him in the car, did
19  he try to headbutt you?
20      A.  No, sir.
21      Q.  Okay.  When you were getting him in the
22  car, I think you said you had Gholston go around
23  the other side to help pull him in?
24      A.  I had him go to the other side because
25  that's when he lunged, as I was setting him in

Page 67

1  there.
2      Q.  Were you setting him in there --
3      A.  The truck sits. . .
4      Q.  Okay.  When you're -- how do you put him
5  in?  Do you put his head in first?  Is that the way
6  -- isn't that the way you were trained?
7      A.  No, sir.  The truck sits pretty high, so
8  you don't have to watch -- they typically step up.
9  And a lot of them that are handcuffed, the truck
10  sits off the ground, you have to physically help
11  them into it.  It's not like a car.
12      Q.  Are you physically helping him from his
13  backside or from his front side?
14      A.  From his side.  I mean, he has -- he gets
15  in, and I typically have one arm that I'm helping
16  -- because they can't use the hand rest up there.
17      Q.  Right.  I got you.
18      A.  In his situation.  If I don't feel
19  threatened and there's no threats or anything, I'll
20  handcuff them in front a lot of times.  That's my
21  -- you know, it's just a lot more comfortable on
22  them.  But after he resisted, and then us having to
23  drag him to the truck, he was handcuffed in the
24  back.
25          And he was -- as he was getting in, of

Page 68

1  course, he's facing me at that point, because he's
2  resting his backside on the seat.  So he didn't
3  just get in and plop down facing forward.  At that
4  point is when he lunged at me with his head.
5      Q.  Okay.  So if I understand this correctly,
6  he didn't try to headbutt you when you were
7  standing up before you put him in, correct?
8      A.  No, sir.
9      Q.  Okay.  And then to help him get in, he's
10  got to turn kind of sideways, and you help push him
11  up by, I guess --
12      A.  By holding his arm.
13      Q.  -- his left side?
14      A.  Right side.  I'm on the back passenger
15  side.
16      Q.  Okay.  So you help push him up.  And then
17  how was he seated once you -- once you first
18  attempt to push them up?  Because you're pushing
19  him sideways, correct?
20      A.  You're trying to help him in sideways, but
21  they turn towards you.
22      Q.  Okay.
23      A.  Their arm is going to end up at the back
24  of the door, at the outer part of the seat, because
25  they're sitting.  Instead of stepping straight up,

Page 69

1  scooting over, and then sitting down as one motion,
2  their backside comes in, then they swing their --
3  typically swing their feet around.  In that case,
4  he didn't swing his feet around.
5      Q.  Did you have to push his feet in?
6      A.  I attempted to, and it didn't work.
7  That's why -- one of the reasons Tim went to the
8  other side.  I couldn't close the door because of
9  his actions.
10      Q.  Okay.
11      A.  But I had it -- it wasn't slammed on him.
12  It was held until we could contain him from the
13  other side and pull him in.
14      Q.  So did Mr. Gholston -- Officer Gholston
15  then grab him by some part of his upper body and
16  kind of pull him in?
17      A.  Yes, sir.
18      Q.  Get his feet in the car?
19      A.  Yes, sir.
20      Q.  Is there a cage or a partition between the
21  front seat and the back seat of your truck?
22      A.  Yes, sir.
23      Q.  Okay.  So after he's sitting up there,
24  after you help him try to get up and while his feet
25  are not pushed to the front -- or in front of him

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 70..73

Page 70

1 in the seat, that's when you say he tried to
2 headbutt you?
3    A.  In the process of him sitting down, and me
4 helping him get on in, is when he lunged at me with
5 his head.  Now, what his intentions were, I really
6 can't tell you.  In my opinion, he was trying to
7 headbutt me.
8    Q.  And if he does that, you can't punch him,
9 right?
10         MS. GRIFFITH:  Object to the form.
11 You can answer.
12 MR. CLARKE CONTINUED:
13    Q.  I mean, at that point, he couldn't
14 actually hit you, could he?
15    A.  He could cause more injury headbutting me
16 than he could with his fist, in my opinion.  He
17 would never get close enough with his fist to me, I
18 hope.
19    Q.  He was handcuffed, so --
20    A.  Yes, sir.
21    Q.  -- that wasn't going to happen.  He's
22 sitting up in the -- he's sitting up in the car,
23 correct?
24    A.  Yes, sir.  In the truck.
25    Q.  His butt is on the seat.

Page 71

1    A.  Yes, sir.
2    Q.  His legs are still not in the truck,
3 correct?
4    A.  Yes, sir.
5    Q.  You're outside.
6    A.  Yes, sir.
7    Q.  Is it your testimony that he could have
8 come down and hit you with his head and headbutted
9 you when you were in that position?
10    A.  Yes, sir.
11    Q.  All right.  And then you closed the door
12 at some point, or --
13    A.  I attempted to.
14    Q.  And his feet --
15    A.  But to keep him from kicking me or -- I'm
16 sorry, I interrupted you.  Finish your question.
17    Q.  Right.  I mean, as his feet didn't go in,
18 did he kick you?
19    A.  No, sir.
20    Q.  And it appears that to protect yourself,
21 you closed the door and kind of held it to where
22 you would be safe.  Correct?
23    A.  Yes, sir.
24    Q.  All right.  And then Deputy Gholston got
25 in and pulled him to where his feet would be in the

Page 72

1 car and you could close the truck?
2    A.  Yes, sir.
3    Q.  Okay.  All right.  Now, as you -- after
4 that happened, did you talk to Gholston about what
5 was happening?  Did you ask him to come with you to
6 the jail?
7    A.  I think it was automatic.  It's time to go
8 -- at that point, it's time to go, and. . .
9    Q.  There's no dilly-dally when that --
10    A.  No, sir.
11    Q.  Okay.
12    A.  Especially when someone's in that
13 condition.
14    Q.  Okay.  So didn't see any injuries on him
15 at that time, correct?
16    A.  No, sir.
17    Q.  Now, do you go immediately from there to
18 the jail?
19    A.  Yes, sir.
20    Q.  Okay.  Did you have any conversation with
21 Mr. Worley from the time you left there until you
22 got to the jail?
23    A.  With him directly?  Not to my memory, no,
24 sir.  He was -- he was pretty belligerent, loud,
25 and making the threats.  I was more interested in

Page 73

1 getting back up -- getting on the radio and back up
2 to the jail.
3    Q.  Did you call in to radio?
4    A.  Yes, sir.
5    Q.  And we should -- that should be taped,
6 right?
7    A.  Yes, sir.
8    Q.  Did you get on your telephone at any time
9 or your way from the levee back to the jail?
10    A.  No, sir.
11    Q.  What's your cell phone number?
12    A.  310-6450.
13    Q.  Is that 662?
14    A.  Yes, sir.
15    Q.  Who is your carrier?
16    A.  C Spire.
17    Q.  C Spire?
18    A.  Yes, sir.
19    Q.  Was that the same carrier in December of
20 2016?
21    A.  Yes, sir.
22    Q.  So it's your testimony that you never
23 spoke to anybody on your cell phone from the time
24 you picked up Mr. Worley until the time you got to
25 the jail?

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 74..77

Page 74

1    A.  To the best of my knowledge, yes, sir,
2  because I'm not a telephone person.  They're out
3  there right now, because I just -- I hate them.
4    Q.  No problem.  All right.  So he's just
5  acting the same kind of belligerent during the trip
6  back to jail, correct?
7    A.  He was the worst I've seen him.  I felt
8  threatened.  I felt threatened for my family.
9    Q.  Okay.  And even if he threatened your
10  family, that wouldn't give you the authority to
11  punch him, would it?
12    A.  No, sir.
13    Q.  Now, when -- tell me what happened when he
14  got to the jail.
15    A.  Got to the jail, I pulled my truck up
16  through the left-hand side of the bay.
17    Q.  Was anybody in the sally port when you
18  pulled up?
19    A.  I think there may have been a couple of
20  trustees out there.  The bay was extremely wet.  It
21  was either the condensation -- there was a -- I
22  think it said "Slippery When Wet."  But either they
23  had just washed it, or it was condensation because
24  of that time of the year.
25        They were in there or were leaving out at

Page 75

1  the time, because I remember seeing Sweat and Bull
2  still inside.  And then when I pulled up here, Tim
3  Gholston pulled up here, on this side of me, which
4  left a gap a little less than a door can fully
5  open.
6    Q.  In between the two cars?
7    A.  In between the two trucks, yes, sir.
8    Q.  Between your truck and Gholston's truck?
9    A.  Yes, sir.
10    Q.  And other -- do you remember the names of
11  the trustees?
12    A.  No, sir.  I don't know -- no, I'm not on a
13  first name -- I'm not on a first name basis with
14  them.  I speak to them all the time.  And it's
15  different ones all the time there.
16    Q.  Do you know --
17    A.  Once they're in that status, they're not
18  going to be there long.
19    Q.  Do you know who they -- do you know how to
20  identify who the trustees were?
21    A.  No, sir.  No, sir.  I've seen so many over
22  the years.
23    Q.  I understand.  But when you got in, was
24  Officer -- or Deputy Sweat and Deputy -- you call
25  him Bull?

Page 76

1    A.  Bull, yes, sir.
2    Q.  Were they already in the sally port?
3    A.  They were in the sally port or standing
4  there at the door of the sally port.  I remember
5  seeing them on this side of me as I went in.  As
6  far as in, out, or standing at -- which side of the
7  door that opens, I do not recall.
8    Q.  Okay.  And when you come to the sally
9  port, do you have to -- do you have some kind of
10  thing to open it up, or do you dispatch in to have
11  it opened?
12    A.  The control tower opens it.  Of course,
13  they were aware I was coming, so they were watching
14  the cameras for me.
15    Q.  Okay.  So when you pulled up there, the
16  door opened?
17    A.  The door opened on that side, yes, sir.
18    Q.  Do they close it when you get in?
19    A.  Yes, sir.  And when --
20    Q.  So when -- I'm sorry.
21    A.  I'm sorry.
22    Q.  That's my fault.  That's on me.  Go ahead.
23    A.  They -- well, they -- before I take
24  anybody out, I make sure the back door's closed,
25  because there's no fenced-in area.  The front door

Page 77

1  a lot of times would stay open.  That particular
2  night, it was closed.
3    Q.  Okay.
4    A.  But there's a fence out there where nobody
5  can get away from us.
6    Q.  Okay.  Do you have to do something to
7  physically close the door once you get in?
8    A.  No, sir.
9    Q.  That's done by the control people?
10    A.  Yes, sir.
11    Q.  All right.  Now -- so before you attempted
12  to get off -- Mr. Worley out of the car, was the
13  sally port closed?
14    A.  Yes, sir.
15    Q.  Now, take me through what you did after --
16  did you get out of your car before the sally port
17  closed?
18    A.  I do not remember if it was fully closed
19  when I opened my door.
20    Q.  Okay.
21    A.  I'm not sure if it was when I stepped out
22  or not.  I know he was still secure.
23    Q.  Okay.  But you didn't attempt to start
24  getting him out until the door was closed?
25    A.  I never attempted to get him out.  I

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 78..81

Page 78

1 didn't have a chance.
2      Q.  Tell me what -- tell me what you did.
3      A.  I got there, opened my door.  Like I said,
4 Officer Gholston pulled up beside us.  My windows
5 are -- well, all of them are.  That's my truck.
6 You can see how dark that tint is.  Those are even
7 darker.
8           If I'm not mistaken, it's done got on
9 after dark.  I think the lights were on in there.
10 And it was almost dark out.  It's like -- I think
11 it was dark at that point.  I'm not -- I don't
12 remember the time of the day.  But it was in late
13 afternoon.  I know I remember ER, it was bad late.
14 I know it was bad late.
15           Anyhow, I get out.  And I typically secure
16 my weapon on my front floorboard of the truck.
17 Close the door, and I go around to the front of it.
18 When I got to the front, the back door was open.
19      Q.  Okay.  So were they getting him out the
20 passenger side door?
21      A.  Yes, sir.
22      Q.  Okay.  And who did you see was getting him
23 out?
24      A.  When I first got there, I couldn't tell
25 who was at the door.  I just knew it was open.

Page 79

1      Q.  What did you see or hear next?
2      A.  When I got to the door and it was open, it
3 appeared that Bull had hit him or was in the
4 process of hitting him.
5      Q.  All right.  And why do you say that?
6      A.  That's the way it looked to me.  That's my
7 thought, is:  He's hit him.
8      Q.  Did you see blood?
9      A.  I don't remember seeing -- if I did or
10 not.  I don't remember at that point.
11      Q.  Where was Deputy Sweat?
12      A.  At the back of the truck close to the bay
13 door.
14      Q.  All right.  So did you ask Officer Bull to
15 come help you?
16      A.  I asked for backup on the way.  Now, did I
17 ask him to open my door?  I didn't ask for anybody.
18 I mean, if I'm there to back somebody up, I'll
19 typically go on and make contact to hopefully, if
20 there's something escalated, it can be de-escalated.
21      Q.  Based on your knowledge of Officer --
22 Deputy Bull, was he the de-escalator?
23           MS. GRIFFITH:  Object to the form.
24 You can answer.
25           THE WITNESS:  It didn't appear he

Page 80

1 was, no, sir.
2 MR. CLARKE CONTINUED:
3      Q.  When you -- so you get out of your car.
4 By the time you -- were you going over to the
5 passenger side to assist with getting Worley out?
6      A.  Yes, sir.
7      Q.  Where were you when you saw Officer Bull
8 with Mr. Worley with the door open?
9      A.  I was at the door.  There's an opening
10 that you could see through.  The door's open, then
11 you got the open spot, and you see into the back
12 seat.
13      Q.  All right.  And where did -- you know, you
14 said it appeared he was hitting him or --
15      A.  Or had hit him or had -- was in the
16 process of swinging at him.
17      Q.  Just describe -- I mean --
18      A.  It just -- it happened so quick, and I
19 hollered, "Bull" -- I don't remember the phrase.  I
20 either told him, "Don't do that," or "Stop.  Let's
21 get him inside."
22      Q.  All right.
23      A.  And he yanks him out.
24      Q.  Right.  So did you see Mr. Worley do
25 anything?

Page 81

1      A.  I did not, no, sir.
2      Q.  So based on everything that you observed,
3 was it an improper strike by Officer -- Deputy
4 Bull?
5           MS. GRIFFITH:  Object to the form.
6           MS. RILEY:  Objection to form.
7 MR. CLARKE CONTINUED:
8      Q.  You can answer.
9      A.  I've never been in that position.  I don't
10 know -- it's -- and I've had difficulty answering
11 this with you.  I just. . .
12      Q.  You don't -- you don't -- you can't --
13 well, let me rephrase my question.
14      A.  Okay.
15      Q.  You were trained, correct?
16      A.  Yes, sir.
17      Q.  You were trained that you can only use
18 that amount of force that is necessary to protect
19 yourself, correct?
20      A.  Yes, sir.
21      Q.  You were trained that if somebody cusses
22 you out or threatens you, that doesn't allow you to
23 punch him unless you are in imminent, immediate
24 danger of injury to yourself, correct?
25      A.  Yes, sir.

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                Pages 82..85

Page 82

1    Q.  So anything that Mr. Worley says when he's
2  handcuffed, that would not justify anybody striking
3  him under your training, correct?
4    A.  If -- anything that he said.
5    Q.  Right.
6    A.  Now, if he tried to bite him or headbutt,
7  I wasn't there.
8    Q.  Well, you were there.
9    A.  Well, I couldn't see.  I --
10       MS. GRIFFITH:  Object to the form.
11  MR. CLARKE CONTINUED:
12   Q.  You were in the sally port, correct?
13   A.  I was in the sally port, yes, sir.
14   Q.  When you told Officer -- or Deputy Bull to
15  stop, that was, you didn't want him to continue to
16  assault Mr. Worley, correct?
17       MS. RILEY:  Objection to the form.
18       MS. GRIFFITH:  Object to the form.
19       THE WITNESS:  Does that mean I answer?
20  MR. CLARKE CONTINUED:
21   Q.  Yes.
22       MS. GRIFFITH:  You can answer.
23       THE WITNESS:  Okay.  Okay.  I'm used
24  to you saying, "You can answer."
25       MS. GRIFFITH:  I'm sorry.

Page 83

1       THE WITNESS:  Well, you used the word
2  "assault."
3  MR. CLARKE CONTINUED:
4    Q.  Punching somebody in the face.
5    A.  The incident that led up to it that I
6  could not see, was not there to see, whether he
7  tried -- attempted to bite him, headbutt him, I
8  don't know.  I don't know what led up to that.  I
9  saw what appeared to be Bull swinging at him one
10  time.
11   Q.  All right.  Where was Mr. Worley?  Was he
12  still in the car?
13   A.  In the truck, yes, sir.
14   Q.  In the truck.  I'm sorry.
15   A.  Yes, sir.
16   Q.  Was Mr. Worley facing Deputy Bull?  Were
17  his legs turned?
18   A.  That was outside of my view.  I couldn't
19  tell where his legs was at.  The door was still
20  open.  I was on the other side.
21   Q.  You were looking in between the crack?
22   A.  I was looking at which was the upper body,
23  and I -- all I could tell, it looked like they were
24  face to face.  Now, whether the rest of his body
25  was or not. . .

