RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Richard Worley - 08/14/2018

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF MISSISSIPPI
 2                        JACKSON DIVISION

 3     RICHARD WORLEY                              PLAINTIFF

 4
       V.                    CAUSE NO. 4:17-cv-193 SA/JMV
 5

 6     DEPUTY DANNY LAWRENCE, Individually and in his
       Official Capacity as a Deputy of the Grenada
 7     County Sheriff's Office; DEPUTY BRYAN GRIFFITH,
       Individually and in his Official Capacity as a
 8     Deputy of the Grenada County Sheriff's Office;
       DEPUTY RANDY SWEAT, Individually and in his
 9     Official Capacity as a Deputy of the Grenada
       County Sheriff's Office; DEPUTY TIM GHOLSTON,
10     Individually and in his Official Capacity as a
       Deputy of the Grenada County Sheriff's Office;
11     DEPUTY DONNY WILLIS, Individually and in his
       Official Capacity as a Deputy of the Grenada
12     County Sheriff's Office; JOHN DOES I-X,
       Individually and in his Official Capacity as a
13     Deputy of the Grenada County Sheriff's Office;
       SHERIFF ALTON STRIDER, Individually and in his
14     Official Capacity as a Sheriff of the Grenada
       County Sheriff's Office; GRENADA COUNTY,
15     MISSISSIPPI                           DEFENDANTS

16
       *************************************************
17
                    DEPOSITION OF RICHARD WORLEY
18
       *************************************************
19

20              DATE:    TUESDAY, AUGUST 14, 2018
                PLACE:   GORE, KILPATRICK & DAMBRINO
21                       2000 GATEWAY, SUITE 160
                         JACKSON, MISSISSIPPI
22              TIME:    10:37 a.m.

23

24                       BETHANY CAMMACK
                     Certified Shorthand Reporter
25                   Mississippi CSR No. 1526
```

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Richard Worley - 08/14/2018
Pages 2..5

**Page 2**

```
 1           APPEARANCES
 2
 3   MARY MCKAY GRIFFITH
     Jacks Griffith Luciano
 4   150 North Sharpe Avenue
     Cleveland, Mississippi  38732
 5   662.843.6171
     mgriffith@jlpalaw.com
 6       Counsel for Defendants
 7
     KATELYN A. RILEY
 8   Allen, Allen, Breeland & Allen
     Post Office Box 751
 9   Brookhaven, Mississippi  39601
     601.833.4361
10   kriley@aabalegal.com
         Counsel for Defendant Bryant Griffin
11
12   ANDREW C. CLARKE
     Attorney at Law
13   6256 Poplar Avenue
     Memphis, Tennessee  38119
14   901.680.9777
     aclarke@accfirm.com
15       Counsel for Plaintiff
```

**Page 3**

```
 1            TABLE OF CONTENTS
 2                                            PAGE
 3
     Title Page................................ 1
 4
     Appearance Page........................... 2
 5
     Table of Contents......................... 3
 6
     Exhibit Index............................. 4
 7
 8   EXAMINATION OF RICHARD WORLEY
 9      By Ms. Griffith........................ 5
        By Ms. Riley........................... 74
10      By Mr. Clarke.......................... 126
        By Ms. Griffith........................ 128
11
12   Reporter's Certificate.................... 132
13   Deponent's Certificate.................... 133
14   Correction Sheet.......................... 134
```

**Page 4**

```
 1            EXHIBIT INDEX
 2
     NO.   DESCRIPTION                         PAGE
 3
 4   1     Photographs of Ms. Kitchens         49
 5   2     Incident Reports, Release Reports,
           Information Sheets, Bonding Sheets
 6         CO DEF 1-484                        52
 7   3     UMMC Grenada Medical Record         94
 8   4     Ware Family Dental Patient Chart    112
```

**Page 5**

```
 1            RICHARD WORLEY,
 2       having been first duly sworn,
 3       was examined and testified as follows:
 4            EXAMINATION
 5   BY MS. GRIFFITH:
 6     Q.  Mr. Worley, I'm Mary McKay Griffith.  I
 7   introduced myself earlier.  And you just sat
 8   through Ms. Kitchens' deposition.  Is that correct?
 9     A.  Yes, I did.
10     Q.  And you're going to have to speak up so
11   everybody --
12     A.  Yes, I did.
13     Q.  Okay.  So just everyone can hear you.  So
14   you kind of understand how it goes.  You know, I'll
15   ask you questions, and just try not to speak over
16   each other.  If you need a break, just let me know.
17         Could you state your full name?
18     A.  Richard Gordan Worley.
19     Q.  And how old are you?
20     A.  I'm 42 years old.
21     Q.  And have you lived in Grenada your entire
22   life?
23     A.  No, I haven't.
24     Q.  Okay.  So where were you born?
25     A.  Winona, Mississippi.
```

844.533.DEPO

Page 26

1 deposition the people that I represent in the case
2 that you've filed against them. And the first one
3 is Danny Lawrence. Can you tell me why you've sued
4 Danny Lawrence?
5    A. Well, police officers are supposedly
6 supposed to protect and serve. I was standing
7 there being struck not one, not two, not three, but
8 repeatedly. He stood there and watched this, and
9 did not intervene.
10    Q. And where are you saying that you were --
11 where were you physically when you are saying that
12 you were struck?
13    A. I was standing at the booking desk at the
14 Grenada County jail.
15    Q. Okay. So when you were in the booking --
16 at the booking desk, where was Danny Lawrence?
17    A. Standing right beside me. He was standing
18 on my left.
19    Q. Are you saying that --
20    A. With my hands cuffed behind my back. And
21 he was kind of standing kind of behind me to my
22 left.
23    Q. So you're just basically saying he failed
24 to stop someone from hitting you?
25    A. Yes.

Page 27

1    Q. What are your claims against Tim Gholston?
2    A. Tim? Tim Gholston, nothing. Tim Gholston
3 was never there. Tim Gholston was never at the
4 jail. Tim Gholston was at the lake when I got
5 arrested. Tim Gholston is -- lives across the
6 street from my brother. He's a nice man. I'm
7 telling you, he's a super great guy.
8    Q. So then why are you suing him if he wasn't
9 there?
10    A. Tim Gholston --
11       MR. CLARKE: Hang on a second. I'm
12 going to -- I'm going to object. Let me ask
13 Mr. Worley to go out, because this involves
14 privileged information. The information -- we
15 didn't have public records stuff at the time. We
16 requested public records. We didn't get them. If
17 you look at my complaint, we say we were going to
18 --
19       MS. GRIFFITH: I saw your footnote.
20       MR. CLARKE: Yeah. We're going to --
21 until we can find out who was there and whatever --
22 once that happens, we intend to let out a number of
23 deputies once we confirm the people that were
24 there.