Page 84

1    Q.  Could you see Mr. Worley's face?
2    A.  Yes, sir.  Dimly.
3    Q.  Excuse me?
4    A.  Dimly, because of the windows and the
5  lighting in the bay.
6    Q.  Was there any blood on his face?
7    A.  I do not remember at that point.
8    Q.  All right.  Why did you say to Deputy
9  Bull, "Stop"?
10   A.  Because in my opinion, at that point, we
11  had -- he either needed to back out and let some of
12  us -- we had enough manpower there to get him out.
13   Q.  Did he stop?
14   A.  Yes.
15   Q.  All right.  And then what happened?
16   A.  That's when I told him to "Stop" or "Quit"
17  or "Don't do this."  "Let's get him inside."  He
18  got him out.  Still at a disadvantage to me.
19   Q.  Who got him out?
20   A.  Bull.
21   Q.  So he didn't stop.
22   A.  No, he got him out.  He didn't swing on
23  him anymore.
24   Q.  Okay.
25   A.  He got him out of the truck.  And about

Page 85

1  the time they got to the back of the truck --
2  there's a drain, a big metal drain there.  In that
3  area, they hit the ground.  That's about the time I
4  got the door shut.
5       Once I got it shut, they were already --
6  you know, it's just a couple of feet to the back of
7  the truck.  They were at the back of it, and I saw
8  them fall.  And whether Bull fell on top of him or
9  not, I don't remember.  I remember bodies hitting
10  the ground.
11   Q.  You saw Mr. Worley on the ground?
12   A.  Yes, sir.
13   Q.  You saw Deputy Bull on the ground?
14   A.  I'm -- the best of my memory, both of them
15  hit the ground.
16   Q.  Did you see Mr. Worley at any time try to
17  run away from any of the officers?
18   A.  I did not.
19   Q.  And when Officer Bull got him out of the
20  car, he walked -- he went with Mr. Worley towards
21  the back of the truck, correct?
22   A.  It appeared that way.  Still, I've got a
23  door in between me and them.
24   Q.  Were you around the front of the truck?
25   A.  I was coming around the front.  The door

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 86..89

Page 86
1  was open.  They were -- the door opens this way.
2  They walked to the back.
3      Q.  Okay.  So you couldn't see Officer --
4  Deputy Bull's arms swinging when he was taking him
5  out of the truck?
6          MS. GRIFFITH:  Object to the form.
7          MS. RILEY:  Objection to the form.
8  MR. CLARKE CONTINUED:
9      Q.  I misunderstood.  I thought you came
10  around the back of the truck.
11     A.  No, sir.  I came around the front.
12     Q.  So you came around he front of the truck.
13     A.  There's -- the door's open.  Doesn't open
14  fully because --
15     Q.  Gholston --
16     A.  -- Gholston's truck's there.  So I've got
17  a door in between me with tinted windows.  The
18  lighting's not the best in the bay.  I saw what I
19  thought was Bull swinging one time -- one time --
20  at Worley.  At that point, I told him, "Stop.
21  Let's get him inside."
22     Q.  And then after he pulled him -- after he
23  got him out, you closed the door?
24     A.  Yes, sir.
25     Q.  And then you saw them --

Page 87
1      A.  When it closed is when I saw them hitting
2  the ground.
3      Q.  And that was both of them, Worley and Bull?
4      A.  To the best of my memory, yes, sir.
5      Q.  All right.  Did you attempt to get Bull
6  away from Worley at that point?
7      A.  No, sir.  At that point, I thought they
8  both just slipped on the wet floor.  I remember
9  Sweat and a couple of jailers being back there, one
10  or two, I'm not sure.  One of them was a female,
11  Ms. Evans, is the only one I really remember.  I'm
12  not sure where Gholston went or -- at that point, I
13  walked in.  I remember them -- somebody picking him
14  up.  And I walked in and walked straight through
15  the booking area to the control tower.
16     Q.  All right.  So when you told Bull to stop
17  and you saw them on the ground, you didn't do
18  anything to get Officer Bull away from Mr. Worley?
19         MS. GRIFFITH:  Object to the form.
20  MR. CLARKE CONTINUED:
21     Q.  Correct?
22     A.  At that point, I -- it was my judgment
23  that they had slipped and fell.  There wasn't a
24  ruckus going on.  The only thing I saw was the one
25  swing.  And what was said or done that led up to

Page 88
1  that, I don't know.  I assumed, which is a bad word
2  to use, that one or both of them fell and hit the
3  bay floor.  I knew Worley did, and I think both of
4  them did, and I thought it was because of the
5  slippery surface.
6      Q.  Well, when you yelled "Stop" to Bull, were
7  you wanting Bull to not be involved with Mr. Worley
8  anymore?
9      A.  I didn't want him to hit him.
10     Q.  But you got -- you had de-escalation
11  training, right?
12     A.  Yes, sir.
13     Q.  You had a number of other officers that
14  were there, right?
15     A.  Yes, sir.
16     Q.  You could have said, "Get the hell out of
17  there, Bull.  Let somebody else take him," right?
18     A.  I wasn't sure who was close enough to get
19  in there to get to him.  I remember myself, and I
20  do not remember if Tim was in -- had gotten out of
21  his truck yet or if he was on the other side.  I
22  don't remember where everybody was at.  And I
23  couldn't get to him, and the door was open.
24     Q.  But you didn't say that?  You didn't say,
25  "Bull, get away from him"?

Page 89
1          MS. GRIFFITH:  Object to the form.
2  You can answer.
3          THE WITNESS:  I didn't say that
4  specifically, no, sir.
5  MR. CLARKE CONTINUED:
6      Q.  And you didn't do anything to get him away
7  from Mr. Worley?
8          MS. GRIFFITH:  Object to the form.
9          MS. RILEY:  Object to the form.
10         MS. GRIFFITH:  You can answer.
11         THE WITNESS:  Physically, I couldn't.
12  Verbally, I could have said, "Just step away.  Stay
13  away."
14  MR. CLARKE CONTINUED:
15     Q.  I'm -- you know, this is my deposition of
16  you to --
17     A.  Yes, sir.
18     Q.  -- find out what you're going to testify
19  to at trial.
20     A.  I'm going to testify that there's a door
21  in between me.  Physically, I couldn't do anything.
22     Q.  But then you closed the door when --
23     A.  At that point, they were on the -- they
24  were going to the ground or on the -- so close to
25  the ground, it was unreal.

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 90..93

Page 90

1    Q.  And you were close enough that you're --
2  you're the bed of a pickup truck away from them?
3    A.  Yes, sir.
4    Q.  Where did you go next?  I know you said
5  you went into the sally port and then went to the
6  control room.
7    A.  I went straight to the control room.
8    Q.  How did you go?  Did you go around the
9  back of the truck or the front of the truck?
10   A.  Like I say, I couldn't -- I don't remember
11 if it was jailers, Sweat; Sweat, Tim, who was
12 picking Worley and/or Bull up.  At that point, I'd
13 felt threatened on the way up there.  It just --
14 that's the only time that someone -- I believed
15 what they said they were going to do.
16      So I was -- this was going through my
17 head, and then I didn't agree with what I thought I
18 saw with the one swing.  So at that point, there
19 was enough people there to contain him.  I had to
20 go and separate myself in the control tower.
21   Q.  All right.  You understood that there --
22 you give somebody to somebody else who's not
23 invested in it, correct?
24      MS. GRIFFITH:  Object to the form.
25      MS. RILEY:  Objection to the form.

Page 91

1  MR. CLARKE CONTINUED:
2    Q.  When you had -- when you had training, the
3  -- in de-escalation training, if there's somebody
4  else who's not involved in the situation, one of
5  the things that you can do is allow somebody who's
6  not invested in the situation to handle it, correct?
7      MS. RILEY:  Objection to the form.
8      MS. GRIFFITH:  Object to the form.
9      THE WITNESS:  And I think you're
10 saying the same thing I did.  I -- I -- I stayed
11 away because I was mentally upset, and I couldn't
12 de-escalate at the time.  There was other officers
13 and jailers there.
14 MR. CLARKE CONTINUED:
15   Q.  But there was also one officer there that
16 you left -- you went to de-escalate yourself.
17   A.  Yes, sir.
18   Q.  Okay.  And you left him with somebody who --
19   A.  With the --
20   Q.  With the person who you felt, based on
21 what you observed, struck him, correct?
22   A.  Yes, sir.
23   Q.  And hopefully the other people might could
24 have been involved.  You were doing what you had to
25 do for your safety, right?

Page 92

1    A.  Yes, sir.
2    Q.  Okay.  So do you go around the back of the
3  truck or the front of the truck when you go in --
4    A.  I went through the back.  They were at a
5  angle at the back of the truck.  And the way the
6  trucks came in, the backs were further apart than
7  the fronts.  And I went away, but I went away -- I
8  wasn't there -- I wasn't able to de-escalate at
9  that point.  But he was also -- Sweat was there,
10 who he was working with, who was. . .
11   Q.  I understand.
12   A.  Okay.
13   Q.  You were doing what you had to do for
14 yourself, and there were other officers there who
15 were going to handle Mr. Worley?
16   A.  Yes, sir.
17   Q.  And if they went through the same training
18 that you did, they would want to de-escalate it
19 too, correct?
20   A.  (No audible response.)
21   Q.  I'll just withdraw that question.  That's
22 a bad question.
23      So you go in through the sally port, the
24 doors to the jail, and you go right to the control
25 room.  Is that correct?

Page 93

1    A.  Yes, sir.
2    Q.  Is the control room where they have
3  cameras?
4    A.  Yes, sir.
5    Q.  Did you ask them to make a copy of the
6  tape?
7    A.  I did not.
8    Q.  Why not?
9    A.  I was talking to the lady controlling
10 everything about what they saw wasn't me, that's
11 not how I handle business.
12   Q.  I understand.
13   A.  In my mind, there was a recorder.  And if
14 you want me to expound on that, I will.
15   Q.  Yeah, sure.
16   A.  As that went on, we end up -- I take him
17 to the emergency room myself.  By myself.
18   Q.  Okay.  I just want to talk about the tape
19 part.
20   A.  Okay, the tape.  All right.  I'm getting
21 to that.  We get back, I instantly call Josh Dale,
22 chief investigator --
23   Q.  Who?
24   A.  Josh Dale, chief -- one of our
25 investigators -- we've got two -- and the sheriff,

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                  Pages 94..97

Page 94

1  and I think Eric Williamson, at that point from the
2  house, asking them for -- to get a copy of it.
3  Because I wanted it.
4      Q.  You wanted to protect yourself?
5      A.  Yes, sir.
6      Q.  And if Bull did something wrong, to have
7  him --
8      A.  Yes, sir.
9      Q.  -- account for it, right?
10     A.  Yes, sir.
11     Q.  So after you got back from the hospital,
12  you told that to the sheriff, one of your
13  investigators, and who else?
14     A.  I think I called all three of them.  I
15  think.
16     Q.  Give me the names again.  I'm sorry.
17  Strider?
18     A.  Strider, Josh Dale, and Eric Williamson.
19     Q.  Okay.
20     A.  Best of my memory, I talked to all three
21  of them.
22     Q.  Okay.  Now, the report that you filled out
23  for the arrest that we don't seem to have a copy of
24  right here, did you note in that report that Deputy
25  Bull punched him?

Page 95

1      A.  I wouldn't know unless I got to see it
2  again.  I'm not sure what was put in there.
3      Q.  All right.  Should it be in there if
4  you're writing an incident report of what happened
5  during the arrest?
6      A.  In the arrest report?  I'm thinking on an
7  arrest report, I put what his charges were, simple
8  arrest report with his charges.  There was no major
9  narrative.  And I thought that I had done a
10  separate narrative pertaining to it.
11     Q.  To the incident with Officer Bull?
12     A.  The whole incident.
13     Q.  Okay.
14     A.  Just for me, and to cover the events and
15  the -- but I can't -- as far as I know, I have not
16  been able to put my hands on where it was saved at,
17  if it was on that computer or my thumb drive.  I
18  don't think I used that.
19     Q.  Okay.
20     A.  Because I couldn't find it.
21     Q.  Well, if you find something like that,
22  just make sure you give it to your attorney.  I
23  mean. . .
24     A.  Yes, sir.
25     Q.  When you spoke to the sheriff, did the

Page 96

1  sheriff ask you to write out everything that you
2  saw?
3      A.  To the best of my knowledge, he did.  To
4  the best of my memory, he did, and that's why I
5  done it.
6      Q.  Did you turn that in to him?
7      A.  I'm not sure what happened to it.
8      Q.  Did you give a copy of that report to the
9  investigator?
10     A.  I'm not sure what happened to it.
11     Q.  Was it a handwritten report?  A typed
12  report?
13     A.  No, sir.  I'm a little OCD as far as
14  reports.  I'll handwrite something just to get --
15  you know, get to where I can get to a computer and
16  sit there and get my thoughts and type it up and go
17  replace it.  I'm not sure.
18     Q.  You're probably like me, can't read your
19  own handwriting.
20     A.  That's right.  Nobody can.
21     Q.  All right.  So let's talk about when you
22  got in -- the control room's close to the booking
23  area, correct?
24     A.  Yes, sir.
25     Q.  And did you see that -- did you see how

Page 97

1  Mr. Worley got into -- from the sally port into the
2  jail area, the booking area?
3      A.  No, sir.
4      Q.  Did you see Mr. Worley or any of the --
5  who was in the jail area when you -- who was inside
6  that you could see when you got into the jail from
7  the sally port?
8      A.  To the best of my memory and knowledge, I
9  remember -- well, I'm not sure where they were
10  standing.  I remember Bull, Sweat, Gholston, and
11  one or two jailers.
12     Q.  Hankins?  Do you know a Hankins?
13     A.  (Shakes head negatively.)
14     Q.  Does that ring a bell?  Do you know who
15  Linda Evans is?
16     A.  Linda Evans was in the control tower with
17  me.
18     Q.  She was in the control tower?
19     A.  With me.
20     Q.  Was anybody at the booking desk?
21     A.  I'm not sure who was at the booking desk.
22     Q.  Well, do you know if there was even
23  somebody at the booking desk?
24     A.  Best of my knowledge, there was.
25     Q.  All right.  White?  Black?

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                        Pages 98..101

Page 98

1    A.  I mean, was I wrong?  Was a different
2  jailer in there?  You've got me thinking.  But I'm
3  -- I've said all along, I was apologizing.  That it
4  wasn't me.  That's not the way I act.  To Ms. Evans.
5    Q.  Well, Ms. Evans, is she an employee?
6    A.  She's a jailer.  Yes, sir.
7    Q.  Okay.  Who normally is doing booking?
8    A.  (Shrugging.)
9    Q.  It could be anybody?
10   A.  Yes, sir.  They swap out more than the
11  inmates do.
12   Q.  Okay.  Did you ask to review the tape in
13  your --
14   A.  I did not, no, sir.
15   Q.  Did you tell them, the people there, to
16  save that tape?
17   A.  No, sir.
18   Q.  Did you ever see a tape after the events?
19   A.  No, sir.  I was told it didn't work.
20   Q.  And who told you that?
21   A.  I think it was Josh Dale.  The best of my
22  memory, Josh Dale's the one that said the
23  recorder's tore up.
24   Q.  Who is Josh Dale?
25   A.  Investigator.

Page 99

1    Q.  All right.  Did you see anything -- did
2  you see anybody once Mr. Worley got inside?  That's
3  a bad question.  I'm sorry.  I might as well go
4  back to Greenville.
5        Once you got in, you went to the control
6  center.  And we have a kind of map that was drawn
7  out by another witness, Exhibit No. 1 to Bibbs.
8  She says the sally port door is over here to the
9  right side of the drawing.  That there's a booking
10  desk, and that the control center is -- does that
11  look where the control center is?
12   A.  Yes, sir.
13   Q.  Can you see from the control center out
14  into the booking area?
15   A.  This counter --
16   Q.  Yeah.
17   A.  It comes to about -- or did come to about
18  right here.  I think they've changed it now.
19   Q.  Okay.
20   A.  It came to about right here.
21       MR. GRIFFITH:  Don't write on that.
22  MR. CLARKE CONTINUED:
23   Q.  Up to your. . .
24       MR. GRIFFITH:  Over my head.
25       MS. GRIFFITH:  How tall are you?

Page 100

1        THE WITNESS:  I'm five nine.  So I
2  comfortably laid my arms on it.  So it's not a low
3  -- it's up (indicating chest height).
4  MR. CLARKE CONTINUED:
5    Q.  And while you were in the control center,
6  I think you saw Gholston, you saw Sweat, you saw
7  Bull, and some inmates?  Who did you see once you
8  were in the control center?
9    A.  I don't know if the inmates were out there
10  or out here -- in here.  There was a couple inmates
11  there when I walked out.  I remember them standing
12  right in there.
13       MS. GRIFFITH:  And just so the record
14  reflects, are you pointing to the booking area?
15       THE WITNESS:  Oh, to the -- to the --
16  MR. CLARKE CONTINUED:
17   Q.  The area where you come in from the sally
18  port?
19   A.  From the sally port -- between the sally
20  port and the counter.
21   Q.  Okay.
22   A.  Which, a lot of times if they're out or
23  something's going on, those trustees know, if they
24  don't want to get involved, they want to get to a
25  neutral area usually.