25       MS. GRIFFITH: But based on what he

Page 28

1 just said, are you saying you want to let him out
2 now? I mean. . .
3       MR. CLARKE: Well, I'm pretty sure we
4 are.
5       MS. GRIFFITH: Okay.
6       MR. CLARKE: Yeah.
7       MS. GRIFFITH: Well, I mean, I've
8 just got to ask him these questions.
9       MR. CLARKE: No, no, no. I
10 understand. If you saw the footnote --
11       MS. GRIFFITH: I saw the footnote.
12       MR. CLARKE: Mr. Worley, stop. This
13 is me talking to the lawyer.
14       We are going to pare it down to probably
15 Griffin and Lawrence.
16       MS. GRIFFITH: Okay.
17       MR. CLARKE: Once I take the
18 depositions and confirm. He was having trouble
19 identifying who was there. He knows Lawrence
20 brought him there.
21       MS. GRIFFITH: Okay.
22       MR. CLARKE: So that's probably
23 what's going to happen. I'd like to do it by
24 consent, but until we -- we didn't get very many
25 records.

Page 29

1       MS. GRIFFITH: I understand.
2 MS. GRIFFITH CONTINUED:
3    Q. Okay. So was Randy Sweat -- was he
4 present when this incident occurred? Do you know
5 him?
6    A. No, ma'am, he was not present, either,
7 until after the fact, after this is -- had
8 occurred.
9       COURT REPORTER: After this is what?
10       THE WITNESS: After the -- it had
11 occurred.
12 MS. GRIFFITH CONTINUED:
13    Q. Okay. What about Donny Willis?
14    A. Donny Willis was not present.
15    Q. Do you even know if he was working that
16 day?
17    A. No, I don't.
18    Q. And I'll just submit to you, he was not.
19       MR. CLARKE: Right. And, look,
20 here's what happened. I was talking with Danny,
21 and he gave me a list of who was present.
22       MS. GRIFFITH: Okay.
23       MR. CLARKE: And those are all those
24 people. Because I was trying to get my public
25 records request done before the year came up. We

**Page 30**

1 had even called the -- you know, and this is why
2 certain people are brought in.
3     It's more -- it's not his information.
4 It's based on what -- and that's why I put that
5 footnote in my complaint, is, until we can identify
6 and confirm who was particularly there, we'll let
7 the other people out. But he gave me that list of
8 people that were potentially present --
9     MS. GRIFFITH: Oh, I understand.
10     MR. CLARKE: -- on that day. So we
11 intend, after this round of depositions -- that's
12 why some mine, when you want to take depositions
13 Thursday, some of these are going to be very quick.
14     MS. GRIFFITH: Oh, well, good. Then
15 maybe we can move some of them up.
16     MR. CLARKE: If we can get them, we
17 may get through more tomorrow.
18     MS. GRIFFITH: Oh, yeah, we could
19 probably do that.
20     MR. CLARKE: Okay.
21 MS. GRIFFITH CONTINUED:
22   Q.  So tell me, was Sheriff Strider present
23 when this incident occurred?
24   A.  No, ma'am.
25   Q.  Okay. So what are your claims against

**Page 31**

1 him?
2     MR. CLARKE: I'm going to object to
3 that on the basis of attorney-client privilege.
4 The claims are based on my information. I wrote
5 the complaint.
6     MS. GRIFFITH: Well, I understand
7 that. But he's the plaintiff, so -- this is my
8 only time to talk to him, and I'd like to know why
9 he's suing Sheriff Strider.
10     THE WITNESS: It's his department.
11 MS. GRIFFITH CONTINUED:
12   Q.  Okay. Did you --
13   A.  He's in authority. He supposedly had
14 these men trained. The behavior that I received
15 from them was -- was not called for.
16   Q.  And I'll just remind you to speak up so
17 she can hear you.
18   A.  It was not -- it was not called for, the
19 way I was treated.
20   Q.  Did you ever speak to him about this
21 incident?
22   A.  No, I haven't.
23   Q.  Now, where had you -- on 12/23, when this
24 incident occurred, '16, where had you been?
25   A.  That morning, I was at the house. Been

**Page 32**

1 basically nowhere. Been there at the house. I had
2 got up. We -- routine. I got up and -- you know,
3 it was Christmas. It was fixing to be the 24th and
4 25th. I asked Barb if she wanted to ride over to
5 her mother's to wish her, you know, a merry
6 Christmas. And --
7   Q.  Did you have anything to drink before you
8 went?
9   A.  Around 12:30, 1:00, I'd had one cup of
10 wine, and then I drank it, and I drank another
11 little ole cup of wine. It was (indicating) a cup
12 of wine. But it was -- I didn't -- I was planning
13 on coming -- visiting with them and coming home and
14 then making me a toddies and enjoying my -- working
15 around the house and shop and, you know, just
16 enjoying my Christmas. You know, enjoying my off
17 time. It was -- you know, off of work.
18   Q.  So y'all went over to her mom's house. Is
19 that correct?
20   A.  Yes, ma'am. Went to her mother's, and I
21 went to get out. Her mom came out, "How you doing,
22 Richard?" Everything was fine.
23     I said, "Well, y'all have a merry
24 Christmas. You going to cook the turkey?" And we
25 talked there a minute, and the next thing I know,

**Page 33**

1 her son Jimmy, upset -- I haven't worked him. I
2 had a big job going on, and I told him I didn't
3 need him.
4     And he felt that -- being, you know,
5 Jimmy, like -- he was like -- I didn't need him
6 because he does not have the skills that I needed.
7 I was working way up in the air, heights. I did
8 not need him. He was upset because I didn't hire
9 him. Basically that was it.
10     And he started hollering, "If you don't
11 leave, I'm going to call the law."
12     I said, "Well, I'm leaving." I said,
13 "But, Nancy, what's going on?"
14     Her mother just shook her head and said,
15 "It's all right, Worley."
16     So I got in the car to leave. I said,
17 "Barb, let's go."
18     Barb said, "We can't leave the scene of an
19 incident."
20     I said, "There's been no incident."
21     She said, "Well, we can't leave the scene
22 of an incident."
23     I said, "What incident?"
24     I just sat in the car. The deputies
25 pulled up. Danny walked up to the passenger car

**Page 34**

1 and said, "Richard, what's going on?"
2     I said -- I put my hands up, I said, "I
3 have no clue." I said, "You're going to have to go
4 ask Jimmy."
5     He went in, talked a few minutes. When he
6 came out, he says, "Richard, y'all are free to --
7 y'all go on home." That was it.