Page 101

1    Q.  Go to the corner.  All right.  And did you
2  ever see Nurse Bibbs come out of the medical
3  center?  The medical room.
4    A.  I do not remember -- well, I saw her, but
5  I don't remember at what point I saw her.  I don't
6  know at what point she come out -- or if she did,
7  to be honest with you.  I remember seeing her when
8  I went to get him to take him to the ER.  That's
9  the only time I remember, in my mind, seeing her.
10  I don't know what her actions were --
11   Q.  Okay.  Did you see --
12   A.  -- anywhere.
13   Q.  Okay.  From the time that Mr. Worley got
14  into the jail, into the -- I'm going to call this
15  the "booking area," from the sally port to the
16  booking desk.  Okay?
17   A.  Countertop.  Yes, sir.
18   Q.  Okay.  Did you see Mr. Worley move or be
19  taken from the sally port through the booking area?
20   A.  They came in behind me, whoever brought
21  him in.  I know they were here.  I remember --
22   Q.  When you say "here," that's the booking
23  desk?
24   A.  In front of the booking desk.
25   Q.  Okay.

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 102..105

Page 102

1    A.  I remember seeing Sweat in this -- I
2  thought in this area right here.  Now, the only
3  time I actually saw Worley in that area -- not even
4  in that area -- was, past this counter somewhere,
5  to the best of my memory, Sweat was pulling him to
6  the nurse's station.
7    Q.  And was he on the ground?
8    A.  He was on the ground, yes, sir.  If I'm
9  not mistaken, he was pulling him by his shirt.
10    Q.  Do you know how he got to the ground?
11    A.  No, sir.
12    Q.  You didn't see Officer Bull strike him
13  again?
14    A.  No, sir.
15        MS. GRIFFITH:  Object to the form.
16  MR. CLARKE CONTINUED:
17    Q.  Did you see any other officer strike him?
18    A.  No, sir.
19    Q.  All right.  So after that happens, when is
20  the next time you see Mr. Worley after you go to
21  the control center?
22    A.  Not sure of the time period there.  He was
23  going here --
24    Q.  "Here" being medical?
25    A.  -- from somewhere in the booking area

Page 103

1  behind this counter.  From my view, obstructed view
2  of the counter, going from that booking area to the
3  nurse's station.  And at some point they said he's
4  got to go to the ER.
5    Q.  But you saw him being dragged across the
6  floor to the nurse's station?
7    A.  To the best of my memory, yes, sir.
8    Q.  Okay.  And when they said he had to go to
9  the hospital, was he your -- was that your
10  responsibility?
11    A.  And here we go into the de-escalation.  I
12  felt like it was at that point.  Because I've never
13  had a physical altercation with him, as long as
14  somebody was there to help me get him loaded up.
15    Q.  Okay.  Well, he was your prisoner, correct?
16    A.  Well, there's a fine line on what point he
17  becomes the jail's.  You know, in my opinion, once
18  we get in that -- that door goes down behind me,
19  where's the fine line of he's from mine to the
20  jail's custody, other than when they take the cuffs
21  off of him and I say goodbye?  At what point
22  legally is theirs, mine?  It's a common ground.
23  I'm not sure.  I took him in, yes.  I arrested him
24  and I put the charges on him.
25    Q.  He's still -- and what charges did you put

Page 104

1  on him?
2    A.  (No audible response.)
3    Q.  Here's a booking sheet, if that helps you.
4    A.  It's going to be disorderly conduct,
5  public drunk, and -- resisting arrest, disorderly
6  conduct, public drunk.
7    Q.  What were the -- resisting arrest, what
8  were the factual bases for resisting arrest that
9  formed the basis of you bringing that charge
10  against him?
11    A.  When I told him he was under arrest, he
12  was going to jail for disorderly conduct -- or
13  public drunk, and he stumbled around the other side
14  of the car, and I tried to get one cuff on him and
15  couldn't get the other one on, and Gholston tried
16  to help me get him --
17    Q.  You didn't put any charge on him for
18  anything that he may or may not have done to Deputy
19  Bull, did you?
20    A.  No, sir.
21    Q.  Did you ever talk to Deputy Bull after
22  these events about what happened?
23    A.  The two of us just haven't, in our
24  careers, had a lot of conversation.  I'm -- have we
25  spoke about it?

Page 105

1    Q.  Yeah.
2    A.  He'll ask me -- a couple of times, he's
3  asked me in passing what have I heard, wants to
4  know when he can come back.  You know, I said,
5  "That's not up to me.  That's up to the attorneys
6  and the sheriff," you know.
7    Q.  Well, did he ever apologize to you about
8  what he did?
9    A.  Not that I remember.
10    Q.  All right.  So at some point, you're --
11  who tells you that he's got to go to the -- well,
12  when did you see any injuries on Mr. Worley, if
13  any?
14    A.  Don't know that I actually saw anything
15  until they said he had to go and I went around the
16  corner to get him.
17    Q.  Okay.  Did you ask anybody how he ended up
18  on the ground by the booking desk?
19    A.  I did not, because I don't know how he got
20  in there, on his own free will or if he was drug in
21  there, if he went in and slipped and fell, or if
22  they pushed him or what.  I don't know.  They were
23  behind me, and I went straight to the control room.
24    Q.  Okay.  That's just what you saw.  So when
25  you went there, did you talk to the nurse, when you

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 106..109

Page 106

1   went -- after you were informed that he needed to
2   go to the hospital?
3       A.  I do not remember which one told me he had
4   to go.  I think it was Ms. Evans or one of the
5   other jailers come in and said he's got to go to
6   the ER.
7       Q.  It wasn't the nurse?
8       A.  I don't remember having a conversation
9   with her at all.
10      Q.  Did you get him out of the nurse's station?
11      A.  I think that's where I went to get him.
12  And I asked him was he -- I was there to help him.
13  Did he -- because of his injury of his fall in the
14  bay.  Was he going to be okay, or was he going to
15  act up if I took him.
16      Q.  Well, you don't know if got injured when
17  he slipped in the bay or whether he --
18      A.  I assumed that.
19      Q.  -- was injured when -- well, you also saw
20  him get punched, right?
21      A.  Yes, sir.  But the injury -- where the
22  injury was at.
23      Q.  Where was the injury?
24      A.  Under the chin.
25      Q.  All right.

Page 107

1       A.  And I said I saw what appeared to be Bull
2   swing at him.  Now, whether or not he made contact,
3   I'm not 100 percent sure because of the conditions.
4       Q.  Okay.  Well, I thought I asked you did you
5   see blood when --
6       A.  You asked me if I saw blood, and I said I
7   don't remember seeing any blood.
8       Q.  So you didn't see any when they were on
9   the ground, right?
10      A.  No, sir.  Because when I went by, I went
11  by and straight in.
12      Q.  Did you see any in the booking area where
13  you saw him on the ground?
14      A.  I didn't see him on the ground in the
15  booking area.  I saw blood when I went to get him
16  and take him out.
17      Q.  Where did you see the blood?
18      A.  The blood was leading to the nurse's
19  station from the booking area and out into the bay.
20      Q.  All right.  You take him -- how did you
21  get him -- did you take him in your car to the
22  hospital?
23      A.  Took him in the truck.  Same truck, same
24  place in the truck, back passenger side.  To the ER.
25      Q.  All right.  Did anybody go with you or

Page 108

1   ride with you?
2       A.  No, sir.
3       Q.  Did anybody meet you there?
4       A.  Yes, sir.
5       Q.  Who met you there?
6       A.  Sweat and Bull.  I told Sweat, "Take him
7   away."
8       Q.  Take who --
9       A.  "All you're" --
10      Q.  Take Bull away.
11      A.  Take Bull away.  "I do not need an
12  escalation in here."
13      Q.  Did you have any problems getting him in
14  the truck or getting him out of the truck to the
15  doctor?
16      A.  No, sir.
17      Q.  All right.
18      A.  Other than mouthing.
19      Q.  Was he saying they got -- he was beat up?
20      A.  He was saying a good bit.  He was using
21  pretty good language.
22      Q.  Was he saying he was -- he got his ass
23  kicked?
24      A.  Oh, he said, "I got -- I took a country
25  ass whooping," is what he said.  He said that

Page 109

1   multiple times.
2       Q.  All right.  And did you stay at the
3   hospital until he was done with his treatment?
4       A.  I did.
5       Q.  Did Sweat and Bull?
6       A.  No, sir.  Just Sweat.
7       Q.  Well, Bull was riding with Sweat.
8       A.  When they got there.
9       Q.  All right.  Did Bull take the car -- take
10  the car, then?
11      A.  Best of my knowledge, he shouldn't have.
12  Because Sweat didn't leave with me.  Sweat's truck
13  was there.  So I don't know what arrangements Sweat
14  made to get him away from the ER.
15      Q.  Okay.
16      A.  That'll be him to answer.
17      Q.  After you brought him -- after you brought
18  him -- after he had his treatment, did you bring
19  him back to the jail?
20      A.  Yes, sir.
21      Q.  Did you book him there?
22      A.  He had already been booked.  All I had to
23  do was drop him off.
24      Q.  It's your testimony that he was booked --
25  he was booked before he went to the hospital?

844.533.DEPO

Page 110

1    A.  I'm not sure -- that is not my testimony.
2  At what point they actually booked him in, no, sir.
3    Q.  Well, what do you --
4    A.  Because I didn't do the booking.  I didn't
5  watch them.
6    Q.  Well, what do you do when you book
7  somebody?
8    A.  They sit there and they ask questions and
9  -- I'm not sure.  I'm not trained in it.
10    Q.  It's your testimony that you stay there
11  until they swap out the handcuffs, right?
12    A.  Right.  But does that mean they've been
13  booked all the way?  No.  I don't know what the
14  process is.
15    Q.  You don't know whether they fingerprint
16  people when they book them or take their pictures?
17    A.  Sometimes they take pictures.  Sometimes
18  they don't.
19    Q.  Okay.
20    A.  It's according to what the situation.  In
21  a situation like that, they typically don't.  They
22  wait until everything is calmed down and sober up,
23  and they'll take a picture before they leave if our
24  camera's working.
25    Q.  Well, there wasn't any time -- you didn't

Page 111

1  see Mr. Worley being sat down or any pictures being
2  taken prior to you taking him to the hospital, did
3  you?
4    A.  I did not.  I can reasonably say that it
5  wasn't done until everything calmed down, based
6  upon experience.
7    Q.  And when you bought him back in, did you
8  swap out your handcuffs?
9    A.  I do not remember if they were still mine
10  or they had already swapped out at that point.  Do
11  not remember at what point they were actually
12  swapped out.
13    Q.  What did you do -- just tell me what
14  happened when you brought him back and when you
15  went back on duty or went off duty.
16    A.  I don't -- I remember bringing him back,
17  dropping him off.  I remember I was well overdue to
18  be home, and I went straight home and made some
19  phone calls.
20    Q.  Did you call people about this incident?
21    A.  That's what I told you.  I called -- to
22  the best of my memory, I called those three people
23  about it.
24    Q.  Did you ever --
25    A.  Because I wanted to be sure that it

Page 112

1  wasn't. . .
2    Q.  You didn't want to get in trouble for what
3  happened?
4    A.  Right.  Because that's not me.
5    Q.  Okay.  After these events, did you ever
6  have any discussions about this incident with
7  Mr. Gholston or Mr. Sweat?
8    A.  We've had discussions, yes, sir.  I mean,
9  we've had -- we've met with them, Ms. --
10    Q.  I don't want to -- anything you talked to
11  your lawyer about, I don't want to know about.  I'm
12  talking about -- you talked a lot before about you
13  know certain things from talking to officers about
14  people, right?
15    A.  (No audible response.)
16    Q.  Did you talk -- do you have -- you know,
17  talk over lunch about what happened and what people
18  saw or what happened?
19    A.  Specific conversations, I don't recall.
20  It's reasonable to assume, yes, it did.  And that's
21  part of our process of helping us cope with stress.
22    Q.  Did Sweat tell you anything about any
23  issues he had with Bull?
24    A.  He didn't say anything about -- I have
25  never heard him say anything -- any instances about

Page 113

1  Bull.
2          MR. CLARKE:  That's all I have.
3          MS. GRIFFITH:  I need to take a
4  break.
5          (OFF THE RECORD.)
6  MR. CLARKE CONTINUED:
7    Q.  What was Deputy Bull wearing?  What was he
8  dressed like?
9    A.  No clue.
10    Q.  No clue?  Were there any Greenville
11  officers inside the booking area?
12    A.  There wasn't any Greenville or Grenada.
13  No, sir, there wasn't any Grenada.
14    Q.  And, look, I apologize.
15    A.  No, there wasn't any Grenada officers.
16    Q.  Okay.  No city officers?
17    A.  No, sir.
18    Q.  Did you see anybody in there -- do you
19  know whether or not -- well, what is the normal
20  uniform?  What were you wearing that day?
21    A.  Most likely black.  I can't say.  I've got
22  three different uniforms.
23    Q.  Well, tell me the three different uniforms
24  you have.
25    A.  Three different uniforms.  I've got a

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 114..117

Page 114

1  issue shirt, short sleeve, which is gray and black.
2      Q.  All right.  And when you wear that --
3      A.  And I wear the badge with it and a name
4  tag, and I wear motorcycle wings here because I'm
5  on the motor unit for both.  I've got black cargo
6  pants.  I've got dark blue issued pants with a
7  stripe down them.
8      Q.  Are these all county?
9      A.  All county.  Actually, that's the only
10 variations then.  There's a third one where I
11 ordered everybody new shirts on the part-time and
12 reserve, and we didn't get them until June of last
13 year.  So there was only two, the shirt, which is
14 gray short sleeve, and the two separate pants.
15     Q.  What other kind of shirts can you wear
16 when you're a county officer?
17     A.  At that date?  The reserves aren't issued
18 anything, so it's whatever they buy.
19     Q.  So when you're a reserve, you don't have
20 an official Grenada police uniform?
21     A.  Typically, no.  There's exceptions to that.
22     Q.  Do you know -- so you can't tell me
23 whether -- I mean, if you can think of, when Bull
24 fell down with Mr. Worley, was he wearing dark
25 clothes?  light clothes?  He wouldn't have a

Page 115

1  sheriff's deputy shirt, correct?
2      A.  Not a gray one, no, sir.
3      Q.  Okay.  So it couldn't be that.  If you can
4  picture that, tell me, was he wearing a dark shirt?
5  a light shirt?
6      A.  I'd be guessing.
7      Q.  Do you know what kind of shoes he was
8  wearing?
9      A.  No, sir.
10         MR. CLARKE:  Okay.  That's all.
11         MS. GRIFFITH:  I have a few
12 questions.
13             EXAMINATION
14 BY MS. GRIFFITH:
15     Q.  Do you know what kind of shoes Mr. Worley
16 was wearing that day?
17     A.  From the incident in the truck, best of my
18 knowledge, it was a pair of boots similar to what
19 I'm wearing now.
20     Q.  So would those boots have had, do you
21 think, a slick sole?
22     A.  These do.  These are just normal work
23 boots made out of leather with the slick sole on
24 the bottom.  Well, this ain't even slick.
25         MR. CLARKE:  That's not slick.

Page 116

1          THE WITNESS:  No, these are not
2  slick.  I'm not sure what kind of sole he had.
3  MS. GRIFFITH CONTINUED:
4      Q.  I'm going to hand you Exhibit 3 to
5  Worley's deposition -- this is the UMC medical
6  records -- and direct you to the top of page 2.
7  And it says "Review of Symptoms.  Reason unable to
8  perform ROS: Patient is intoxicated and very
9  noncooperative."  Why would there be a hospital
10 note such as that?
11         MR. CLARKE:  Object to the form.
12 MS. GRIFFITH CONTINUED:
13     Q.  You can answer.
14     A.  Because of his highs and lows and him
15 using the language he was using.  He refused --
16 when they stitched him, he refused -- he made it
17 clear, no one was going to -- going to use a needle
18 to deaden any pain.  He was going to take it like a
19 man.  And he took it like a man.
20     Q.  So do you think he was so drunk that he
21 just didn't feel the pain?
22     A.  I've been in the medical field most of my
23 Army career, and either the intoxication or some
24 other substance, yes.  Because a normal human
25 being, in my opinion, can't take it like he took

Page 117

1  it.  I was hurting just watching.
2      Q.  About how many stitches do you think he
3  had to have?
4      A.  The number eight keeps ringing up in my
5  head.  I'm not sure the exact number.
6      Q.  So you said he was using all sorts of
7  language.  And I hate to ask you to do that, but
8  could you tell me what sort of language he was --
9  what sort of things he was saying?
10     A.  He used the N word several times, "That
11 N," he said, "whooped my ass."  He even said he
12 knocked his teeth out, but I don't remember any
13 teeth being knocked out.
14     Q.  So you didn't see any --
15     A.  Was there anything in the -- the only
16 injury I knew that was treated was this (indicating
17 chin), and they x-rayed it several times, the best
18 of my memory.  Or -- and they were real slow about
19 what they were doing because of the way he was
20 treating the hospital staff.
21     Q.  Do you think the hospital staff felt
22 threatened?
23     A.  I did.  Even though we were there, they
24 were very cautious.
25     Q.  Did you see any evidence that he had a

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                    Pages 118..121

Page 118

1  tooth knocked out?
2     A.  No, ma'am.
3     Q.  If someone testified that you could not
4  smell alcohol on his breath, would that be a true
5  statement?
6     A.  No, ma'am.  You're saying that somebody
7  else testified they didn't smell alcohol?
8     Q.  Yes.  And they had been in close proximity
9  to him.
10    A.  Unless they had some bad sinus problems,
11  no, ma'am.
12    Q.  If Mr. Worley testified that he only had
13  two glasses of wine prior to you picking him up,
14  would you believe that?
15    A.  Did he say what size glasses?  You know,
16  I --
17    Q.  He did not.
18    A.  I mean, seriously, he was -- he was bad.
19  And two after how much of what other alcohol?  He
20  was highly intoxicated.
21    Q.  Did you go to the justice court and fill
22  out an affidavit against him for threatening you
23  and your family?
24    A.  Yes, ma'am.
25    Q.  Did you ever see Nurse Bibbs dragging him