8   Q. Well, did you go home?
9   A. Started home. And when you cross the
10 levee there at Grenada, I had to use the bathroom.
11 That's where I pulled off, down the levee. The
12 bathroom's right to the right. Sure enough, lo and
13 behold, the law pulled in, the law did, and looked
14 in the back glass. And I told them I needed to use
15 the bathroom, and he said, "Go on."
16     Well, I went in there to use the bathroom.
17 I went in there and peed. Came out, and Mr. Danny
18 Lawrence was standing by the passenger side of the
19 car door when I went to get in. He said, "Worley,
20 I thought y'all was going home."
21     I said, "You know, I was. I had to use
22 the bathroom." I said, "You see my fishing poles
23 in the back." I said, "I was going to do some
24 fishing."
25     He said, "How much have you had to drink?"

**Page 35**

1 I said, "I've had a couple cups of wine."
2     He said, "Well, I don't want you going
3 fishing. I want you to go home."
4     I said, "No, Danny, I'm going to go
5 fishing." I said, "I've got a license." I said,
6 "You see I ain't drunk."
7     He said, "No, just go on home."
8     I said, "Danny, I can't go fishing?" I
9 think that was the third time.
10     He said, "Well, that's it. I'm just going
11 to -- I'm going to carry you to jail."
12     I said, "Oh, Danny, don't carry me to
13 jail. I ain't done nothing." I said, "I'll go on
14 home, then."
15     I went to open up the door. He said, "No,
16 I'm going to carry you on to jail." And he kind of
17 -- he grabbed my hand. When he grabbed my hand, I
18 said, "Go on, carry me to jail." I said, "What are
19 you going to carry me for?"
20     That's when he said, "I'm going to arrest
21 you for public drunk."
22     I said, "All right."
23   Q. **So you really think I should believe that**
24 **you were that calm and had that demeanor about you**
25 **when you were talking to him?**

**Page 36**

1     MR. CLARKE: Object to the form.
2     THE WITNESS: I sure did. That's the
3 God's honest truth. God as my witness, that's the
4 truth.
5 MS. GRIFFITH CONTINUED:
6   Q. **Did you have any beer in your car?**
7   A. No.
8   Q. **So did you calmly get into his vehicle?**
9   A. Handcuffed behind the back. And the way
10 it is -- it's not a car. It's actually like a SUV.
11 It's off the ground. I put my one foot here, and
12 when I turned my body to sit in the seat, turned my
13 body, and he went to -- he slammed the door. And I
14 didn't quite have my feet in the door, and he
15 slammed the feet -- my feet got hung right there in
16 that door when he slammed them.
17     And the only time I got loud is, I told
18 him, "Don't slam my feet. Don't slam the door on
19 my feet again, Danny." That's what I done. Put my
20 feet in the truck, and he shut the door and got in.
21 We proceeded to jail.
22   Q. **So did you do any kicking or screaming?**
23   A. None whatsoever.
24   Q. **Do you think it was just an accident that**
25 **he did that with your ankle?**

**Page 37**

1   A. Who knows?
2   Q. **But that's not part of this lawsuit. Is**
3 **that what you're saying?**
4   A. Right. That's -- I'm just explaining what
5 happened.
6   Q. **But you're not claiming that he**
7 **intentionally --**
8   A. No, I'm not.
9   Q. **-- hurt your ankle?**
10   A. No, I'm not.
11   Q. **So did Tim Gholston also come out there**
12 **when you were being arrested?**
13   A. Yes, Tim was there. He was present.
14   Q. **Okay. And did you talk to Tim or say**
15 **anything to him?**
16   A. Tim just kind of shook his head. I said,
17 "Do you believe this, Tim?" He just shook his
18 head. He just kind of. . .
19   Q. **So did you have any -- did you talk to**
20 **Danny Lawrence when he was driving you to jail?**
21   A. Yes, I did.
22   Q. **What did y'all talk about?**
23   A. On the way to jail, all I -- I told him, I
24 said, "You know, Danny, I think it's mighty sorry
25 you've got a niece and a nephew here, and you

### Page 38

1  ain't -- you don't -- you haven't even give them a
2  birthday card, Christmas card. Father's passed
3  away." I said, "You could do something to help
4  these kids. They need guidance, even somebody to
5  talk to. Do something. Don't just throw them out
6  of their aunt's life."
7      I mean, I don't think that's right when
8  they don't have any family. They don't have any
9  family but Big Sonny's sister, which is their aunt,
10 and Danny. That's it. And they don't have any
11 contact with these kids. I thought that was -- I
12 thought that was kind of sad, to be honest.
13     Q. Well, who are you to tell him that?
14     A. Well, that's just the way I felt. Who am
15 I -- that's the way I felt.
16     Q. You don't even have any contact with your
17 ten- or 11-year-old children.
18         MR. CLARKE: Object to the form.
19 That's argumentative.
20         THE WITNESS: I pay my child support.
21 I do support my children.
22 MS. GRIFFITH CONTINUED:
23     Q. How do you pay your child support if you
24 don't have a job?
25     A. Well, I'm a little behind right now, but I

### Page 39

1  will get it caught up.
2      Q. So how far behind are you?
3      A. I'm -- $5,000.
4      Q. So when is the last time you paid
5  anything?
6      A. It's been a few years.
7      Q. And that goes through Kentucky?
8      A. Yes.
9      Q. Okay. So once y'all were on your way, you
10 had this conversation with Danny, told him what you
11 thought. What happened after that?
12     A. He was on his cell phone. He was talking
13 to somebody. I couldn't quite make what he was
14 saying because he was really quiet.
15     Q. Okay. And then he takes you into -- I
16 guess he drove into the sally port?
17     A. Correct.
18     Q. And what happened after that?
19     A. Well, went into sally port, and he gets
20 out, walks around, opens the door. I step out, and
21 we walk in the jail. Nobody's there but me and
22 Danny Lawrence.
23     Q. So did you fall in the sally port?
24     A. No, ma'am. None whatsoever.
25     Q. Was the sally port wet?

### Page 40

1      A. No, ma'am. None whatsoever.
2      Q. So nothing happened in the sally port?
3      A. None whatsoever. Not a thing. Put it on
4  God's word.
5      Q. So did you try to run from the officers or
6  kick them?
7      A. No, ma'am. None whatsoever.
8      Q. And who was in the sally port besides you
9  and Danny Lawrence?
10     A. No one else.
11     Q. So what happened once you got in the
12 booking area?
13     A. Got into the booking area, I was standing
14 there, he was to the left kind of behind me.