Page 119

1  to her medical office?
2     A.  No, ma'am.
3     Q.  But you saw Randy Sweat dragging him in
4  that direction?
5     A.  Best of my memory, it was Randy Sweat.
6     Q.  Where you were in -- I believe you said it
7  was the control tower.  Is that correct?
8     A.  Yes, ma'am.
9     Q.  Could you see Worley in the booking area
10  from where you were in the control tower?
11    A.  No, ma'am.  The height of the bench,
12  countertop, whatever -- I remember seeing Sweat.
13  But apparently he was on the floor.  For what
14  reason, I don't know.  I don't know if they brought
15  him in, he wouldn't come in, they drug him in.  I'm
16  not sure of why he was on the floor.  I never saw
17  him here.  I saw him when he passed here.
18    Q.  Meaning when Mr. Sweat was dragging him to
19  medical.  Is that correct?
20    A.  Best of my memory, Sweat was the one that
21  drug him to the nurse's station.
22    Q.  So it's my understanding from your
23  testimony earlier that you felt like after you saw
24  him fall down in the sally port, that there were
25  other trained officers there who were fully capable

Page 120

1  of getting him into the booking area.  Is that
2  correct?
3     A.  Yes, ma'am.  The jail staff.  Officer
4  Gholston was in the sally port.  Randy Sweat was in
5  the sally port.
6     Q.  Was Donny Willis working this day, to your
7  knowledge, for the SO?
8     A.  Not to my knowledge.
9     Q.  Did you see him in the sally port or in
10  the booking area?
11    A.  Do not recall seeing him the whole day,
12  nor the sally port or the booking area.
13    Q.  So when Bull was trying to get Worley out
14  of your truck, do you know if Worley was trying to
15  kick Bull?
16    A.  I do not, because of the obstructive view
17  of the door.
18    Q.  Do you know if Worley was trying to bite
19  Bull?
20    A.  I do not because of where I -- from the
21  time Worley got there, until the time I got my gun
22  secured on the front floorboard, until the time I
23  come around, the door was open, and I had an
24  obstructed view.
25    Q.  So when you were out at the levee and

Page 121

1  placing him under arrest, is it your testimony that
2  he tried to run from you?
3     A.  Yes, ma'am.
4     Q.  And when you told him to stop, did he
5  stop?
6     A.  No, ma'am.  I was a little bit quicker
7  than him.
8     Q.  Well -- and if Worley came in and
9  testified that he was absolutely, equivocally, not
10  drunk on this 12/23/16 date, what would you say to
11  that?
12    A.  He perjured himself if he done it under
13  oath.  And I would say I'm pretty sure he wouldn't
14  even let them draw blood that day, and that may be
15  why.  Did they draw blood?
16    Q.  I can't answer your questions.
17    A.  Okay.  All right.
18    Q.  But it's your testimony -- are you saying
19  that you did not see them draw blood in the
20  hospital?
21    A.  I didn't.
22    Q.  Do you think he refused?
23    A.  I remember him refusing the shots.  Best
24  of my knowledge, he refused anything other than the
25  stitching.

844.533.DEPO

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 122..125

Page 122

1    Q.   Do you know if Worley was ever accused of
2  beating Barbara Kitchens?
3    A.   Not firsthand knowledge.  I think I've
4  read a report that that was the accusa- -- yes.  It
5  was in court.  And once in court, she testified, I
6  think, she had a four-wheeler wreck or something.
7        And one of the deputies -- or bailiffs,
8  actually, said that as they went out the back
9  door -- they made a comment that "They got by with
10 that one."  And I think his name was Rob Wilkerson.
11       COURT REPORTER:  I'm sorry?
12       THE WITNESS:  His name was Rob
13 Wilkerson, if that's the correct bailiff that was
14 working that day.  One of them told me that when
15 they walked out the back door, they thought it was
16 funny because they had gotten by with that one.
17 MS. GRIFFITH CONTINUED:
18   Q.   Meaning they believed that Worley had beat
19 her up?
20       MR. CLARKE:  Object to the form.  You
21 can answer.
22       THE WITNESS:  That in fact that's
23 what happened.  But in my experience, 99 percent of
24 them come back, and they're on the side of the
25 person who done it.

Page 123

1  MS. GRIFFITH CONTINUED:
2    Q.   Why would Barbara Kitchens believe that
3  you're related to her?
4    A.   That still is just -- I have no clue.
5    Q.   So are you saying today that you are
6  absolutely not related to Barbara Kitchens?
7    A.   I need to check my family tree.
8  Absolutely not.  I have no blood relatives in
9  Grenada County.
10   Q.   So do you know of any of the instances
11 that Worley -- or I'm sorry.  Scratch that.  Do you
12 know -- have you ever talked to Sonja Willis about
13 Worley?
14   A.   Yes.
15   Q.   And what has she told you?  Or what have
16 y'all discussed?
17   A.   I've been in the room when -- I think
18 there was an incident -- I don't remember if it was
19 on the radio or in a room -- when she responded to
20 a call down there and she had to ask for backup.  I
21 was not on the scene.  I cannot remember if I was
22 working with the PD or the SO that day.  But I
23 think he threatened to kill her.  If. . .
24   Q.   Have you ever spoken with her personally
25 about that?

Page 124

1    A.   I do not remember.
2    Q.   Have you ever arrested Barbara Kitchens?
3    A.   Since that incident, I have.
4    Q.   What did you arrest her for?
5    A.   Possession of controlled substance,
6  resisting.
7    Q.   What did she have in her possession?
8    A.   Crystal -- what I believe to be crystal
9  meth.  And I think she pled guilty this time on
10 that.  I'm -- that's what I've been told.  I
11 haven't followed up with it.
12   Q.   Is that the only time you have arrested
13 her?
14   A.   To the best of my memory, yes.
15       MS. GRIFFITH:  I don't have any
16 further questions.  Ms. Riley might.
17       MS. RILEY:  Just a couple.
18       EXAMINATION
19 BY MS. RILEY:
20   Q.   Earlier when you were being asked
21 questions by plaintiff's counsel, you mentioned
22 that once you and Randy Sweat and Bryant Griffin
23 got to the -- once y'all were at the hospital, at
24 one point you told Sweat to take Bull, or
25 Mr. Griffin, away.  Is that correct?

Page 125

1    A.   Yes, ma'am.
2    Q.   And I believe you mentioned earlier that
3  the reason you asked him to be taken away is
4  because you didn't need an escalation.  Is that
5  right?
6    A.   Yes, ma'am.
7    Q.   But you weren't saying that Deputy Griffin
8  was escalating the situation, were you?
9    A.   It was a potential.  I didn't say he was
10 escalating.  I was saying there was a potential
11 because of the language that had been used.  He's
12 pretty up -- pretty up with the N word.  And it had
13 been used several times on the way to the ER.
14       And I didn't need another incident to
15 escalate.  So to keep it from escalating, I told
16 Sweat he had to take him away.  Mr. Worley never
17 saw him, because I stopped them at the door.  And --
18   Q.   So Deputy Griffin, he never -- he wasn't
19 saying that he wanted to fight Mr. Worley, was he?
20   A.   No.  No, ma'am.  Not to my knowledge.
21   Q.   Y'all weren't having to hold him off of
22 him or anything?
23   A.   No, ma'am.  No, ma'am.  This was -- at the
24 door, I stopped them and said, "He can't come in
25 here.  I don't need this."

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 126..129

Page 126

1    MR. CLARKE:  Are you talking about
2  the hospital door?
3    THE WITNESS:  At the emergency room
4  door, yes, sir.
5  MS. RILEY CONTINUED:
6    Q.  And just to be clear, in the sally port,
7  when Deputy Griffin was taking the plaintiff out of
8  your truck, you weren't sitting in your truck,
9  right?
10   A.  No, ma'am.  I was standing at the open
11 door between me and him.  I had come around -- I
12 secured my weapon in the front passenger
13 floorboard, closed my door, and came around.  And
14 as I come around, the door was open.  So I couldn't
15 see what was happening on the other side.
16   Q.  And what were you actually doing on the
17 other side of the door?
18   A.  When I first approached it and thought I
19 saw him swing, I told him to stop, let's get him
20 inside.
21   Q.  But what were you doing?  Were you just
22 standing on the other side of the door?
23   A.  As I approached it, that's when it all
24 went down.  We're talking about -- from the front
25 of the truck to the door to him getting him out,

Page 127

1  we're talking about three to four seconds, five
2  seconds.  Everything happened pretty quick.  This
3  didn't go on for a minute or two.  It was pretty
4  quick on everything.
5    Q.  And you mentioned that you had concerns
6  about your own safety, so you called for dispatch
7  -- I mean, for backup.  Is that correct?
8    A.  I called dispatch and I asked that I have
9  backup inside the jail because of the threats that
10 had been made.
11   Q.  Did you share those threats with Officer
12 Sweat?
13   A.  I never talked to Officer Sweat until -- I
14 think the first time I even spoke to Sweat was at
15 the ER door.  The way everything went down, I went
16 straight -- you know, I spoke -- I said what I said
17 to Bull.  To the best of my knowledge, I walked in
18 and went straight in the control tower.
19     At some point -- I stayed there to take
20 him.  And the next time I saw him, he come in the
21 back door of the ER.  I never remember speaking to
22 him.  Now, what they heard on the radio in the
23 background, I'm not sure what all they could hear.
24   Q.  When you called -- when you called
25 dispatch, was it through your radio, and so it came

Page 128

1  across the radio?
2    A.  Yes, ma'am.
3    Q.  Does Officer Sweat have a radio in his
4  vehicle?
5    A.  We carry personal handhelds.  We don't
6  have mobile -- we don't have fixed radios.  We've
7  got -- they're on our belt, and we can take them
8  on, off, whatever.
9    Q.  Does Deputy Griffin -- does he have one of
10 those radios as well?
11   A.  Whether or not he had one -- I would
12 assume he did.  Not a -- they're there.  And it's
13 for your safety to take one with you.  The problem
14 is, you've got two radios, well, they echo.  So
15 usually, if you have somebody in the vehicle, one
16 of you has to keep it turned down until you get
17 out.  Or off.
18   Q.  But those radios are loud enough,
19 generally, if you're sitting next to each other in
20 a vehicle, you're in a patrol vehicle --
21   A.  Yes, ma'am.
22   Q.  You would -- both people would hear it?
23   A.  Yes, ma'am.  It's according to -- well, I
24 can't speak for that, because I don't have a radio
25 on, period.  There's not a radio on in that truck.

Page 129

1  I listen to that radio, and radio only, when I'm in
2  the vehicle.  And I don't like other people in
3  there for that reason, talking, so I can hear the
4  radio.  I can't answer what their situation was.
5    MS. RILEY:  I'm looking over my notes
6  to make sure I haven't forgotten anything.
7    All right.  That's all I have.
8    FURTHER EXAMINATION
9  BY MR. CLARKE:
10   Q.  Do you know what happened to the charges
11 that you brought against Mr. Worley?
12   A.  I do not.  I don't remember whether he
13 pled guilty.  I did not look to. . .
14   Q.  Did you have to testify in court ever?
15   A.  Could I clarify that?  That's the joke
16 that I -- about being kin to her.  That's the most
17 packed courtroom we've every had in my history of
18 either one.  He hired an attorney, and before it
19 even started, in front of everybody, he asked me
20 upfront had I -- was I kin to her.  And that just
21 threw me for a loop.  And --
22   Q.  I don't want that.  I don't want that.
23   A.  Okay.
24   Q.  What I'm saying is, did you ever testify
25 in court?

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

Page 130

1    A.  I can't honestly answer if he went on and
2  pled guilty or if it was court testimony.  I would
3  have to go back to justice court to find out.
4        MR. CLARKE:  All right.  I think I'm
5  done, except, did you find out if there's any other
6  document?  You said you were emailing the sheriff's
7  office to see if there were any other documents.
8        MS. GRIFFITH:  We talked about that
9  at the break, and he believes he has it on his
10  computer, and he'll get it to us by tomorrow.
11        THE WITNESS:  Are you going to
12  explain the process of arrest report and affidavit?
13        MS. GRIFFITH:  Yeah.  It's my
14  understanding from -- that if there was an arrest
15  -- an actual arrest report, it just would have been
16  a handwritten thing that was given to the sheriff
17  and given to booking.  And those are not apparently
18  saved.  That's just to allow the person to state --
19        MR. CLARKE:  What the charges are?
20        MS. GRIFFITH:  Yeah.  And so he would
21  have then gone to sign an affidavit on the actual
22  charges.  But Danny believes that he does have a
23  second incident report, and he said he will get
24  that and email to me by first thing in the morning.
25        MR. CLARKE:  Okay.  Well, will he be

Page 131

1  able to come back here tomorrow so I can question
2  him about it?
3        THE WITNESS:  Yes, sir.
4  MR. CLARKE CONTINUED:
5    Q.  Okay.  And let me just ask you something
6  about it, because I thought that when I questioned
7  you, you didn't know if you had a report.  Why do
8  you think you have a report on your personal. . .
9    A.  I'm pretty sure -- I went by today to see
10  -- to refresh my memory, and I remember finding
11  that second report that's there.
12    Q.  Is that report --
13    A.  It's not this one.
14    Q.  I understand that.  Is it on the same
15  format as that?
16    A.  Yes, sir.
17    Q.  Okay.  So you would have a cover sheet and
18  then a narrative at the end?
19    A.  Yes, sir.  It would have its own case
20  number.  That case number is 1669?  Yes, sir.
21  There's another one that was done later for the
22  second.  I had two different case numbers.
23    Q.  Okay.  All right.  And if you can get
24  that.  I didn't find one that was produced in
25  discovery.

Page 132

1        MR. CLARKE:  If you can -- we'll just
2  ask him about that report in the morning?
3        MS. GRIFFITH:  Do you want to be here
4  at 8:30 or 9:00?
5        MR. CLARKE:  Whatever.  I'm going to
6  stay here tonight, so whatever is good for you to
7  start.
8        MS. GRIFFITH:  What would work for
9  you?
10        THE WITNESS:  I get up at 4:30 or
11  5:00.
12        MR. CLARKE:  You're going to be up
13  for a while.
14        THE WITNESS:  Drink coffee and eat
15  breakfast.
16        MS. GRIFFITH:  Bethany, do you think
17  a court reporter could be here by 9:00?
18        COURT REPORTER:  Yes.  Yes.
19        MS. GRIFFITH:  I think the -- I don't
20  think this office building actually opens until
21  9:00.  So perhaps we might just want to come at
22  9:00, if that would be okay with you.
23        THE WITNESS:  Be fine with me.
24        MR. CLARKE:  And you will email it to
25  her, and you can email it to me.

Page 133

1        MS. GRIFFITH:  Uh-huh (affirmative
2  response).
3        MR. CLARKE:  And if I don't need to
4  ask questions about it, I'll let you know.
5        MS. GRIFFITH:  Okay.
6        MR. CLARKE:  I mean, you know, I
7  don't want you to -- I don't ask questions unless I
8  have questions.
9        MS. GRIFFITH:  Okay.  Well, do we
10  want to just plan on starting at 9:00, regardless,
11  and if for some reason you don't want to talk to
12  him, I'll try to get Donny Willis here at 9:00?
13        MR. CLARKE:  Whatever.  I don't know
14  what the schedule is.  So we're going to reset
15  Gholston and Sweat.
16        MS. GRIFFITH:  That's fine with me.
17        COURT REPORTER:  Are we off now?
18        MR. CLARKE:  Yeah.  I'm sorry.
19  (DEPOSITION CONCLUDED APPROXIMATELY 4:37 P.M.)
20      (READING AND SIGNING IS NOT WAIVED.)
21
22  ORIGINAL:  ANDREW CLARKE
23  COPIES:   MARY MCKAY GRIFFITH
24        KATELYN RILEY
25

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Pages 134..136

Page 134
CERTIFICATE OF REPORTER

1
2       I, BETHANY CAMMACK, Certified Shorthand
3   Reporter and Notary Public for the State of
4   Mississippi, do hereby certify that the above and
5   foregoing pages contain a full, true and correct
6   transcript of the proceedings, as taken by me at
7   the time and place indicated, and later reduced to
8   typewritten form under my supervision and to the
9   best of my skill and ability.
10       I further certify that I placed the
11  witness under oath to tell the truth and that all
12  answers were given under that oath.  I further
13  certify that the witness has chosen the right to
14  not waive the reading and signing of the deposition.
15       I further certify that I am not in the
16  employ of or related to any counsel or party in
17  this matter, and have no interest, monetary or
18  otherwise, in the final outcome of this case.
19       Witness my signature and seal this
20  the 31st day of August, 2018.
21
22
23
24  BETHANY CAMMACK, CSR
    CSR NO. 1526
25  My Commission Expires May 1, 2019

Page 135
CERTIFICATE OF DEPONENT

1
2
3       I,_____, do hereby
4   certify that the foregoing testimony is true and
5   accurate to the best of my knowledge and belief, as
6   originally transcribed, or with the changes as
7   noted on the attached Correction Sheet.
8
9
            (SIGNATURE)
10
11
12
13
14
15       Subscribed and sworn to before me this the
16      day of              , 2018.
17
18  My Commission Expires:
19
20
            (NOTARY PUBLIC)
21
22
23
24
25