15     Q. And you're talking about Danny?
16     A. Yes. Yes, ma'am. And nobody was --
17 nobody -- just me and him. And it was kind of odd
18 there was not a -- generally you got a guard that
19 sits at the desk. A guard that sits at the desk,
20 you know, to process you in. You have another
21 guard that's going to take your belt and, you know,
22 unhandcuff you and stuff and -- you know, they take
23 control. Nobody was there.
24         What happened next, the doors open, and
25 this black deputy -- I have never seen this man in

### Page 41

1  my life -- was walking through the sally port door
2  there and walking toward me. And I made the
3  comment, I said, "The donuts are pretty good up at
4  the donut shack." Because was he kind of -- you
5  know, I just had a -- I sensed something wrong, and
6  I wanted to get his attention.
7      But he never said a word. He never -- he
8  kind of had his head down and he was walking toward
9  me. Never said a word. Never stopped. When he
10 got up to me, when he hit me, I hit the ground.
11     Q. And what did you hurt when you hit the
12 ground?
13     A. When he hit me, he -- he come around this
14 -- he hit me dead in the mouth. When he hit me in
15 the mouth, it busted my mouth and nose, and I went
16 straight to the ground. But being me, stubborn, I
17 rolled -- when I hit the ground, I kind of rolled
18 -- I was handcuffed behind my back. When I hit the
19 ground, I rolled around and jumped straight back to
20 my feet and told him, "My mother hits harder than
21 that."
22     And that's when he hit me again. And this
23 time when he hit me, I went straight to the ground
24 again. And I got back up, and that's when I told
25 him that a black man would not hit a man in

**Page 42**

1 handcuffs, but a nigger will every time.
2     And he reared back -- when he hit me, I
3 put my head back, and he hit me right there on the
4 chin and busted my chin wide open. Hit the ground
5 and started back up again, and that's when he put
6 his -- that's when he stomped me.
7   **Q. What do you mean, he stomped you?**
8   A. What I mean, he took his boots and he -- I
9 went to turn around, which I was -- and he stomped
10 me on my head. Head facing this way. That's where
11 the blood is coming out of my ear. And I don't
12 remember too much after that. I remember the nurse
13 screaming. I remember that. "Get off of
14 Mr. Worley."
15   **Q. What nurse are you talking about?**
16   A. Ms. Bibbs.
17   **Q. And then what happened?**
18   A. I remember her pulling me away. I mean, I
19 woke up, got to, and she said, "Mr. Worley, stand
20 up." And she had pulled me from the -- this little
21 lady here, four foot tall, pulled me from here to
22 the door outside right there, on the other side of
23 this door.
24     And she said -- and by that time, I was
25 kind of getting coherent. She said, "Can you stand

**Page 43**

1 up?"
2     I said, "Yes, ma'am."
3     She helped me up and she got me in the
4 nurse's room there. And she said, "Oh, my God,
5 we've got to get you to the emergency room." And
6 that's when she got out there and got on to Danny
7 and them. That little woman, she was fired up.
8 She said, "Y'all are going to get Mr. Worley to the
9 hospital now. I'm going to call an ambulance."
10     And Danny spoke up and said, "No, I'll
11 carry Richard to the hospital."
12     And I was like, "No, I don't want to go,
13 Ms. Bibbs. They might take me off and kill me." I
14 said, "I don't want to go."
15     She said, "Don't" -- I said -- that's
16 exactly what I told her, too. I didn't want to go
17 with Danny. Here I'd done been nearly stomped to
18 death and beat with my hands behind my back. I
19 didn't want -- I was scared.
20     She said, "I promise you, if you'll go
21 with -- they're not going to harm you anymore."
22 Those were the words out of her mouth.
23     And I said, "If you promise." She -- then
24 that's when the other deputy showed up. I guess he
25 came from the sheriff's office. He's an older

**Page 44**

1 deputy. I guess that was who you-all are calling
2 Sweat. He's gray-headed.
3     I got in Danny's -- back in Danny's SUV,
4 and they took me to the hospital. And that's
5 when -- that's what happened.
6   **Q. So were any other deputies at the hospital**
7 **besides Danny Lawrence and Deputy Sweat?**
8   A. Yes, ma'am. I don't -- you know, you-all
9 are saying Griffin. Mr. Griffin. The black deputy
10 that was -- when I was going in, he was like this.
11 He came up there to see the extent of my injuries.
12 He was standing at the -- all -- the door. And I
13 did -- told him how sorry he was, the way he beat
14 me.
15     And Danny and Mr. Sweat said, "Come on,
16 Richard. It's going to be all right. Come on."
17     And I just -- because it was through a
18 door, and I just kind of yelled at him that "That
19 was sorry, the way you done me." And I was -- you
20 know, I was upset the way I got beat. That's the
21 truth.
22   **Q. So what treatment did you get at the**
23 **hospital?**
24   A. At the hospital, they -- the doctor sewed
25 me up. My front tooth was knocked back. They

**Page 45**

1 didn't actually break it out, thank God, because I
2 love my teeth. I got good teeth. And I'm real --
3 I was ticky about my teeth. And it chipped my
4 tooth. It got chipped right there and knocked
5 back.
6     I went to a dentist. They told me --
7 x-rayed it and done all that, and told me, he said,
8 "Richard, it's not broke." He said, "What they
9 done, they knocked the root and stuff loose." And
10 it pushed back. And he put some -- like put some
11 glue on it to keep it, you know, kind of
12 stabilized. He said it would take root back and
13 stay.
14   **Q. So do you have any problems with that**
15 **tooth now?**
16   A. I got a dead feeling in it, like a -- you
17 know, a -- it ain't a numbness. I don't know how
18 to express -- it's like a -- you know, when I eat,
19 it's just like just a dead -- deadish feeling under
20 the gum.
21   **Q. So you had to get stitches in your chin?**
22   A. I don't recall how many. I think it's 22.
23   **Q. They didn't even give you pain medicine**
24 **for that, did they?**
25   A. No, ma'am.

**Page 46**

1 Q. You didn't want it, did you?
2 A. I don't take pills. I don't. I take an
3 aspirin.
4 Q. So besides you claiming that your tooth
5 was injured and you had these stitches in your
6 chin, did you have any other injuries?
7 A. It's just my -- it's like -- I can't
8 explain it. You know, it's just like when I was
9 beat like that, I don't -- my main injury is, I
10 feel -- you know, I don't want to get out in the
11 public. I don't want to get -- I used to like to
12 ride and go fishing and do things and -- but now
13 I'm afraid.
14    I'm afraid. I've heard talk around town.
15 Deputy sheriffs talked to my brother up there that
16 Strider is not going to play fair. I'm just
17 scared. You know, I'm scared. I don't want to. .
18 . I'm scared of getting hurt.