Page 136
CORRECTION SHEET

1
2
3       I,_____, do hereby
4   certify that the following corrections and
5   additions are true and accurate to the best of my
6   knowledge and belief.
7
8   PAGE:  LINE:  SHOULD READ:  REASON FOR CHANGE:
9
10
11
12
13
14  _____
15
16
17
18
            (SIGNATURE)
19
20       Subscribed and sworn to before me this the
21      day of              , 2018.
22
23  My Commission Expires:
24
25
            (NOTARY PUBLIC)

844.533.DEPO

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Index: 1..air

**Exhibits**

**Lawrence Exhibit 1**
9:11 11:12 12:1
14:8 55:19 99:7

**Lawrence Exhibit 2**
12:22,25 14:3

**Lawrence Exhibit 3**
15:11,12,13 116:4

**Lawrence Exhibit 4**
42:3,4,6

**1**

**1** 9:4,11 11:12 12:1
14:8 55:19 99:7

**100** 20:24 21:16,17
107:3

**11** 12:25

**12** 8:24

**12/23/16** 121:10

**120** 21:17

**13** 8:24

**14** 8:24 22:9

**15** 22:11

**16** 31:11

**1669** 131:20

**1990** 17:14

**2**

**2** 12:22,25 14:3
16:13 116:6

**20** 18:25 31:12

**2009** 23:3,10,23

24:11,14

**2010** 23:4,25 24:3
25:11,12 35:7

**2012** 30:1 33:1,5

**2013** 18:23 33:1,5

**2014** 22:6

**2016** 43:22,25 50:7
54:3 55:2,17 73:20

**2017** 44:2

**23rd** 43:22,25 50:7
52:15 54:3 55:2,17

**24** 31:11,12

**26th** 35:1

**27** 19:1

**3**

**3** 15:12,13 116:4

**30** 9:21

**310-6450** 73:12

**3rd** 22:10

**4**

**4** 42:3,4,6

**40** 30:10

**45** 9:21

**4:00** 48:24,25

**4:30** 132:10

**4:37** 133:19

**4th** 34:25

**5**

**5** 16:13

**5:00** 132:11

**6**

**6** 18:15,18

**662** 73:13

**8**

**80** 18:22

**81** 20:7

**81-'82** 16:25

**82** 16:25

**88** 17:17 21:25

**891** 5:9

**8:30** 132:4

**9**

**90** 17:14

**99** 29:1 122:23

**9:00** 132:4,17,21,22
133:10,12

**A**

**A-A-R-O-N** 48:15

**Aaron** 48:13

**absolutely** 121:9
123:6,8

**academies** 24:4

**academy** 23:7,17,
18,21,24 24:5,6,10,
23 25:11,12,15,19
26:1 27:20 35:4,6,
9,19,22 36:6,18
40:19,21 41:5,18

53:13

**accident** 5:22 6:3

**account** 94:9

**accurate** 15:24

**accusa-** 122:4

**accused** 122:1

**act** 98:4 106:15

**acting** 74:5

**action** 18:24

**actions** 18:25 69:9
101:10

**active** 19:2 22:5
51:15

**actively** 49:13

**activities** 38:16

**actual** 12:3 14:4
25:15 30:4 42:23
130:15,21

**adamant** 57:22

**addition** 14:2,19

**address** 5:8

**administrative**
18:24

**advantage** 21:8

**affidavit** 118:22
130:12,21

**affirmative** 133:1

**affirmatively** 15:5
19:11

**afternoon** 78:13

**agree** 38:16 90:17

**ahead** 25:2 76:22

**air** 32:10

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                    Index: airbags..Barbara

**airbags** 5:20

**airport** 33:21 34:8

**alcohol** 118:4,7,19

**allowed** 27:17
30:13

**allowing** 39:17

**altercation** 103:13

**amendment** 17:5
19:9 40:7

**amount** 31:7,8,9,13
81:18

**analysis** 33:14 34:4

**and/or** 62:15 90:12

**ANDREW** 133:22

**angle** 92:5

**animal** 30:19 31:1

**answer's** 7:7

**answering** 54:6
81:10

**answers** 6:24

**anymore** 84:23
88:8

**apologetic** 57:9

**apologize** 25:25
32:20 105:7 113:14

**apologizing** 98:3

**apparently** 33:14
52:15 55:17 57:25
59:22 119:13
130:17

**appeared** 79:3
80:14 83:9 85:22
107:1

**appears** 71:20

**applied** 55:1

**approached** 58:19
126:18,23

**APPROXIMATELY**
133:19

**area** 51:21 76:25
85:3 87:15 96:23
97:2,5 99:14
100:14,17,25
101:15,19 102:2,3,
4,25 103:2 107:12,
15,19 113:11 119:9
120:1,10,12

**arm** 60:18 67:15
68:12,23

**arms** 86:4 100:2

**Army** 19:22,23 21:9
22:1,22 116:23

**arrangements**
109:13

**arrest** 11:13,21
12:2,3,14,16,17
13:2,10,14,17 14:4,
14,18,22 27:12,13,
15 37:14,23 38:10,
25 39:4,12,15
40:13 45:23 50:11,
12,23 64:5 94:23
95:5,6,7,8 104:5,7,
8,11 121:1 124:4
130:12,14,15

**arrestable** 39:16

**arrested** 12:19
16:21 17:9,19 39:9
48:14 50:13,18,20
51:13 52:5 53:9
63:12 103:23
124:2,12

**arresting** 40:8 51:7

52:12

**arrests** 27:17 28:16
52:23 54:18 55:1

**arrival** 43:15

**arrived** 47:15,22

**ass** 108:22,25
117:11

**assault** 82:16 83:2

**assignments**
26:12,14

**assist** 64:11,12
80:5

**assume** 8:2 112:20
128:12

**assumed** 88:1
106:18

**attached** 15:16

**attempt** 65:18
68:18 77:23 87:5

**attempted** 61:5
66:18 69:6 71:13
77:11,25 83:7

**attention** 25:23,24

**attorney** 95:22
129:18

**attorneys** 8:6 105:5

**Atwater** 40:1,6

**audible** 6:24 18:16
48:21 92:20 104:2
112:15

**authority** 37:23
74:10

**automatic** 72:7

**aware** 9:13 11:2
31:2 54:13,20

76:13

---

**B**

**back** 22:11,12
41:16 45:10 47:5,
15,18 51:20 52:16
53:23 59:6,8,9,23
60:9,21 61:3,14
64:1,25 66:11
67:24 68:14,23
69:21 73:1,9 74:6
76:24 78:18 79:12,
18 80:11 84:11
85:1,6,7,21 86:2,10
87:9 90:9 92:2,4,5
93:21 94:11 99:4
105:4 107:24
109:19 111:7,14,
15,16 122:8,15,24
127:21 130:3 131:1

**backed** 45:21

**background** 20:1,2
127:23

**backs** 92:6

**backside** 67:13
68:2 69:2

**backup** 60:7 61:18
79:16 123:20
127:7,9

**bad** 59:25 78:13,14
88:1 92:22 99:3
118:10,18

**badge** 23:9 24:11
114:3

**bailiff** 122:13

**bailiffs** 122:7

**Barbara** 55:20,23
56:15 57:8,23

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                     Index: Barbara's..car

59:17 122:2 123:2, 6 124:2

**Barbara's** 57:19 58:20

**based** 27:22 33:16, 18 55:17 58:1 79:21 81:2 91:20 111:5

**bases** 104:8

**basic** 22:18

**basis** 34:23 75:13 104:9

**Bates** 8:18

**bathhouse** 58:23

**bathroom** 59:8,11

**bay** 74:16,20 79:12 84:5 86:18 88:3 106:14,17 107:19

**beat** 108:19 122:18

**beating** 122:2

**bed** 90:2

**beer** 59:21,23

**beginning** 33:1

**belief** 15:25

**believed** 61:15 90:14 122:18

**believes** 130:9,22

**bell** 97:14

**belligerent** 53:14 63:18 72:24 74:5

**belt** 128:7

**bench** 119:11

**benefits** 32:6

**Bethany** 132:16

**Bibbs** 99:7 101:2 118:25

**big** 36:4 85:2

**bit** 19:25 31:25 58:17 61:19 62:13, 19 108:20 121:6

**bite** 46:25 48:5 54:1,12 62:5 64:25 65:2,3 82:6 83:7 120:18

**black** 97:25 113:21 114:1,5

**blind** 36:24

**block** 32:21

**blocks** 47:13,19

**blood** 57:2 79:8 84:6 107:5,6,7,15, 17,18 121:14,15,19 123:8

**blue** 114:6

**bodies** 85:9

**body** 69:15 83:22, 24

**bond** 39:20

**book** 38:4 42:15 109:21 110:6,16

**booked** 109:22,24, 25 110:2,13

**booking** 13:6 87:15 96:22 97:2,20,21, 23 98:7 99:9,14 100:14 101:15,16, 19,22,24 102:25 103:2 104:3 105:18 107:12,15,19 110:4 113:11 119:9 120:1,10,12 130:17

**boots** 115:18,20,23

**born** 20:11,12

**bottom** 8:18 9:5 115:24

**bought** 111:7

**branch** 19:21

**break** 10:3 11:5 61:19 113:4 130:9

**breakfast** 132:15

**breath** 118:4

**bring** 39:4 109:18

**bringing** 104:9 111:16

**brought** 17:17 101:20 109:17 111:14 119:14 129:11

**Bryant** 124:22

**building** 132:20

**Bull** 75:1,25 76:1 79:3,14,22 80:7,19 81:4 82:14 83:9,16 84:9,20 85:8,13,19 86:19 87:3,5,16,18 88:6,7,17,25 90:12 94:6,25 95:11 97:10 100:7 102:12 104:19,21 107:1 108:6,10,11 109:5, 7,9 112:23 113:1,7 114:23 120:13,15, 19 124:24 127:17

**Bull's** 86:4

**burn** 61:17

**business** 93:11

**butt** 61:11 70:25

**butting** 66:10

**buy** 114:18

---

**C**

**cage** 69:20

**call** 11:16,23 43:8, 13,14 48:22,23 52:23 55:19 58:2,4 60:7 73:3 75:24 93:21 101:14 111:20 123:20

**called** 36:21 59:23 61:18 94:14 111:21,22 127:6,8, 24

**calls** 30:25 49:4 111:19

**calmed** 110:22 111:5

**camera's** 110:24

**cameras** 76:14 93:3

**Camp** 22:2,3,4

**Canada** 20:12

**capable** 119:25

**capacity** 50:4

**captains** 32:12

**car** 24:20 25:4 47:14 51:16 58:20 60:9,16,18 64:16 65:8,11,19 66:3,18, 22 67:11 69:18 70:22 72:1 77:12, 16 80:3 83:12 85:20 104:14 107:21 109:9,10

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018

**care** 21:21

**career** 116:23

**careers** 104:24

**Carey** 21:13

**cargo** 114:5

**carrier** 73:15,19

**carry** 128:5

**carrying** 60:24

**cars** 75:6

**case** 5:11 17:11,25 43:14 46:23 54:8 69:3 131:19,20,22

**casting** 12:11

**caught** 62:17

**caution** 61:25 62:3

**cautious** 117:24

**cell** 73:11,23

**center** 99:6,10,11, 13 100:5,8 101:3 102:21

**Central** 20:16

**certification** 27:22

**certified** 23:20,21 26:11 28:24 31:4

**chance** 58:7 60:11 78:1

**change** 16:20

**changed** 99:18

**charge** 104:9,17

**charges** 12:17,19 17:21 95:7,8 103:24,25 129:10 130:19,22

**check** 123:7

**chest** 100:3

**chief** 32:12 93:22, 24

**chin** 106:24 117:17

**choice** 60:14

**Christmas** 57:13

**circuit** 40:2 48:9

**circumstances** 5:18 44:3 45:15

**city** 23:14,15 24:17 25:6,8,9 26:2,8,13, 15,25 27:2,4,11,21, 24 28:2,4,11 31:15, 21,23 32:18 33:7, 10,16,18,19 34:4,8 43:2 47:16 48:6 50:1,3 61:13 113:16

**civil** 5:17

**civilian** 6:4

**clarify** 129:15

**CLARKE** 5:5 9:12, 16 10:22,24 12:8,9, 23 15:6,11,14,16, 19 16:5 17:12 18:10,17 19:8,12, 17 26:7 32:8 37:5, 10 40:5,11,17 41:10 42:2,5,12,13 45:2 46:8 49:22 54:25 55:7 56:5 62:7 66:1 70:12 80:2 81:7 82:11,20 83:3 86:8 87:20 89:5,14 91:1,14 99:22 100:4,16 102:16 113:2,6 115:10,25 116:11

122:20 126:1 129:9 130:4,19,25 131:4 132:1,5,12,24 133:3,6,13,18,22

**classes** 53:19

**classroom** 36:10 42:23

**clear** 61:17 66:7 116:17 126:6

**clearance** 18:25

**close** 59:14,24 69:8 70:17 72:1 76:18 77:7 78:17 79:12 88:18 89:24 90:1 96:22 118:8

**closed** 71:11,21 76:24 77:2,13,17, 18,24 86:23 87:1 89:22 126:13

**clothes** 114:25

**clue** 113:9,10 123:4

**code** 36:21

**coffee** 132:14

**college** 20:25 21:13

**colleges** 21:12

**comfortable** 67:21

**comfortably** 100:2

**comment** 122:9

**committed** 39:5

**common** 103:22

**communicate** 6:13

**complete** 12:2 13:4,7

**completed** 14:9 20:25

**completely** 16:15 54:17

**completes** 13:5

**computer** 10:9 45:5 95:17 96:15 130:10

**concentration** 21:2

**concerns** 127:5

**CONCLUDED** 133:19

**condensation** 74:21,23

**condition** 72:13

**conditions** 107:3

**conduct** 16:23 104:4,6,12

**confused** 38:12

**Constitution** 40:7

**contact** 11:20 14:9 43:8 79:19 107:2

**contained** 66:10

**container** 17:10

**continue** 25:19 31:20,23 82:15

**CONTINUED** 9:16 10:24 12:9,23 15:6, 19 16:5 17:12 18:10,17 19:17 26:7 32:8 37:5,10 40:11,17 41:10 42:5,13 45:2 46:8 49:22 55:7 56:5 62:7 66:1 70:12 80:2 81:7 82:11,20 83:3 86:8 87:20 89:5,14 91:1,14 99:22 100:4,16 102:16 113:6

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018

Index: control..degree

116:3,12 122:17
123:1 126:5 131:4

**control** 23:1 26:23,
24 30:19 31:1
76:12 77:9 87:15
90:6,7,20 92:24
93:2 96:22 97:16,
18 99:5,10,11,13
100:5,8 102:21
105:23 119:7,10
127:18

**controlled** 124:5

**controlling** 93:9

**conversation** 7:3
72:20 104:24 106:8

**conversations** 6:20
112:19

**convicted** 63:2

**cope** 112:21

**COPIES** 133:23

**copy** 8:17 15:12
41:13,20,21,23
42:7 44:6 93:5
94:2,23 96:8

**corner** 8:19 101:1
105:16

**correct** 10:6 11:13
13:11,15 14:5,11,
20 24:6,10 25:13,
16 28:5,16 29:21
33:17 34:5 35:19,
23 36:6,9,12 38:19
39:1,4,13,25 48:20
53:23 54:3 58:3
63:20 65:20 66:3
68:7,19 70:23 71:3,
22 72:15 74:6
81:15,19,24 82:3,
12,16 85:21 87:21

90:23 91:6,21
92:19,25 96:23
103:15 115:1
119:7,19 120:2
122:13 124:25
127:7

**correction** 16:3,6

**correctly** 68:5

**council** 26:25 27:2
28:4

**counsel** 39:25
124:21

**count** 19:8

**counter** 99:15
100:20 102:4
103:1,2

**countertop** 101:17
119:12

**country** 108:24

**county** 16:23 18:5,
6 20:9,18 23:19
25:16 26:10 27:5,
13,16,22,25 28:11,
12,15,21,23 29:12,
14,24,25 30:20
31:10,18 33:2,10,
17 34:1,16,22,25
41:12 42:8 43:3,6,
18 47:2,16 48:18
49:15,24 54:21
114:8,9,16 123:9

**county's** 41:21,23

**couple** 8:7,10 23:5,
6 24:21 26:10 31:8
74:19 85:6 87:9
100:10 105:2
124:17

**courses** 21:6 36:9

**court** 6:21 7:8,18
9:7,10 17:19 18:4,
7,9 39:19 40:2
56:20 62:2 118:21
122:5,11 129:14,25
130:2,3 132:17,18
133:17

**courtroom** 129:17

**courts** 39:20

**cover** 95:14 131:17

**crack** 83:21

**crashed** 45:6,8

**crazy** 48:10

**create** 13:14

**crime** 39:5,13 40:6

**criminal** 16:17

**crowd** 26:24

**crying** 51:3,4

**crystal** 22:7 124:8

**cuff** 104:14

**cuffed** 47:1 54:15

**cuffs** 48:7 54:16
55:10,13 60:19
103:20

**curriculum** 35:18

**cusses** 81:21

**custody** 46:18
103:20

**custom** 55:8,10

**cut** 64:1

**D**

**daily** 45:11 63:8

**Dale** 93:21,24
94:18 98:21,24

**Dale's** 98:22

**danger** 65:15,23
81:24

**Danny** 5:1,7 130:22

**dark** 78:6,9,10,11
114:6,24 115:4

**darker** 78:7

**date** 42:1 53:10
114:17 121:10

**day** 16:8,16 36:5
45:8 47:10 50:14
54:5,13 58:13
61:16 63:6 78:12
113:20 115:16
120:6,11 121:14
122:14 123:22

**days** 34:24

**de-escalate** 53:16,
23 60:4 91:12,16
92:8,18

**de-escalated** 79:20

**de-escalation**
88:10 91:3 103:11

**de-escalator** 79:22

**deaden** 116:18

**deal** 53:14

**December** 18:22
22:11 23:3,10 30:1
33:1,4 43:21,22,25
50:7 52:15 54:2
55:2,16 73:19

**DEF** 8:24 12:25

**degree** 20:25 21:1,
3,15

844.533.DEPO

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                        Index: department..employment