19 Q. So have you had to go to a psychiatrist?
20 A. My plans is, after this deposition, I'm
21 going to Kentucky. The only reason I've stuck
22 around this long is to get this here done, and I'm
23 moving back to Murray.
24 Q. So have you started packing?
25 A. I've got -- I've started selling. I been

**Page 47**

1 selling a lot of stuff. And that's another reason
2 -- I been selling a lot of stuff. You're saying
3 how am I making a living. I'm selling a lot of my
4 belongings. I done sold a boat. I done sold a
5 camper. I done sold three four-wheelers of mine.
6 I've sold a lot of stuff to pay bills and to
7 maintain.
8 Q. So besides your chin being injured, and
9 you claim your tooth, did you have any other
10 injuries besides you saying you just don't get out
11 in the public anymore?
12 A. My tooth and my dignity, my pride. It's
13 all just. . . just. . . I can't explain it. It's
14 more of a psychological thing, I guess. I don't
15 know. I don't know. I just -- that just took the
16 drive out of me. It took -- after that, it just --
17 I can't. . .
18 Q. And, again, if you'll speak up so the
19 court reporter --
20 A. After that beating, I just -- I'm just --
21 I'm different. I just think different. I do
22 things differently. I just want to stay at home.
23 I don't -- you know, basically I don't want to be
24 around nobody.
25 Q. So when you were in that booking area, did

**Page 48**

1 you ever talk to a booking officer?
2 A. Never did. And that was strange.
3 Q. So once you went back to Marilyn Bibbs'
4 office, did you see anyone in there besides
5 Marilyn?
6 A. From the hospital, when I got back? Yes,
7 there was a lady at the booking desk then, and
8 booked me in. Took my picture.
9 Q. Okay. So they took you back to the jail
10 after they took you to the hospital. Is that what
11 you're saying?
12 A. Yes, ma'am.
13 Q. And at that point you were actually booked
14 in? Is that what you're saying?
15 A. Yes, ma'am.
16 Q. And do you know who booked you in?
17 A. No, ma'am. It was a lady.
18 Q. And how long did you stay in jail?
19 A. I stayed in there that night. They did
20 not set me a bond whatsoever that night. They
21 didn't set me a bond that morning. I didn't get
22 out until late that afternoon.
23 Q. And who got you out?
24 A. Barbara.
25 Q. And it's my understanding you followed up

**Page 49**

1 with a dentist. Is that correct?
2 A. Yes, ma'am.
3 Q. Did you follow up with any other type of
4 doctor?
5 A. I got my stitches -- they took my stitches
6 out.
7 Q. Do you have any outstanding medical bills?
8 A. They've sent me some to the mailbox,
9 statements and stuff, you know, my medical bills.
10 I haven't paid any of them. I figured this would
11 go on my credit. And I could, you know, pay them
12 when I got financially able.
13 Q. So do you know about how much you owe?
14 A. Not today -- not -- no, ma'am. Not no
15 total or nothing, no, ma'am. I'd be lying if I
16 told you I did.
17    MS. GRIFFITH: Do you want to take a
18 quick break?
19    (OFF THE RECORD.)
20    MS. GRIFFITH: I'd like to mark as
21 Exhibit 1 to his deposition the photographs of
22 Ms. Kitchens.
23    (EXHIBIT 1 WAS MARKED FOR THE RECORD.)
24 MS. GRIFFITH CONTINUED:
25 Q. Have you ever been to rehab?

### Page 74

1 personally. I don't know -- and I've never seen
2 Griffin.
3     MS. GRIFFITH: I don't have any
4 further questions at this time. Thank you.
5     THE WITNESS: Yes, ma'am.
6     EXAMINATION
7 BY MS. RILEY:
8   Q. Mr. Worley, I've got a number of questions
9 here.
10   A. Yes, ma'am.
11   Q. And I'll try not to double up on anything.
12 My name is Katelyn Riley. I represent
13 Bryant Griffin in this lawsuit. When did you first
14 learn the name of Bryant Griffin?
15   A. When -- the first time I learned his name,
16 because I had no clue to who this guy was
17 whatsoever, was the --
18     MR. CLARKE: Hang on. We got a --
19 can't ask him about attorney-client privileged --
20 any information he got from me is privileged.
21     MS. RILEY: I can ask him when he
22 first learned about it. That's not -- that's not
23 attorney-client privilege by any means.
24     MR. CLARKE: That's true.
25 MS. GRIFFITH CONTINUED:

### Page 75

1   Q. When did you -- when did you first learn
2 of Bryant Griffin?
3   A. That would be. . . First learned was on
4 July the 3rd, I think. July the 3rd, 2018.
5   Q. So after the incident that you filed this
6 lawsuit about?
7   A. Yes, ma'am.
8   Q. All right. And what do you know about
9 Mr. Griffin?
10   A. I know that he's probably five nine. I
11 know that he's African-American. I know that he's
12 a little bit stockier built than I am. And I know
13 he can sure throw a punch.
14   Q. What color is his hair?
15   A. Black.
16   Q. What kind of hairstyle does he have?
17   A. It was just -- his hair at that time when
18 I seen him, it was just, you know, like straight.
19 It was straight up.
20   Q. Would it be about your length, or --
21   A. No. It was -- well, it was kind of, you
22 know -- no, it's not my length. It was kind of
23 slick and -- you know.
24   Q. Would you say it was --
25   A. It was very short.

### Page 76

1   Q. Very short?
2   A. Yeah, short.
3   Q. Would you say an inch?
4   A. No, no, no. It was no inch.
5   Q. Okay.
6   A. It was short. I would say hardly --
7 shoot, hardly no hair there, I know, right in the
8 front. He was slick.
9   Q. Okay. When was the -- when do you first
10 remember -- on the date of the incident, on
11 December 23rd, when do you first remember
12 Mr. Griffin becoming involved?
13   A. When he came in from the sally port.
14   Q. What did he do?
15   A. He walked straight toward me.
16   Q. Okay. Who was in -- and you're saying
17 when he came in from the sally port, you're saying
18 he came into the booking area?
19   A. Correct.
20   Q. Who all was in the booking area?
21   A. At that time, me, Danny, and Mr. Griffin
22 arrived.
23   Q. Okay. There was nobody else?
24   A. No one.
25   Q. Okay. So there were no other arrestees in

### Page 77

1 the room?
2   A. No, ma'am.
3   Q. Was Nurse Bibbs in the room?
4   A. No, ma'am.
5   Q. Does Nurse Bibbs -- is her office -- does
6 it open up to the booking area?