**department** 23:4, 11,12 32:14 33:19 35:11,13 43:9

**departments** 41:8

**deploy** 5:20

**deployment** 22:9

**depo** 7:14

**deposition** 5:16 6:9 8:5 13:19 89:15 116:5 133:19

**deputies** 122:7

**deputy** 28:8 30:22 34:1 45:20 47:20 48:2,18 49:14 65:13 71:24 75:24 79:11,22 81:3 82:14 83:16 84:8 85:13 86:4 94:24 104:18,21 113:7 115:1 125:7,18 126:7 128:9

**describe** 80:17

**desk** 97:20,21,23 99:10 101:16,23,24 105:18

**detail** 12:18

**detailed** 43:16

**detain** 38:24

**difficulty** 81:10

**digging** 51:22

**dilly-dally** 72:9

**Dimly** 84:2,4

**direct** 116:6

**direction** 119:4

**directly** 72:23

**disabled** 6:1

**disadvantage** 84:18

**disagree** 53:8

**discharged** 19:18

**disciplinary** 18:24

**disciplined** 49:23 50:4

**discovery** 131:25

**discuss** 36:20

**discussed** 123:16

**discussion** 40:10

**discussions** 112:6, 8

**dismissed** 17:21

**disorderly** 16:23 17:2 104:4,5,12

**dispatch** 76:10 127:6,8,25

**distance** 59:14

**distinctions** 28:21

**disturbance** 50:15

**disturbances** 58:8

**divorced** 20:17

**doctor** 108:15

**document** 40:24 130:6

**documents** 8:6 11:4 12:2 14:1 18:20 42:7,14,15 130:7

**Donny** 120:6 133:12

**door** 51:17 59:6,9

60:23 61:4,7,9,10, 12 66:9,11 68:24 69:8 71:11,21 75:4 76:4,7,16,17,25 77:7,19,24 78:3,17, 18,20,25 79:2,13, 17 80:8,9 83:19 85:4,23,25 86:1,17, 23 88:23 89:20,22 99:8 103:18 120:17,23 122:9,15 125:17,24 126:2,4, 11,13,14,17,22,25 127:15,21

**door's** 76:24 80:10 86:13

**doors** 92:24

**double** 19:7

**drag** 61:9 67:23

**dragged** 103:5

**dragging** 118:25 119:3,18

**drain** 85:2

**draw** 121:14,15,19

**drawing** 99:9

**drawn** 99:6

**dressed** 113:8

**Drink** 132:14

**drive** 45:5,11 95:17

**driving** 36:15 57:9

**drop** 109:23

**dropping** 111:17

**drug** 61:12 105:20 119:15,21

**drugs** 62:16,18

**drunk** 50:19 51:4 53:3,14 57:8 60:1, 12,25 62:15 63:18 104:5,6,13 116:20 121:10

**DUI** 17:9

**duly** 5:2

**dusk** 58:17

**duties** 22:16 30:23

**duty** 19:2 111:15

**E**

**ear** 62:13,20

**earlier** 119:23 124:20 125:2

**eat** 63:6 132:14

**echo** 128:14

**educate** 39:11

**education** 20:23

**educational** 20:1 21:8

**effectively** 6:13

**Elliot** 22:5

**email** 130:24 132:24,25

**emailing** 12:6 130:6

**emergency** 30:17 36:15 93:17 126:3

**employed** 22:21

**employee** 29:24 33:19 98:5

**employment** 21:20, 22

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Index: enacted..form

**enacted** 44:1

**encountered** 58:3

**end** 15:17,21 16:13 18:23 33:1 58:19 68:23 93:16 131:18

**ended** 57:4 105:17

**enforcement** 6:3,6 22:25 23:2,20 33:23,24 35:17 38:3,15 50:4 61:22, 25 63:7

**engage** 38:15

**entrusting** 39:18

**environments** 27:10

**equates** 31:12

**equivocally** 121:9

**ER** 78:13 101:8 103:4 106:6 107:24 109:14 125:13 127:15,21

**Eric** 47:22,24 94:1, 18

**escalate** 125:15

**escalated** 79:20

**escalating** 125:8, 10,15

**escalation** 108:12 125:4

**escorts** 29:11

**ethics** 36:17

**Evans** 87:11 97:15, 16 98:4,5 106:4

**event** 48:16

**events** 41:2 50:6

95:14 98:18 104:22 112:5

**evidence** 38:14 117:25

**exact** 117:5

**EXAMINATION** 5:4 115:13 124:18 129:8

**examined** 5:3

**exceptions** 29:2,3 114:21

**excuse** 28:13 84:3

**exhibit** 9:11 11:12 12:1,22,25 14:3,8 15:11,13 42:3,4,6 55:19 99:7 116:4

**exists** 23:2

**experience** 111:6 122:23

**explain** 6:25 10:19 12:12 32:4 130:12

**expound** 93:14

**extremely** 74:20

**eye** 36:24

---

## F

**face** 46:24 83:4,24 84:1,6

**facilities** 21:12

**facing** 68:1,3 83:16

**fact** 48:7 62:15 122:22

**factory** 21:24,25

**factual** 104:8

**failed** 10:20

**fair** 8:2 13:22

**faithfully** 45:11

**fall** 85:8 106:13 119:24

**family** 20:15 61:16 74:8,10 118:23 123:7

**fasten** 65:14

**father** 20:16

**fault** 76:22

**faxed** 10:25

**feel** 67:18 116:21

**feet** 69:3,4,5,18,24 71:14,17,25 85:6

**fell** 85:8 87:23 88:2 105:21 114:24

**fellow** 18:1 36:25

**felon** 63:2

**felt** 74:7,8 90:13 91:20 103:12 117:21 119:23

**female** 87:10

**fence** 77:4

**fenced-in** 76:25

**field** 116:22

**fight** 125:19

**fighting** 48:4

**figure** 16:10 30:8 31:10 60:6

**file** 42:8

**filed** 13:18

**fill** 29:20 118:21

**filled** 94:22

**find** 44:11,14,18 54:7 89:18 95:20, 21 130:3,5 131:24

**finding** 44:25 131:10

**fine** 42:12 103:16, 19 132:23 133:16

**fines** 18:2

**fingerprint** 110:15

**finish** 7:15 71:16

**finished** 7:15

**firearm** 25:3

**firing** 36:11

**firsthand** 122:3

**fishing** 51:22 59:21,22 60:13 63:22

**fist** 70:16,17

**fitness** 35:23 36:5

**fixed** 128:6

**floor** 87:8 88:3 103:6 119:13,16

**floorboard** 78:16 120:22 126:13

**focus** 21:2

**focusing** 32:23

**follow** 55:9

**food** 26:21 28:5

**foot** 45:22

**force** 81:18

**forgotten** 129:6

**form** 37:2 40:14 41:3 46:5 54:23

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                      Index: format..hands

65:24 70:10 79:23
81:5,6 82:10,17,18
86:6,7 87:19 89:1,
8,9 90:24,25 91:7,8
102:15 116:11
122:20

**format** 10:9 131:15

**formed** 104:9

**forward** 68:3

**found** 13:1

**four-wheeler** 122:6

**fourth** 26:22 40:7
50:10

**free** 105:20

**Friday** 34:18,19

**friends** 20:18

**front** 18:21 48:10
58:23 59:15 60:16
67:13,20 69:21,25
76:25 78:16,17,18
85:24,25 86:11,12
90:9 92:3 101:24
120:22 126:12,24
129:19

**fronts** 92:7

**full** 5:6 7:9,10 12:18
19:6 27:12,13

**full-blown** 38:9

**full-time** 22:1 24:5
27:14,15,19 28:8,
20 29:20 35:4
46:14 47:7

**fully** 75:4 77:18
86:14 119:25

**functions** 28:4

**funerals** 29:13

**funny** 122:16

**Furniture** 21:25

---

**G**

**gap** 75:4

**gathering** 5:19

**gave** 6:8

**gear** 59:22

**general** 35:17

**generally** 128:19

**generic** 41:6

**gentleman** 48:8

**get all** 22:16

**Gholston** 58:10
64:9,10 66:22
69:14 71:24 72:4
75:3 78:4 86:15
87:12 97:10 100:6
104:15 112:7 120:4
133:15

**Gholston's** 75:8
86:16

**Ghoolston** 64:7

**Gillon** 5:9

**give** 5:21 6:24
61:23 65:13 74:10
90:22 94:16 95:22
96:8

**giving** 39:17,18

**glasses** 118:13,15

**good** 9:9,10 59:14
108:20,21 132:6

**goodbye** 103:21

**governor** 29:11

**grab** 69:15

**grabbed** 60:18

**graduate** 20:2,4

**graduated** 20:19,22

**graduating** 21:23,
24

**gray** 114:1,14
115:2

**Green-** 32:18

**Greenville** 25:7,9,
20,22 26:3 31:15
33:13 34:5 50:1
99:4 113:10,12

**Grenada** 17:9
22:13 23:7,13,19
24:17 25:8,10,16,
21,22 26:4,6,8,13
27:4,11,16 28:11,
12 31:16 32:19
33:7,16 34:6,7 47:2
49:15,24 50:2,3
113:12,13,15
114:20 123:9

**Griffin** 45:16,18
46:21 48:2,20
124:22,25 125:7,18
126:7 128:9

**GRIFFITH** 10:20
12:5 15:4,15 16:1
17:7 18:16 19:10,
14 32:4 37:2,7
39:25 40:14 41:3
42:10 44:20,22
46:5 54:23 55:3
56:4 65:24 70:10
79:23 81:5 82:10,
18,22,25 86:6
87:19 89:1,8,10
90:24 91:8 99:21,

24,25 100:13
102:15 113:3
115:11,14 116:3,12
122:17 123:1
124:15 130:8,13,20
132:3,8,16,19
133:1,5,9,16,19

**ground** 6:12 67:10
85:3,10,11,13,15
87:2,17 89:24,25
102:7,8,10 103:22
105:18 107:9,13,14

**guard** 22:2 63:11

**guess** 11:11 68:11

**guessing** 30:1
115:6

**guilty** 17:24,25
18:1 124:9 129:13
130:2

**gun** 120:21

---

**H**

**habit** 13:14

**half** 19:1 58:18

**hand** 55:6 67:16
116:4

**handcuff** 64:7
67:20

**handcuffed** 65:5
67:9,23 70:19 82:2

**handcuffs** 64:12
110:11 111:8

**handhelds** 128:5

**handle** 54:21 91:6
92:15 93:11

**hands** 52:1 95:16

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                          Index: handwrite..inmates

handwrite 96:14

handwriting 96:19

handwritten 12:20
14:21 96:11 130:16

Hankins 97:12

happen 17:13
39:11 57:25 70:21

happened 5:21
44:12 48:17 52:14
54:4 72:4 74:13
80:18 84:15 95:4
96:7,10 104:22
111:14 112:3,17,18
122:23 127:2
129:10

happening 38:1
72:5 126:15

hard 45:5

hate 74:3 117:7

hats 34:10

he'll 62:14 105:2
130:10

head 6:21 15:4
19:10 33:19 61:6,
11 65:1,4 66:10
67:5 68:4 70:5 71:8
90:17 97:13 99:24
117:5

headbutt 61:2
62:14 64:25 65:10
66:5,8,19 68:6
70:2,7 82:6 83:7

headbutted 65:20
71:8

headbutting 70:15

hear 65:5 79:1
127:23 128:22

129:3

heard 60:2 61:20
62:12,13,14,19,22
105:3 112:25
127:22

heartbeat 62:14,24

height 100:3
119:11

held 23:19 61:4,9
69:12 71:21

hell 88:16

helping 67:12,15
70:4 112:21

helps 104:3

hesitate 60:7

high 20:2,4,6,8,20,
22,23 21:23 67:7

highly 118:20

highs 116:14

highway 29:12
43:12

Hinds 21:13

hire 24:9,12

hired 30:18 129:18

history 21:20 60:3
62:4 129:17

hit 46:23 61:6 62:5
70:14 71:8 79:3,7
80:15 85:3,15 88:2,
9

hitting 79:4 80:14
85:9 87:1

hold 125:21

holding 68:12

holiday 57:14

holidays 24:22
57:17

hollered 80:19

hollering 57:10,12
60:23

home 57:15,16,24
58:5,6,25 59:18
60:11 111:18

honest 101:7

honestly 13:20
32:20 130:1

honorably 19:18

hope 10:11 70:18

hospital 94:11
103:9 106:2 107:22
109:3,25 111:2
116:9 117:20,21
121:20 124:23
126:2

hour 9:21 31:12

hours 20:25 21:1,
16 26:16 28:3 30:7,
9,10,12,16,20,21
31:3,11 36:3

house 14:10 49:6
50:15 55:21 57:5,
22 61:17 94:2

huh-uh 6:20

human 32:11,14
116:24

hurt 62:23

hurting 117:1

_____

I

idea 7:4

identified 42:6

identify 10:12 13:2
75:20

immediately 72:17

imminent 81:23

important 7:17

improper 36:24
81:3

incident 8:9,14,25
9:19 10:1,2,5 11:9
13:10 14:3,8,13,19
40:24 44:5,9 46:2
49:11,15 50:24
52:9 54:11 55:18
63:9 83:5 95:4,11,
12 111:20 112:6
115:17 123:18
124:3 125:14
130:23

independent 60:6

indicating 51:6
100:3 117:16

individually 35:13

information 15:25

informed 106:1

initial 11:16

injured 43:19,23
44:3,8 106:16,19

injures 46:19

injuries 72:14
105:12

injury 70:15 81:24
106:13,21,22,23
117:16

inmate 46:18,22

inmates 98:11

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Index: inside..left

100:7,9,10

**inside** 65:19 75:2
80:21 84:17 86:21
97:5 99:2 113:11
126:20 127:9

**instances** 112:25
123:10

**instantly** 93:21

**intent** 64:2

**intentions** 70:5

**interested** 72:25

**interrogatories**
18:12

**interrogatory** 15:1,
12

**interrupt** 25:1

**interrupted** 71:16

**interstate** 43:11

**intoxicated** 50:16
116:8 118:20

**intoxication** 116:23

**invested** 90:23
91:6

**investigator** 93:22
96:9 98:25

**investigators** 37:20
93:25 94:13

**involved** 40:23
88:7 91:4,24
100:24

**involving** 6:2

**issue** 64:24 114:1

**issued** 114:6,17

**issues** 112:23

---

**J**

**jail** 13:5 39:4,20
45:23 47:18,19
52:19,24 53:1 54:5
55:12 58:7 61:18
72:6,18,22 73:2,9,
25 74:6,14,15
92:24 97:2,5,6
101:14 104:12
109:19 120:3 127:9