7   A. No, ma'am.
8   Q. Okay. How many times do you claim that
9 Officer Griffin hit you?
10   A. Hit me three times.
11   Q. Okay. Where?
12   A. The first time, dead in the mouth.
13   Q. Okay.
14   A. The second time, that's when I told him
15 that -- and he -- I got hit again. And the third
16 time, that's when he struck me on the chin.
17   Q. When was the second time? What was that
18 -- where did he hit you the second time?
19   A. In the face.
20   Q. Where at on your face?
21   A. On -- when -- first time in the mouth,
22 second time right in -- right beside -- right here.
23     MS. RILEY: All right. Let the
24 record reflect that the deponent, Mr. Worley, is
25 putting his fist to his cheek.

RICHARD WORLEY V. DEPUTY DANNY LAWRENCE, ET AL.
Richard Worley - 08/14/2018
Pages 78..81

Page 78

1  THE WITNESS: Yes, that would be
2  right side.
3  MS. RILEY: His right --
4  THE WITNESS: Yeah.
5  MS. RILEY: His right cheek.
6  MS. RILEY CONTINUED:
7  Q. Do you agree?
8  A. Yeah, right cheek.
9  Q. Okay. And you said the third time was to
10 your chin?
11 A. Yes. I tried to avoid that blow.
12 Q. What did he hit you with? Just his fist?
13 A. Appears to me -- if you seen a deputy
14 sheriff, he had like a leather -- it come up -- it
15 had a -- I know he had leather -- your fingers, you
16 can see your fingers, but it's a -- it's a black
17 glove. But your fingers go through it. And it's
18 like a -- it's black. Black leather glove, but
19 it's not a complete glove. It's not like I wear,
20 work gloves.
21 Q. Like a fingerless glove?
22 A. Yes.
23 Q. All right. And you also mentioned earlier
24 that Deputy Griffin stomped you on your head. How
25 many times did he do that?

Page 79

1  A. I recall just that one time.
2  Q. How do you know it was only Deputy
3  Griffin?
4  A. I was kind of incoherent. After the --
5  after the --
6  COURT REPORTER: I'm sorry?
7  THE WITNESS: After the kick, I was
8  kind of incoherent.
9  MS. RILEY CONTINUED:
10 Q. You said after the kick. When were you
11 kicked?
12 A. That third time I had fell down.
13 Q. Okay. When you fell down -- how many
14 times did you fall down?
15 A. I fell down -- got hit and fell down --
16 the licks were the reason I fell down. Three
17 times.
18 Q. Okay. And how did you get back up?
19 A. I'm going to be honest with you, I rolled
20 and stood up. I mean, stood up. Literally rolled
21 and -- but I -- rolled to my feet and stood
22 straight up.
23 Q. Did you jump up?
24 A. More or less, yes.
25 Q. When you would fall, would you fall on

Page 80

1  your back?
2  A. Well, when he struck me, I fell -- to my
3  -- the first lick I fell was to my side, to my left
4  side, and then I rolled and got up.
5  Q. Okay. What about the second time you
6  fell?
7  A. The second time, I can't really recall how
8  I got up. God helped me up on that one.
9  Q. Now, the second time, how did you fall?
10 A. I just --
11 Q. Your side? Your back? Your stomach?
12 A. I didn't -- I fell to my side, back. I
13 don't know exact- --
14 Q. Which one was it?
15 A. I can't --
16 Q. You don't remember, really, do you?
17 A. After that first lick, I was just -- my
18 state of mind was getting up, trying -- I couldn't
19 defend myself or hold my hands in front me. So my
20 thing was, I didn't want to get caught on the
21 ground and get killed. My thing was to stand up.
22 That was my only thing I could think of, was, Get
23 back to your feet.
24 Q. Okay. So I appreciate all that, but my
25 question was, that second time you fell, what part

Page 81

1  of your body did you fall on? Your back, your
2  front, or your side, or you don't remember?
3  A. I didn't fall on my back, because my back
4  of my head wasn't -- I didn't have no bad bruise on
5  my head. So that's the reason -- because my head
6  would have hit the concrete. I would have knowed
7  if I -- it had to been the side. Had to been on my
8  side.
9  Q. It couldn't have been on your front?
10 A. No. Because I facing him. Every time.
11 Q. So there's no possible way that you fell
12 forward?
13 A. I would've had to -- I would've had to
14 fall forward. And to fall forward, I would've had
15 to fell toward him. No way possible.
16 Q. And you're absolutely certain, under oath,
17 that is how you fell?
18 A. Under oath, so help me God.
19 Q. But I thought you weren't coherent after
20 that first lick.
21 A. I wasn't coherent after I got stomped.
22 Q. Okay. Well --
23 A. After the third lick and I was stomped,
24 that's when I wasn't coherent. I was coherent and
25 talking to the man -- each time that he hit me, I

844.533.DEPO

**Page 82**

1 stood up.
2    Q. Okay.
3    A. I was coherent. I knew what I was
4 receiving.
5    Q. So that third time you were hit, how did
6 you fall?
7    A. The third time, to the side again.
8    Q. Which side?
9    A. My left.
10    Q. Okay. Which side did you fall on the
11 second time?
12    A. That would have been my left. Then I
13 rolled and jumped to my feet. I wish we had the
14 camera. It would have showed everything.
15    Q. Okay. So after the -- after the third
16 lick, you fell, and you jumped right back up at
17 him, right?
18    A. After the what?
19    Q. After the third hit, you fell down, right?
20 Isn't that what you said?
21    A. Yes, I fell.
22    Q. And then you jumped right back up?
23    A. No.
24    Q. Okay. So --
25    A. I did not after the third. After the

**Page 83**

1 third lick, I fell, and when I -- I was very -- I
2 done took three. That was the third one. And he
3 could hit pretty good. I was slow then. I started
4 back up, but I never made it, when he stomped me.
5    Q. Did you see him stomping you?
6    A. I felt the stomp. He was the one doing
7 the attacking. For all reality, who else would
8 have stomped me? It wasn't --
9    Q. So you felt the stomp?
10    A. Yes.
11    Q. But you didn't see the stomp?
12    A. Just a black boot. He's the only one, you
13 know -- boot, all I seen.
14    Q. None of the other officers were wearing
15 boots?
16    A. I didn't pay no attention. The only one I
17 seen was the one coming to my head.
18    Q. So you don't know if the other officers in
19 the room were wearing boots?
20    A. Officers -- there was -- there was two
21 officers. There was Danny Lawrence and
22 Mr. Griffin. There was no other officers.
23    Q. Okay.
24    A. There was one officer, and that was Danny.
25    Q. Okay. So who was Deputy Griffin?

**Page 84**

1    A. That's your other. There was two
2 officers, Griffin and Deputy Lawrence.