**jail's** 103:17,20

**jailer** 98:2,6

**jailers** 87:9 90:11
91:13 97:11 106:5

**January** 22:11
23:5,10,25 24:8
25:11 33:4,5 35:7

**jerks** 53:15

**job** 22:15,16 32:6
49:18

**jobs** 21:21 22:24,25

**Joe** 5:7

**joined** 17:3 18:22
27:7

**joke** 129:15

**Josh** 93:21,24
94:18 98:21,22,24

**judge** 48:9

**judgment** 87:22

**judo** 53:19

**July** 21:25 34:25

**June** 20:6,7 114:12

**jurisdiction** 43:12

**jury** 7:18

---

**justice** 118:21
130:3

**justify** 82:2

---

**K**

**KATELYN** 133:24

**kick** 61:5,10 71:18
120:15

**kicked** 108:23

**kicking** 71:15

**kill** 61:16 123:23

**kin** 55:25 56:14,15
129:16,20

**kind** 6:11,20 7:3
23:16 33:14 41:15
55:8 58:2 63:5
68:10 69:16 71:21
74:5 76:9 99:6
114:15 115:7,15
116:2

**kinship** 56:25

**Kitchens** 50:15
51:20 55:23 56:7,
15 122:2 123:2,6
124:2

**Kitchens'** 11:17
55:20

**knew** 49:2 50:6
61:17 78:25 88:3
117:16

**knocked** 117:12,13
118:1

**knowledge** 15:24
42:21 44:17 63:17
74:1 79:21 96:3
97:8,24 109:11
115:18 120:7,8

---

121:24 122:3
125:20 127:17

---

**L**

**L-E-E** 18:8

**lady** 93:9

**Lago** 40:1

**laid** 100:2

**Lamb** 50:22 52:21

**language** 108:21
116:15 117:7,8
125:11

**late** 22:11 58:16
78:12,13,14

**law** 6:3,5 22:25
23:2,20 33:23,24
35:17 38:3,14 40:8
50:4 61:22,24 63:7

**Lawrence** 5:1,7

**lawsuit** 13:18 44:13

**lawyer** 112:11

**leading** 5:22
107:18

**Leake** 18:5

**leather** 115:23

**leave** 55:15 109:12
110:23

**leaving** 74:25

**led** 83:5,8 87:25

**Lee** 16:23 18:6,7,8
20:9,18

**left** 5:19 22:10
48:25 68:13 72:21
75:4 91:16,18

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Index: left-hand..money

**left-hand** 74:16

**legally** 103:22

**legs** 71:2 83:17,19

**LEOTA** 23:21,23

**levee** 14:14,16
58:19 73:9 120:25

**levee's** 58:18

**levels** 38:13

**lie** 13:24

**light** 114:25 115:5

**lighting** 84:5

**lighting's** 86:18

**lights** 78:9

**Linda** 97:15,16

**list** 58:14 61:23

**listen** 7:5 55:11
129:1

**lived** 20:15 57:21
61:18

**living** 20:19

**loaded** 103:14

**loaned** 18:2

**long** 57:21 58:18
75:18 103:13

**longer** 23:2 33:22,
25

**looked** 14:25 59:7,
8,9 79:6 83:23

**loop** 129:21

**loops** 58:15

**lost** 62:16

**lot** 6:19 7:2 12:10
45:8 67:9,20,21

77:1 100:22 104:24
112:12

**loud** 57:18,19
63:18 72:24 128:18

**Louisiana** 20:16

**loving** 57:10

**low** 100:2

**lows** 116:14

**lunch** 11:4 63:6
112:17

**lunged** 66:13,25
68:4 70:4

────────────

**M**

**made** 11:20,23
58:15 59:20 61:17
107:2 109:14
111:18 115:23
116:16 122:9
127:10

**maintain** 58:14

**major** 95:8

**majority** 35:21

**make** 6:12 7:13
10:23 14:24 16:3
27:17 28:3,15
29:10 31:7 38:9
39:20 76:24 79:19
93:5 95:22 129:6

**making** 72:25

**man** 62:23 116:19

**man's** 62:13

**manager** 33:21
34:8

**mandatory** 26:19

**manpower** 84:12

**manufacturer** 5:25

**map** 99:6

**March** 44:1

**mark** 15:11 42:2

**marked** 9:11 11:12,
25 12:22 14:2,7
15:13 42:4 55:19
64:18

**marking** 12:24

**marriage** 57:2

**married** 56:6 57:20

**MARY** 133:23

**matter** 5:17

**Mccain** 22:2,3,4

**MCKAY** 133:23

**Meaning** 119:18
122:18

**means** 38:3

**medical** 101:2,3
102:24 116:5,22
119:1,19

**meet** 26:19 108:3

**meeting** 26:19,20

**meetings** 27:1 28:5

**memory** 45:24
72:23 85:14 87:4
94:20 96:4 97:8
98:22 102:5 103:7
111:22 117:18
119:5,20 124:14
131:10

**mentally** 91:11

**mentioned** 124:21
125:2 127:5

**mentor** 26:23

**met** 58:10 60:16
108:5 112:9

**metal** 85:2

**meth** 124:9

**middle** 5:12 51:18

**miles** 58:18

**military** 17:3,15,16,
17 18:15,18,19,22
19:1 21:4 23:7 30:2

**mind** 42:11 44:11
59:2 93:13 101:9

**mine** 12:21 103:19,
22 111:9

**minimal** 24:21

**minimum** 26:16

**minute** 51:1,4 57:9,
10,11 127:3

**minutes** 9:21 60:8

**Mississippi** 20:20
22:1,15,17

**mistake** 7:13

**mistaken** 47:22
78:8 102:9

**mistreat** 46:4,7
47:3

**misunderstood**
86:9

**MLEOTA** 30:11,17
31:3,9,13 36:1

**mobile** 128:6

**Monday** 34:18

**monetary** 31:6,9,13

**money** 18:2

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                                      Index: month..opinion

**month** 26:16,20,22

**months** 19:6

**morning** 26:22 130:24 132:2

**mother** 20:17 57:19

**mother's** 11:17 55:21 57:5,22

**mother-in-law** 57:19

**mother-in-law's** 14:10

**motion** 69:1

**motor** 114:5

**motorcycle** 114:4

**motorcycles** 29:4

**mouthing** 53:3 57:7 108:18

**mouths** 55:11

**move** 101:18

**moved** 20:18 22:2, 6

**movements** 22:21

**moving** 5:12

**multiple** 109:1

---

**N**

**Nam** 20:17

**names** 61:24 75:10 94:16

**narrative** 44:10,12 45:12 95:9,10 131:18

**National** 22:2

**nature** 37:15

**naval** 20:12

**needed** 84:11 106:1

**needle** 116:17

**Negative** 52:13

**negatively** 97:13

**neighborhood** 58:11,16

**nephew** 56:7,14

**neutral** 100:25

**niece** 56:21,22

**night** 49:6,8 77:2

**nights** 23:5 24:23

**nod** 6:21

**nods** 15:4 19:10

**nonarrestable** 40:9

**noncooperative** 116:9

**normal** 30:4 34:15 113:19 115:22 116:24

**Northwest** 22:15, 17

**note** 44:7 94:24 116:10

**notes** 129:5

**notification** 22:9

**November** 18:23 30:1

**number** 9:4 10:1 16:13 28:3 30:12 31:3 36:3 43:14 73:11 88:13 117:4, 5 131:20

**numbers** 8:18,23 131:22

**nurse** 101:2 105:25 106:7 118:25

**nurse's** 102:6 103:3,6 106:10 107:18 119:21

---

**O**

**oath** 6:16 15:21 121:13

**Object** 37:2 40:14 41:3 46:5 54:23 65:24 70:10 79:23 81:5 82:10,18 86:6 87:19 89:1,8,9 90:24 91:8 102:15 116:11 122:20

**objecting** 37:7

**Objection** 81:6 82:17 86:7 90:25 91:7

**observed** 48:19 57:5 81:2 91:21

**obstructed** 103:1 120:24

**obstructive** 120:16

**obvious** 61:3

**occasions** 15:10

**occur** 16:24

**occurred** 14:14

**OCD** 96:13

**offense** 39:13,16, 17,19,21 40:9

**offered** 21:4

**office** 119:1 130:7 132:20

**officer** 26:12 27:4 28:25 29:20 30:12, 20 31:4,5 33:10 36:25 42:18 45:16, 18 46:15,21 47:3 48:2,6,20 69:14 75:24 78:4 79:14, 21 80:7 81:3 82:14 85:19 86:3 87:18 91:15 95:11 102:12,17 114:16 120:3 127:11,13 128:3

**officer's** 23:9

**officers** 23:20 29:6 36:24 38:15 46:14 85:17 88:13 91:12 92:14 112:13 113:11,15,16 119:25

**official** 114:20

**on-the-job** 24:19

**open** 17:10 51:17 59:5,6,7,8 75:5 76:10 77:1 78:18, 25 79:2,17 80:8,10, 11 83:20 86:1,13 88:23 120:23 126:10,14

**opened** 76:11,16, 17 77:19 78:3

**opening** 80:9

**opens** 76:7,12 86:1 132:20

**operating** 35:16

**opinion** 66:15 70:6, 16 84:10 103:17

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                  Index: opportunities..port

opportunities 21:9

opportunity 54:7

option 59:19

order 38:24

ordered 114:11

ORIGINAL 133:22

outer 68:24

overdue 111:17

overlook 53:5

overlooked 10:17

overseas 19:5

overspoke 66:16

**P**

P.M. 133:19

packed 129:17

paid 18:1 32:17

pain 116:18,21

pair 115:18

panned 63:15

pantry 26:21 28:5

pants 114:6,14

paperwork 19:13

park 59:15

part 28:13 68:24
69:15 93:19 112:21

part-time 22:24
23:7,18,22 24:5
25:19,20 26:2
27:14,15,18 28:12,
15,20 29:9,24 30:3,
7,12,19 31:3,18

33:2,9 34:1 35:6,9,
12,19,22 36:18
42:17 47:5 114:11

participate 40:4

parties 7:18

partition 69:20

passed 119:17

passenger 59:5
60:21 64:1 68:14
78:20 80:5 107:24
126:12

passing 105:3

past 8:7 102:4

Patient 116:8

patrol 29:12 43:12
60:22 128:20

pay 26:17

pay's 31:11

paying 25:23,24

PD 123:22

peace 27:2

penalty 6:16

pending 34:3

people 45:25 49:3
53:14 58:13 61:23
63:7 77:9 90:19
91:23 98:15 110:16
111:20,22 112:14,
17 128:22 129:2

percent 29:1 107:3
122:23

perform 116:8

period 8:7 24:8,24
26:9 58:8 102:22
128:25

perjured 121:12

perjury 6:16

permanently 5:25

person 5:25 46:18
48:14 60:6 74:2
91:20 122:25
130:18

person's 48:12

personal 45:4
63:17 128:5 131:8

personally 123:24

personnel 42:8

pertain 11:15

pertaining 13:1
42:20 95:10

pertains 14:4

Pest 23:1

phone 73:11,23
111:19

phrase 80:19

physical 35:22 36:5
103:13

physically 67:10,12
77:7 89:11,21

picked 73:24

picking 87:13
90:12 118:13

pickup 90:2

picture 110:23
115:4

pictures 110:16,17
111:1

place 107:24

placing 121:1

plaintiff 126:7

plaintiff's 124:21

plan 20:25 21:3
32:16 133:10

plead 17:23

pled 17:25 18:1
124:9 129:13 130:2

plop 68:3

point 27:3 58:1
63:16,22 64:24
68:1,4 70:13 71:12
72:8 78:11 79:10
84:7,10 86:20 87:6,
7,12,22 89:23
90:12,18 92:9 94:1
101:5,6 103:3,12,
16,21 105:10 110:2
111:10,11 124:24
127:19

pointed 59:7,10

pointing 100:14

police 23:3,9,11,12
27:11 35:4,6
114:20

policies 35:10,14
40:20 41:9,13,21,
24 42:21,24 44:1
47:2 54:24 55:1,6

policy 28:23 41:6,
12 42:15 43:7,18
54:20

port 74:17 76:2,3,4,
9 77:13,16 82:12,
13 90:5 92:23 97:1,
7 99:8 100:18,19,
20 101:15,19
119:24 120:4,5,9,
12 126:6

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

**portion** 36:4

**position** 22:1,12
33:17,18 34:25
71:9 81:9

**positions** 22:20

**possession** 124:5,
7

**post** 20:23

**potential** 14:1
125:9,10

**powers** 27:13,15

**pre-2016** 54:24

**presence** 27:18

**present** 21:20

**pretty** 20:15 59:13,
14 60:5 67:7 72:24
108:21 121:13
125:12 127:2,3
131:9

**Price** 40:2

**prior** 6:5 34:17 46:1
50:14 54:2 111:2
118:13

**prisoner** 46:4
103:15

**prisoners** 54:21

**probable** 37:15
38:7,8,11 39:1,3,6,
8

**problem** 51:7 52:20
54:6 74:4 128:13

**problems** 52:2,11,
18 108:13 118:10

**procedure** 41:7

**procedures** 35:16

**process** 70:3 79:4
80:16 110:14
112:21 130:12

**produce** 10:21

**produced** 18:20
42:7 131:24

**program** 10:9
22:15 27:25

**promised** 57:23

**proper** 37:14

**property** 50:17,21
57:8

**protect** 45:12,13
62:10 65:6 71:20
81:18 94:4

**provided** 21:9
41:13 44:18

**proximity** 118:8

**public** 50:18 60:12
104:5,6,13

**pull** 21:18 47:9
66:23 69:13,16

**pulled** 58:23 59:4
71:25 74:15,18
75:2,3 76:15 78:4
86:22

**pulling** 102:5,9

**punch** 46:24 53:25
54:14 70:8 74:11
81:23

**punched** 48:3
94:25 106:20

**Punching** 83:4

**pursuant** 43:7

**pursuit** 5:23 45:22

**push** 68:10,16,18
69:5

**pushed** 69:25
105:22

**pushing** 68:18

**put** 9:4 23:9 25:15
45:7 51:10,25 56:2
64:21 65:12 66:17,
18 67:4,5 68:7
95:2,7,16 103:24,
25 104:17

**putting** 24:11 65:14


**Q**

**qualify** 25:3

**question** 7:7,9,20,
22 8:1 15:18 33:12
43:22 54:6 71:16
81:13 92:21,22
99:3 131:1

**question's** 7:4

**questioned** 131:6

**questions** 43:1
110:8 115:12
121:16 124:16,21
133:4,7,8

**quick** 42:11 80:18
127:2,4

**quicker** 121:6

**quiet** 57:18

**Quit** 84:16


**R**

**radio** 58:1 73:1,3
123:19 127:22,25
128:1,3,24,25

129:1,4

**radios** 128:6,10,14,
18

**raised** 20:11

**ran** 51:19

**Randy** 52:21 119:3,
5 120:4 124:22

**range** 36:12

**reach** 65:12,13

**read** 96:18 122:4

**READING** 133:20

**ready** 13:19 22:17,
19

**real** 66:7 117:18

**realized** 51:20

**reason** 6:7 39:9
116:7 119:14 125:3
129:3 133:11

**reasonable** 37:14,
17,19 38:2 112:20

**reasons** 69:7

**recall** 14:18 42:1
44:25 52:4 54:4
55:5 76:7 112:19
120:11

**received** 18:24

**record** 8:17 9:11,
13,15 12:6,22
15:13 16:1,17 26:5
42:4 49:21 100:13
113:5

**recorder** 93:13

**recorder's** 98:23

**records** 116:6

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Index: recruit..safety

**recruit** 22:14

**reflects** 16:2
100:14

**refresh** 131:10

**refused** 116:15,16
121:22,24

**refusing** 121:23

**related** 123:3,6

**relatives** 123:8

**remember** 12:4
19:16 44:4,19,20,
21,22,24 51:15
52:10,19 54:10
75:1,10 76:4 77:18
78:12,13 79:9,10
80:19 84:7 85:9
87:8,11,13 88:19,
20,22 90:10 97:9,
10 100:11 101:4,5,
7,9,21 102:1 105:9
106:3,8 107:7
111:9,11,16,17
117:12 119:12
121:23 123:18,21
124:1 127:21
129:12 131:10

**remembers** 52:22

**repeat** 33:8

**rephrase** 7:23
30:14 31:16 81:13

**replace** 96:17

**report** 8:12,13,14,
25 9:17,19,20 10:1,
5,13,14 11:25 12:1,
4,14,17 13:10,14,
18 14:3,8,14,18,20,
22 40:21 41:2 43:7,
10,13,15,19,23
44:2,6,7,9 46:11

55:18 94:22,24
95:4,6,7,8 96:8,11,
12 122:4 130:12,
15,23 131:7,8,11,
12 132:2

**reporter** 6:21 7:8
9:7,10 18:4,7,9
62:2 122:11
132:17,18 133:17

**reports** 11:9 12:16
37:20 43:4 96:14

**requested** 42:8
47:15

**required** 41:2 43:18

**requirements**
26:15 28:2 31:2

**requirements/
policies** 43:3

**requires** 43:7 54:20

**reserve** 25:12 26:2,
12,15,20 27:4,11,
12,14,16,21 28:19,
23 29:6,10,11,14,
24 31:15,20,24
32:7 33:6,16 34:3,4
41:19 49:14
114:12,19

**reserves** 27:1
29:19 114:17

**reset** 133:14

**residence** 11:17

**resist** 62:4

**resisted** 60:20
64:15 67:22

**resisting** 63:21
104:5,7,8 124:6

**resources** 32:11,15

**respect** 43:4

**respond** 30:25
43:11

**responded** 123:19

**responding** 58:2

**response** 18:16
48:21 92:20 104:2
112:15 133:2

**responses** 15:1,12

**responsibility**
103:10

**responsible** 47:6,9

**rest** 67:16 83:24

**resting** 68:2

**restroom** 58:24
59:1,16

**retired** 19:1

**retirement** 32:24

**retract** 30:14

**review** 8:6 15:20
98:12 116:7

**reviewed** 8:11,12
13:17

**Richard** 51:24
57:15 59:10 60:10,
25 63:9

**ridden** 33:5

**ride** 28:24 108:1

**riding** 23:11 45:25
47:8,10 109:7

**right-hand** 8:19 9:7

**Riley** 81:6 82:17
86:7 89:9 90:25
91:7 124:16,17,19
126:5 129:5 133:24

**ring** 97:14

**ringing** 117:4

**risk** 54:17

**road** 5:9 50:18
51:16,17,18

**Roark** 40:3

**Rob** 122:10,12

**rode** 26:9 27:5 29:7
33:10 45:22 47:18
58:11

**room** 90:6,7 92:25
93:2,17 101:3
105:23 123:17,19
126:3

**room's** 96:22

**ROS** 116:8

**Roster** 32:9,10

**rotation** 26:25

**roughly** 21:16
22:13

**ruckus** 87:24

**rules** 6:12

**rumor** 62:8,9

**rumors** 60:2 61:21
62:11,19,22 63:15
65:5

**run** 45:21 60:17
63:23,25 85:17
121:2

**S**

**safe** 71:22

**safety** 64:24 91:25
127:6 128:13

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                                Index: salaried..sir