3    Q. Okay. What kinds of shoes were you
4 wearing on the date of your arrest, on December
5 23rd, 2016?
6    A. I was wearing work boots.
7    Q. All right. What kind of work boots?
8    A. They're just leather -- leather work boots
9 with a slip-resistant sole for oil and -- they're
10 work boots. They're slip-resistant. They're like
11 a hundred and something dollars a pair.
12    Q. That day, you'd been to see Barbara
13 Kitchens' mother, right?
14    A. You ought to see them. They're nice work
15 boots. They're new.
16    Q. And you weren't going to work that day,
17 though, were you?
18    A. But they're my new work boots. I wear
19 them.
20    Q. So you just wanted to wear your work boots?
21    A. Yeah, I wanted to wear my --
22    Q. You still got those new work boots?
23    A. Yes, ma'am, I do.
24    Q. All right. So you can provide those work
25 boots to your attorney so that we can examine them?

**Page 85**

1    A. Yes, ma'am.
2    Q. Okay.
3    A. I don't even own a pair of cowboy boots.
4    Q. I didn't say anything about any cowboy
5 boots.
6    A. Leather sole. Now --
7    Q. When do you wear your cowboy boots?
8    A. I don't. I don't have any. But I read
9 the depositions. In my paperwork, it's in there.
10 But it's not cowboy boots. I used to wear cowboy
11 boots years ago.
12    Q. What kind of boots -- shoes you got on
13 today?
14    A. These right here are like Stacy Adams.
15 These are church shoes.
16    Q. Okay. And how long have you had those
17 shoes?
18    A. I've had these here, oh -- I think I got
19 them up there at the Goodwill. I've had them about
20 six months.
21    Q. Do you still have a receipt from the day
22 you purchased those shoes?
23    A. No, ma'am.
24    Q. When you were booked into the jail, were
25 you given slippers, like jail-issued slippers?

**Page 86**

1  A. Huh-uh (negative response). They just
2  took -- they took -- didn't give me -- I didn't
3  take a shower or nothing. They put me in there,
4  and they give me -- they did give me some sandals,
5  I recall, like a sandal. They -- what did they
6  give me? They kind of like -- looked kind of like
7  -- a sandal.
8  Q. So they made you take off your work boots,
9  right?
10 A. Yes.
11 Q. Okay. And so when they made you take off
12 your work boots, they didn't let you take those
13 work boots into the jail cell with you, did they?
14 A. No.
15 Q. So they logged them a property log. Is
16 that right?
17 A. Yes, should have.
18 Q. Did you sign that property log?
19 A. I don't recall.
20 Q. Okay.
21 A. I don't know. I don't think I did, no.
22 Q. How long were you in jail after that
23 arrest?
24 A. I was in there that night. The next day,
25 I got out that evening. And I want to think it was

**Page 87**

1  about dark. So it had to been -- it was pretty
2  dark, because when I went -- arrived at my
3  brother's, it was already dark. Because his wife
4  is the one that took the photos of me.
5  Q. Whose wife took the photos?
6  A. My brother's.
7  Q. What's her name?
8  A. Tina Worley.
9  Q. Why was she taking photos?
10 A. She was taking them to prove my injuries
11 and the blood. Looked like I been out of a horror
12 movie.
13 Q. But had you been to the hospital before
14 you were released?
15 A. Yes, before, they took me to hospital.
16 Q. And when you went to the hospital, they
17 didn't clean off any of that blood?
18 A. No, ma'am.
19 Q. You didn't ask them to?
20 A. They didn't -- all they done is sewed up
21 my chin. And when I went back in there, they
22 didn't let me have a shower. I asked them if I
23 could get a shower. They put me in Beat 22, and
24 that's where I stayed until all that night. I
25 asked for a shower that morning. "Let me get

**Page 88**

1  cleaned up."
2  "No. We'll let you when we get ready."
3  That rocked on until they -- I said, "Have
4  they set me a bond?"
5  "No."
6  Then late that evening about dark is when
7  they finally -- the judge set a bond, and I got
8  released.
9  Q. But the nurses that you saw at Grenada
10 hospital, they don't work for the jail, do they?
11 A. No.
12 Q. But you're saying that those nurses didn't
13 take the time to clean up their patient at all?
14 A. Just where I got my little -- my 22
15 stitches.
16 Q. So where all did you have blood on you?
17 A. I was bloody from head to toe.
18 Q. What was bleeding down on your toes?
19 A. Jeez, my nose, my mouth, my chin. Yes,
20 ma'am.
21 Q. You were just spitting blood, and they
22 took you back to jail?
23 A. I wasn't spitting it at that time, but it
24 was sure already on me. I still -- when I got
25 back, I was still bleeding out the ear. I was

**Page 89**

1  bleeding out the ear most all that night.
2  Q. What clothing were you wearing on the day
3  you were arrested?
4  A. I had a button-down shirt, I recall. It
5  was black button-down, I recall. And I had blue
6  jeans and my work boots. And I think those boots
7  -- I still got them. They got blood on them.
8  Q. Okay. You haven't worn them since then?
9  A. I got them put up. I wanted to keep the
10 clothes, also, and put them in a bag, but I didn't
11 get to do that.
12 Q. Why didn't you get to do that?
13 A. Barb was set on washing them.
14 Q. I'm sorry?
15 A. Barbara washed them.
16 Q. Oh, okay. Mr. Worley, how long have you
17 said you lived in Grenada?
18 A. I have lived here now -- I've been -- four
19 years.
20 Q. Okay.
21 A. I've been at my spot. I got it paid for.
22 Q. Have you ever previously lived in Grenada?
23 A. Years ago, like ten years ago.
24 Q. And how long did you live in Grenada in
25 that ten-year -- that period ten years ago?

Page 126

1  Q. But didn't you say to us --
2  A. If I could build a fence around it, it
3  would be more better.
4  Q. Didn't you say to us today that you're
5  getting ready to get in your car tomorrow and drive
6  all the way from here to Kentucky?
7  A. I would feel a lot safer in the state of
8  Kentucky away from here. I wouldn't feel
9  threatened. I feel -- right here, I feel
10 threatened.
11         MS. RILEY: Okay. All right. That's
12 all the questions I have.
13         MR. CLARKE: I have one followup.
14              EXAMINATION
15 BY MR. CLARKE:
16 Q. If you look at Exhibit No. 3, Mr. Worley.
17 A. Yes, sir.
18 Q. That's it right there. Not this.
19         MR. CLARKE: We'll have to make a
20 copy of this and -- pull that out and mark it as
21 Exhibit 4.
22 MR. CLARKE CONTINUED:
23 Q. Go to the first page. You were asked to
24 read some stuff by --
25         MR. CLARKE: I apologize, what's your

Page 127

1  name again?