**salaried** 32:12 33:19

**sally** 74:17 76:2,3, 4,8 77:13,16 82:12, 13 90:5 92:23 97:1, 7 99:8 100:17,19 101:15,19 119:24 120:4,5,9,12 126:6

**sat** 57:15 111:1

**Saturday** 26:22 32:16

**save** 98:16

**saved** 95:16 130:18

**scene** 6:3 123:21

**schedule** 30:4 34:15,21 35:2 133:14

**school** 20:2,4,6,8, 20,22,23 21:23

**scooting** 69:1

**Scratch** 123:11

**screaming** 57:10, 11

**search** 49:5 55:13

**seat** 59:5,23 60:23 61:3 64:1 68:2,24 69:21 70:1,25 80:12

**seatbelt** 39:9,10 64:22 65:12,14,17

**seated** 68:17

**seconds** 127:1,2

**Secret** 18:25

**secure** 77:22 78:15

**secured** 120:22 126:12

**security** 18:25

**selected** 22:14

**send** 12:7

**separate** 10:2,14 11:8,19 13:9 52:23, 24 90:20 95:10 114:14

**serve** 5:11 19:5 33:15

**served** 18:23 33:5

**service** 18:19 19:3, 7

**serving** 48:18 49:14

**set** 40:19

**setting** 44:2 66:25 67:2

**shakes** 97:13

**Shane** 50:22 52:20

**Shannon** 20:6,8

**share** 127:11

**sheet** 13:6 104:3 131:17

**sheriff** 46:12 49:18 93:25 94:12 95:25 96:1 105:6 130:16

**sheriff's** 23:4 43:9 115:1 130:6

**shirt** 102:9 114:1, 13 115:1,4,5

**shirts** 114:11,15

**shoes** 115:7,15

**short** 114:1,14

**shots** 121:23

**show** 8:16 12:24 30:5 39:19 45:6

**showed** 11:11 49:3

**Shrugging** 98:8

**shut** 61:12 85:4,5

**side** 5:21 9:8 26:15 31:10 51:17 53:22 60:17,18,21 61:9 66:23,24 67:13,14 68:13,14,15 69:8, 13 74:16 75:3 76:5, 6,17 78:20 80:5 83:20 88:21 99:9 104:13 107:24 122:24 126:15,17, 22

**sideways** 68:10,19, 20

**sign** 15:3,9 130:21

**signed** 15:20 41:25

**significant** 21:22

**SIGNING** 133:20

**silence** 36:21

**similar** 115:18

**simple** 95:7

**sinus** 118:10

**sir** 5:17 6:5,10,14, 18,23 7:1,12,16,21, 25 8:3,10,15,20,22 9:18,25 10:7,11,15 11:1,6,10,14,24 13:3,5,8,12,16 14:12,16,21 15:8, 22 16:18 17:3,16, 20,22 19:4,6,20,24 20:3,12,21,24 21:10 22:23 23:15 24:7,16 25:5,14,17

26:6 27:23 28:1,6, 9,17,22 29:22 30:6, 9 31:19,22 32:19 33:3,11 34:2,6,9, 12,14 35:5,8,13,15, 20,24 36:2,7,10,13, 16,19 37:1,9,12,16 38:4,7,17,20,23 39:2,5,14,23 40:16, 22,25 41:14,22 42:16,19,22,25 43:5,24 44:15 45:17 46:3,10,20, 25 47:19 48:15 49:9,12,25 50:5,8, 22 51:9,11 52:13 53:18,20,24 54:13, 22 55:22,24 56:1, 10,16 57:1,3 58:4 60:13 62:21 63:16, 19,21 64:14,17,20 65:9,18,21 66:4,20 67:7 68:8 69:17,19, 22 70:20,24 71:1,4, 6,10,19,23 72:2,10, 16,19,24 73:4,7,10, 14,18,21 74:1,12 75:7,9,12,21 76:1, 17,19 77:8,10,14 78:21 80:1,6 81:1, 16,20,25 82:13 83:13,15 84:2 85:12 86:11,24 87:4,7 88:12,15 89:4,17 90:3 91:17, 22 92:1,16 93:1,4 94:5,8,10 95:24 96:13,24 97:3 98:6, 10,14,17,19 99:12 101:17 102:8,11, 14,18 103:7 104:20 106:21 107:10 108:2,4,16 109:6, 20 110:2 112:8

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Index: sit..Supreme

113:13,17 115:2,9
126:4 131:3,16,19,
20

**sit** 61:3 63:6 96:16
110:8

**sits** 67:3,7,10

**sitting** 45:7 68:25
69:1,23 70:3,22
126:8 128:19

**situation** 56:20
67:18 91:4,6
110:20,21 125:8
129:4

**situations** 30:18

**size** 118:15

**slammed** 69:11

**sleeve** 114:1,14

**slick** 115:21,23,24,
25 116:2

**slipped** 87:8,23
105:21 106:17

**slippery** 74:22 88:5

**slob-** 60:24

**slow** 117:18

**smell** 118:4,7

**SO-12** 58:9

**sober** 52:1 110:22

**sole** 115:21,23
116:2

**somebody's** 53:21
62:20

**someone's** 72:12

**something's**
100:23

**Sonja** 123:12

**SOPS** 35:15

**sort** 38:12 117:8,9

**sorts** 117:6

**south** 20:9 22:4
58:19

**span** 23:6

**speak** 35:12 46:15
54:18 75:14 128:24

**speaking** 8:5
127:21

**specific** 43:16
112:19

**specifically** 89:4

**spent** 22:9 58:9

**spillway** 58:21,23

**Spire** 73:16,17

**spoke** 73:23 95:25
104:25 127:14,16

**spoken** 123:24

**spot** 80:11

**Springs** 22:7

**squalling** 50:25
51:3

**staff** 117:20,21
120:3

**staff's** 22:16

**stand** 55:11

**standard** 35:15

**standards** 30:11
36:1

**standing** 66:6,17
68:7 76:3,6 97:10
100:11 126:10,22

**start** 7:5,7 21:21
63:4 77:23 132:7

**started** 23:2,10,25
24:11,23 26:18
61:14 129:19

**starting** 133:10

**starts** 60:9

**state** 5:6 35:19 40:8
130:18

**stated** 16:2

**statement** 118:5

**statements** 15:23

**States** 40:1

**station** 20:13 102:6
103:3,6 106:10
107:19 119:21

**status** 28:10 75:17

**stay** 77:1 89:12
109:2 110:10 132:6

**stayed** 22:5,13
91:10 127:19

**staying** 57:23

**steadily** 61:10

**step** 67:8 89:12

**stepped** 77:21

**stepping** 68:25

**Steve's** 23:1

**stitched** 116:16

**stitches** 117:2

**stitching** 121:25

**stone** 52:1

**stop** 38:5,6,25
39:10 58:5 59:20
64:4 80:20 82:15

84:9,13,16,21
86:20 87:16 88:6
121:4,5 126:19

**stopped** 125:17,24

**story** 5:21

**straight** 50:19
57:24 58:5,25
68:25 87:14 90:7
105:23 107:11
111:18 127:16,18

**street** 38:18

**streets** 33:6

**stress** 112:21

**Strider** 94:17,18

**strike** 46:9 47:3
49:7 81:3 102:12,
17

**striking** 82:2

**stripe** 114:7

**struck** 91:21

**structured** 27:10

**stuff** 45:9 63:5

**stumbled** 50:19
59:5,13,16 104:13

**stumbling** 60:9

**subject** 6:16

**subpoena** 5:11

**substance** 116:24
124:5

**Sunday** 35:1

**supervisor** 47:21

**supposed** 40:24
43:13 47:4 53:17

**Supreme** 40:2

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                           Index: surface..tinted

**surface** 88:5

**suspect** 37:22
  46:22 48:2

**suspects** 54:21

**suspicion** 37:14,
  17,19 38:3,13

**sustain** 46:19

**sustainment** 22:14

**swap** 48:24 54:16
  98:10 110:11 111:8

**swapped** 111:10,12

**Sweat** 52:21 75:1,
  24 79:11 87:9
  90:11 92:9 97:10
  100:6 102:1,5
  108:6 109:5,6,7,12,
  13 112:7,22 119:3,
  5,12,18,20 120:4
  124:22,24 125:16
  127:12,13,14 128:3
  133:15

**Sweat's** 109:12

**swing** 69:2,3,4
  84:22 87:25 90:18
  107:2 126:19

**swinging** 80:16
  83:9 86:4,19

**sworn** 5:2

**Symptoms** 116:7

—————————
              **T**
—————————

**tag** 51:19 114:4

**takes** 55:12

**taking** 42:10 86:4
  111:2 126:7

**talk** 38:19,21 41:1,
  11,12 55:16 72:4
  93:18 96:21 104:21
  105:25 112:16,17
  133:11

**talked** 94:20
  112:10,12 123:12
  127:13 130:8

**talking** 7:11 54:2,
  24,25 93:9 112:12,
  13 126:1,24 127:1
  129:3

**talks** 18:18

**tall** 99:25

**tape** 93:6,18,20
  98:12,16,18

**taped** 73:5

**tase** 48:6

**taught** 40:21

**teeth** 117:12,13

**telephone** 73:8
  74:2

**telling** 23:18

**tells** 105:11

**term** 38:2,7

**terminology** 28:19

**Terry** 38:5

**testified** 5:3 118:3,
  7,12 121:9 122:5

**testify** 54:8,9
  89:18,20 129:14,24

**testimony** 6:2,15
  7:17 17:4 47:17
  64:6 71:7 73:22
  109:24 110:1,10
  119:23 121:1,18

130:2

**tests** 42:20

**Thanksgiving**
  50:14 54:5

**That'll** 109:16

**theoretical** 40:10

**thing** 7:2,6 13:1
  15:2,7 18:13 30:17
  61:15 63:8 76:10
  87:24 91:10
  130:16,24

**things** 12:10 18:11
  29:13 37:15 40:10
  55:12 63:3 91:5
  112:13 117:9

**thinking** 13:21 52:6
  95:6 98:2

**Thomas** 50:22
  52:20

**thought** 10:18
  44:10,11 47:14,17
  65:16 79:7 86:9,19
  87:7 88:4 90:17
  95:9 102:2 107:4
  122:15 126:18
  131:6

**thoughts** 96:16

**threatened** 61:16
  67:19 74:8,9 90:13
  117:22 123:23

**threatening** 53:3
  118:22

**threatens** 81:22

**threats** 53:4,6
  67:19 72:25 127:9,
  11

**threw** 53:25 129:21

**throw** 54:14

**thrown** 17:10

**thumb** 45:4,10
  95:17

**Thursday** 34:18

**ticket** 40:13

**ticketable** 39:16

**tickets** 29:15

**Tim** 58:9 59:23
  60:8,19 61:8,12
  64:7 69:7 75:2
  88:20 90:11

**time** 6:8 8:7 13:18
  17:8 22:25 23:8
  24:9,13,15,21 26:9,
  17 28:14 29:1,5,19
  43:14,15,20 45:6,
  24 48:5 50:10,13,
  23 51:12 52:5,12
  53:4,22 61:13 72:7,
  8,15,21 73:8,23,24
  74:24 75:1,14,15
  78:12 80:4 83:10
  85:1,3,16 86:19
  90:14 91:12 101:9,
  13 102:3,20,22
  110:25 120:21,22
  124:9,12 127:14,20

**timeframe** 16:25
  17:14

**times** 6:19 7:2 8:10
  26:10 48:17 51:14
  52:12 63:12 67:20
  77:1 100:22 105:2
  109:1 117:10,17
  125:13

**tint** 78:6

**tinted** 86:17

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                   Index: today..volunteered

**today** 16:12 31:15, 24 64:6 123:5 131:9

**told** 16:2 50:17 53:13 58:4 59:17 60:10,13 61:8 63:1, 3 64:4 80:20 82:14 84:16 86:20 87:16 94:12 98:19,20 104:11 106:3 108:6 111:21 121:4 122:14 123:15 124:10,24 125:15 126:19

**tomorrow** 130:10 131:1

**tonight** 132:6

**tooth** 118:1

**top** 85:8 116:6

**tore** 98:23

**totality** 45:15

**touch** 5:11

**tour** 20:17

**tower** 76:12 87:15 90:20 97:16,18 119:7,10 127:18

**track** 36:14 43:2

**traffic** 26:23 29:15 39:12,15,21 40:13 58:1

**train** 35:10

**trained** 22:17 38:9 67:6 81:15,17,21 110:9 119:25

**trainees** 22:16

**training** 22:10,18 23:20 24:18,19

35:18 36:17,23 37:11,13 40:12,19, 20 42:23 82:3 88:11 91:2,3 92:17

**transcripts** 21:18

**transfer** 22:7

**transport** 47:11

**transporting** 61:14

**transports** 52:24

**treated** 117:16

**treating** 117:20

**treatment** 109:3,18

**tree** 123:7

**trees** 59:15

**trial** 7:19 89:19

**trick** 10:16 11:3

**trip** 74:5

**trouble** 52:25 53:2 66:3 112:2

**truck** 59:11 60:22 61:4 64:17,18 65:9 66:4 67:3,7,9,23 69:21 70:24 71:2 72:1 74:15 75:8 78:5,16 79:12 83:13,14 84:25 85:1,7,21,24 86:5, 10,12 88:21 90:2,9 92:3,5 107:23,24 108:14 109:12 115:17 120:14 126:8,25 128:25

**truck's** 86:16

**trucks** 52:23 75:7 92:6

**true** 15:24 118:4

**trustees** 74:20 75:11,20 100:23

**Tuesday** 26:20

**Tupelo** 18:6 20:9, 10 21:25

**turn** 36:24 37:20 68:10,21 96:6

**turned** 58:20 60:15 83:17 128:16

**Twelve** 19:6

**two-week** 24:24

**type** 7:10 9:19 10:8 27:24 28:3 49:24 96:16

**typed** 10:8 12:20, 21 14:18 96:11

**typed-up** 14:21

**types** 12:16 21:12 36:8

**typical** 50:25 51:2

**typically** 12:15 13:16 67:8,15 69:3 78:15 79:19 110:21 114:21

## U

**uh-huh** 6:20 133:1

**UMC** 116:5

**unable** 116:7

**uncle** 56:22

**understand** 6:17 7:20,22 13:22,25 32:25 54:19 62:8, 11 65:25 68:5 75:23 92:11 93:12 131:14

**understanding** 11:8 31:6 37:21 49:19 66:2 119:22 130:14

**understood** 8:2 90:21

**uniform** 113:20 114:20

**uniforms** 113:22, 23,25

**unit** 22:7 114:5

**United** 40:1

**unreal** 89:25

**upfront** 129:20

**upper** 69:15 83:22

**upset** 91:11

## V

**Vague** 53:3

**variations** 114:10

**vehicle** 30:22 36:15 59:2 128:4,15,20 129:2

**verbal** 53:19

**Verbally** 89:12

**versus** 40:1,3

**view** 83:18 103:1 120:16,24

**violate** 40:7

**violent** 63:20

**Vista** 40:1

**volunteer** 24:12 26:17 32:17

**volunteered** 22:6

EXHIBIT B - DEPOSITION OF DANNY LAWRENCE

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Danny Lawrence - 08/15/2018                                    Index: wait..young

24:14

## W

**wait** 110:22

**WAIVED** 133:20

**walk** 38:18

**walked** 85:20 86:2 87:13,14 100:11 122:15 127:17

**wanted** 45:12 57:8 94:3,4 111:25 125:19

**wanting** 62:4,5 64:25 88:7

**warrant** 37:25 49:5 51:15,25 52:3,6 58:12,14

**warrants** 58:13

**washed** 74:23

**watch** 63:10 67:8 110:5

**watching** 76:13 117:1

**ways** 43:22

**weapon** 78:16 126:12

**wear** 114:2,3,4,15

**wearing** 39:9 113:7,20 114:24 115:4,8,16,19

**week** 5:14 23:5 24:23 30:10,20,21

**weekends** 23:6 24:24

**weekly** 30:4

**weeks** 22:8 23:6 24:21 32:23

**weight** 62:16

**wet** 74:20,22 87:8

**When's** 51:12

**White** 97:25

**Whitfield** 48:11

**whooped** 117:11

**whooping** 108:25

**Wilkerson** 122:10, 13

**William** 21:13

**Williams** 47:24 48:13,15

**Williamson** 47:23, 25 48:1 94:1,18

**Willis** 120:6 123:12 133:12

**windows** 78:4 84:4 86:17

**wine** 118:13

**wings** 114:4

**withdraw** 92:21

**woman** 32:14

**won** 17:11

**wondering** 56:19

**woods** 51:21,23

**word** 38:4 83:1 88:1 117:10 125:12

**work** 23:1 26:10,23 27:21 30:13 31:4, 13,23 32:13 35:1, 21 69:6 98:19 115:22 132:8

**worked** 21:24 27:1 34:20,24 45:18 48:19 49:4,10

**working** 25:19 30:19,21 31:14,20 32:16 33:13 92:10 110:24 120:6 122:14 123:22

**world** 57:11 63:7

**Worley** 14:4,10 44:8 46:1 48:17 49:10,15 50:6,9 51:21 53:7 56:18 57:20 61:21 63:9 72:21 73:24 77:12 80:5,8,24 82:1,16 83:11,16 85:11,16, 20 86:20 87:3,6,18 88:3,7 89:7 90:12 92:15 97:1,4 99:2 101:13,18 102:3,20 105:12 111:1 114:24 115:15 118:12 119:9 120:13,14,18,21 121:8 122:1,18 123:11,13 125:16, 19 129:11

**Worley's** 84:1 116:5

**worms** 51:22

**worst** 74:7

**wreck** 5:20 43:11 122:6

**write** 9:17 29:14 41:2 43:4,7,19,23 44:2 96:1 99:21

**writing** 40:21 95:4

**written** 55:6

**wrong** 36:25 60:7 94:6 98:1

**wrote** 10:5 11:8 41:7 44:5

## X

**x-rayed** 117:17

## Y

**y'all** 123:16 124:23 125:21

**yanks** 80:23

**yard** 48:4

**year** 19:6 22:13 50:14 74:24 114:13

**years** 8:8 19:1,2 48:8,9 75:22

**yelled** 88:6

**young** 17:1

844.533.DEPO