2         MS. RILEY: "Defense counsel" is fine
3  on the record.
4         MR. CLARKE: Okay. Defense counsel.
5  MR. CLARKE CONTINUED:
6  Q. If you look at the first page -- the first
7  page, at the top, it says -- do you see where it
8  says, "The history is provided by the patient and
9  the police"?
10 A. Yes, sir.
11 Q. Okay. Go to the fourth page, before the
12 treatment for March 28th, 2016. The last line,
13 where it says, "Patient states," if you'll read
14 that.
15 A. "Was assaulted on 12/23, had previous
16 bilateral jaw" --
17 Q. No, no. Look at the -- that's on 12/28.
18 Look at the line above that. What did it -- what
19 did you state? Here is the next day. This is the
20 end of 12/23. What did you state?
21 A. "Patient states, 'They beat the s--t out
22 of me'. . . by the PD."
23 Q. All right. Did you -- when you drafted --
24 when you filed your lawsuit, do you know what the
25 requirements are for a First Amendment case? You

Page 128

1  were asked about your complaint.
2  A. Yes, sir.
3  Q. In the lawsuit. Did you go to a lawyer to
4  make allegations based on what you told him?
5  A. Yes.
6  Q. Do you know what a First Amendment
7  violation is?
8  A. No, sir.
9  Q. Do you know what a Fourth Amendment
10 violation is?
11 A. No, sir.
12 Q. Did you just provide facts to your
13 attorney to file a complaint?
14 A. Yes, sir.
15         MR. CLARKE: That's all I have.
16         MS. GRIFFITH: I have a few followup.
17              FURTHER EXAMINATION
18 BY MS. GRIFFITH:
19 Q. On page 7 of that same exhibit.
20         MR. CLARKE: Exhibit 3?
21         MS. GRIFFITH: Yes, Exhibit 3.
22 MS. GRIFFITH CONTINUED:
23 Q. When you went back on 12/28 to the ER, it
24 looks like they prescribed you some medication.
25 Did you fill that medication?

Page 129

1  A. Yes, I did.
2  Q. And what pharmacy do you use?
3  A. I think Walgreens.
4  Q. Is that here in Grenada?
5  A. Uh-huh (affirmative response).
6         MR. CLARKE: You've got to say yes or
7  no.
8         THE WITNESS: Yes.
9  MS. GRIFFITH CONTINUED:
10 Q. And did you complete taking that
11 medication?
12 A. Yes.
13 Q. What was it for?
14 A. That was just for -- it was like for
15 swelling and like a -- it keeps your muscles, you
16 know, as far as -- like swelling and stuff is
17 basically what it was for.
18 Q. So was it a form of pain medication?
19 A. No, it's not really a pain -- it didn't
20 strike me as a pain medication. It was more of a
21 muscle -- like a muscle relaxer. You could kind of
22 -- it keeps, you know, from -- just swelling down
23 and stuff that was all in my face.
24 Q. You mentioned that you've lost thousands
25 of dollars in lost wages. Do you have any tax

### Page 130

1  returns from 2015?
2  A.  Yes.
3  Q.  And approximately what did you make that
4  year?
5  A.  2015, it was right at 80. And I also got
6  to pay some -- the IRS. 80 -- around $80,000.
7  Q.  How much did you make in 2014?
8  A.  That was a slow year. Around 30.
9  Q.  What would you say in 2013?
10 A.  2013, it was around 48.
11 Q.  Do you think that you might not remember
12 some of the things that perhaps you did on 12/23 of
13 '16 because you were drunk?
14 A.  No. Not no, but no whatsoever. I
15 remember everything to the correct moment I took
16 the first blow to the last.
17 Q.  Do you think that maybe you no longer feel
18 comfortable going out in the public or going out to
19 work because you aren't really getting drunk any
20 longer?
21 A.  No.
22 Q.  Did you ever see --
23 A.  I don't -- I don't go in the public drunk.
24 I do that at home.
25 Q.  Do you go to church?

### Page 131

1  A.  Yes. I'm a Christian.
2  Q.  Where do you go to church?
3  A.  I serve my Lord at home. I can talk to
4  Him right here with you-all. Wherever there's one
5  or two more people, God is there.
6  Q.  But you don't go, say, to --
7  A.  I haven't been -- I don't belong to a
8  church here in Grenada County. No, I don't. I was
9  saved and baptized at Mt. Carmel Baptist in New
10 Concord, Kentucky.
11 Q.  So have you ever seen and spoken to a
12 preacher about this emotional distress that you're
13 claiming?
14 A.  No, I haven't. But I have put it in God's
15 hands.
16     MS. GRIFFITH: I don't have anything
17 further. Thank you.
18     (DEPOSITION CONCLUDED APPROXIMATELY 1:30 P.M.)
19     (READING AND SIGNING IS NOT WAIVED.)
20
21 ORIGINAL: MARY MCKAY GRIFFITH
22 COPIES:   ANDREW CLARKE
23          KATELYN RILEY

### Page 132

CERTIFICATE OF REPORTER

I, BETHANY CAMMACK, Certified Shorthand Reporter and Notary Public for the State of Mississippi, do hereby certify that the above and foregoing pages contain a full, true and correct transcript of the proceedings, as taken by me at the time and place indicated, and later reduced to typewritten form under my supervision and to the best of my skill and ability.

I further certify that I placed the witness under oath to tell the truth and that all answers were given under that oath. I further certify that the witness has chosen the right to not waive the reading and signing of the deposition.

I further certify that I am not in the employ of or related to any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of this case.

Witness my signature and seal this the 27th day of August, 2018.

BETHANY CAMMACK, CSR
CSR NO. 1526
My Commission Expires May 1, 2019

### Page 133

CERTIFICATE OF DEPONENT

I, _____, do hereby certify that the foregoing testimony is true and accurate to the best of my knowledge and belief, as originally transcribed, or with the changes as noted on the attached Correction Sheet.


(SIGNATURE)




Subscribed and sworn to before me this the day of _____, 2018.

My Commission Expires:


(NOTARY PUBLIC)

```
                                Page 134
 1                CORRECTION SHEET
 2
 3        I,_____, do hereby
 4   certify that the following corrections and
 5   additions are true and accurate to the best of my
 6   knowledge and belief.
 7
 8   PAGE:  LINE:  SHOULD READ:  REASON FOR CHANGE:
 9
10
11
12
13
14   _____
15
16
17
18
                       (SIGNATURE)
19
20         Subscribed and sworn to before me this the
21         day of              , 2018.
22
23   My Commission Expires:
24
25
                       (NOTARY PUBLIC)
```